1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
4  Telephone:  415/288-4545
   415/288-4534 (fax)
5  shawnw@rgrdlaw.com
          – and –
6  BRIAN E. COCHRAN (286202)
   FRANCISCO J. MEJIA (306477)
7  655 West Broadway, Suite 1900
   San Diego, CA  92101-8498
8  Telephone:  619/231-1058
   619/231-7423 (fax)
9  bcochran@rgrdlaw.com
   fmejia@rgrdlaw.com
10
   Attorneys for Plaintiff
11
   [Additional counsel appear on signature page.]
12
                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14

15 | FRANKIE J. ADAMO, Individually and on Behalf of All Others Similarly Situated, | ) | Case No. |
|---|---|---|
16 | | ) | CLASS ACTION |
| Plaintiff, | ) | |
17 | | ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) | |
18 | NEXTDOOR HOLDINGS, INC., SARAH J. FRIAR, MICHAEL DOYLE, VINOD KHOSLA, SAMIR KAUL, PETER BUCKLAND, KHOSLA VENTURES LLC, and KHOSLA VENTURES SPAC SPONSOR II LLC, | ) | |
| Defendants. | ) | DEMAND FOR JURY TRIAL |

Plaintiff Frankie J. Adamo ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Nextdoor Holdings, Inc. f/k/a Khosla Ventures Acquisition Co. II ("Nextdoor" or the "Company") and securities analyst reports, press releases, and other public statements issued by, or about, the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the publicly traded Class A common stock of Nextdoor between July 6, 2021 and November 8, 2022, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against the Company and certain of the Company's officers and directors under §10(b), and SEC Rule 10b-5 promulgated thereunder, and §20(a) of the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

4.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b), because the Company maintains its corporate headquarters in and conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

1   to, the U.S. mails, interstate telephone communications, and the facilities of the national securities

2   markets.

3                                              **PARTIES**

4           6.      Plaintiff Frankie J. Adamo, as set forth in the accompanying certification which is

5   incorporated herein by reference, purchased Nextdoor Class A common stock during the Class

6   Period and was damaged thereby.

7           7.      Defendant Nextdoor is headquartered in San Francisco, California.   Shares of

8   Nextdoor Class A common stock trade on the New York Stock Exchange ("NYSE") under the

9   ticker symbol "KIND."  Prior to the Merger (defined below), Nextdoor Class A common stock

10  traded on the NASDAQ under the ticker symbol "KVSB."

11          8.      Defendant Sarah J. Friar ("Friar") served as Chief Executive Officer ("CEO"),

12  President, and as a member of the Board of Directors (the "Board") of Nextdoor, Inc. ("Nextdoor

13  Private") from December 2018 until the Merger in November 2021.  Following the Merger,

14  defendant Friar served as Nextdoor's CEO, President, and Chairperson of the Company's Board

15  until her resignation in February 2024.

16          9.      Defendant Michael Doyle ("Doyle") served as Chief Financial Officer ("CFO") of

17  Nextdoor Private from August 2018 until the Merger in November 2021.  Following the Merger,

18  defendant Doyle served as CFO of Nextdoor until his resignation in November 2023.

19          10.     Defendant Vinod Khosla ("Khosla") is the founder of Nextdoor and was a member

20  of its management team prior to the Merger.

21          11.     Defendant Samir Kaul ("Kaul") served as CEO of Nextdoor prior to the Merger.

22          12.     Defendant Peter Buckland ("Buckland") served as Chief Operating Officer

23  ("COO"), CFO, Treasurer, and Secretary of Nextdoor prior to the Merger.

24          13.     Defendant Khosla Ventures LLC ("Khosla Ventures") is a venture capital firm

25  owned and controlled by defendants Khosla, Kaul, and Buckland.

26          14.     Defendant Khosla Ventures SPAC Sponsor II LLC ("KV SPAC Sponsor") served

27  as the blank check sponsor of Nextdoor, and is owned and controlled by defendants Khosla, Kaul,

28  Buckland, and Khosla Ventures.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 2 -

15.     Defendants Khosla, Khosla Ventures, KV SPAC Sponsor, Kaul, and Buckland are collectively referred to herein as the "Sponsor Defendants."

16.     Defendants Friar, Doyle, Khosla, Kaul, and Buckland are collectively referred to herein as the "Individual Defendants."

17.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company and/or Nextdoor Private at the highest levels and was privy to confidential proprietary information concerning these companies and their business, operations, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company and/or Nextdoor Private, and approved or ratified these statements, in violation of the federal securities laws.

18.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and traded on the NASDAQ and later the NYSE, which are both governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company and/or Nextdoor Private, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company and Nextdoor Private during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading

1  statements were made, and had the ability and opportunity to prevent their issuance or cause them

2  to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the

3  public statements detailed herein and is, therefore, primarily liable for the representations

4  contained therein.

5                                    **BACKGROUND**

6        20.    Nextdoor began as Khosla Ventures Acquisition Co. II ("KV Acquisition Co."), a

7  blank check company formed by the Sponsor Defendants.  A blank check company is sometimes

8  referred to as a special purpose acquisition vehicle, or "SPAC," and does not initially have any

9  operations or business of its own.  Rather, it raises money from investors in an initial public

10 offering ("IPO") and then uses the proceeds from the offering to acquire business or operational

11 assets, usually from a private company that does not publicly report financial or operating results.

12 As a result, investors in blank check companies rely on the skill, transparency, and honesty of the

13 blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound

14 target company that offers attractive risk-adjusted returns for investors.

15       21.    On March 26, 2021, KV Acquisition Co. completed its IPO.  In the IPO, the

16 Sponsor Defendants sold 41.6 million shares of Class A common stock (including a partial over-

17 allotment) at $10 per share, generating total gross proceeds of $416 million.

18       22.    Although KV Acquisition Co. did not identify any target at the time of the IPO, the

19 IPO offering documents claimed KV Acquisition Co.'s search would focus on target businesses

20 with a "large market opportunity" that possessed a "highly differentiated" proprietary technology.

21 The IPO offering lauded the management team's purported expertise in business transactions,

22 representing that KV Acquisition Co. would rely on their "decades of combined experience in

23 sourcing transactions, understanding and conducting due diligence on new breakthrough

24 technologies and developing management teams in order" to consummate a business combination

25 with an "exceptional business."

26       23.    The IPO offering documents specified acquisition criteria that KV Acquisition Co.

27 would purportedly use to "guide[]" its evaluation of potential targets, including the following: (i)

28 "Large and Growing Addressable Market"; (ii) "Proprietary Technology Advantage"; (iii)

1   "Scaling Business with Compelling Growth Opportunity"; and (iv) "World Class Management

2   Teams."

3       24.   In the event KV Acquisition Co. did not complete an initial business combination,

4   it was obligated to redeem 100% of its outstanding public shares equal to the aggregate trust

5   proceeds plus interest.  Moreover, shareholders could redeem their shares at the time of the initial

6   business combination if they did not want to retain a continuing interest in the business after the

7   transaction.  If enough shareholders redeemed their shares, a deal would not be economically

8   feasible.

9       25.   However, if KV Acquisition Co. was successful in completing an initial business

10  combination within the allotted time frame, the Sponsor Defendants and various company insiders

11  would be richly rewarded.  Specifically, KV SPAC Sponsor received 10 million founder shares

12  for a nominal purchase price (consisting of Class B and Class K shares), equaling 15% to 30% of

13  Nextdoor's outstanding common stock on a converted basis following the Merger, subject to

14  certain triggering events.  Notably, the upper limit of this range was substantially higher than the

15  20% equity commonly allotted to sponsors in SPAC transactions.  Defendant KV SPAC Sponsor

16  held these founder shares for the benefit of defendants Khosla Ventures, Khosla, Kaul, and

17  Buckland.  If the Sponsor Defendants failed to complete a merger within the allotted time, they

18  would need to essentially return the money raised in the IPO to investors, causing them to forfeit

19  these potentially lucrative benefits.  The aggregate market value of the Sponsor Defendants'

20  founder shares, as stated in the joint proxy statement/prospectus for the Merger, was over $103

21  million based upon the closing price of $10.13 per share on NASDAQ on September 29, 2021 (the

22  most recent practicable date prior to the date of the proxy statement/prospectus).  As a result, the

23  Sponsor Defendants were highly incentivized to complete an initial business combination and to

24  convince shareholders to approve the Merger.

25      26.   On July 6, 2021, KV Acquisition Co. and Nextdoor Private jointly announced they

26  had entered into a merger agreement.  Pursuant to the agreement, KV Acquisition Co. would

27  contribute all remaining cash from its IPO to the combined business and KV Acquisition Co. and

28  shareholders would receive the right to receive shares of Nextdoor in exchange for their shares of

1   KV Acquisition Co. (the "Merger").  In addition, the company raised $270 million in a private

2   investment in public equity ("PIPE") offering, making the total cash contribution to the Merger

3   $686 million.  At the time of the Merger, defendants stated the pro forma equity value of the

4   combined company would be $4.3 billion.

5         27.     Self-proclaimed as the "neighborhood network," Nextdoor operates a hyperlocal

6   online social networking platform that connects neighbors, public agencies, and businesses via the

7   internet.  Nextdoor purports to facilitate this online community through various features and

8   technological functions including, *inter alia*, a news feed where "neighbors" (*i.e.*, users) can view

9   posts, discussions, and pictures from other neighbors, as well as notifications, comments, and

10  groups.  At bottom, these features enable users to exchange information, services, and goods.

11        28.     Following the Merger, virtually all of Nextdoor's revenues are generated through

12  advertising sales.  Nextdoor purports to offer a differentiated advertising solution that allows its

13  clients to deploy local level marketing campaigns at scale.  Nextdoor's advertising clients range

14  from large national brands to small and mid-sized businesses.

15        29.     Nextdoor Private's platform (later acquired by Nextdoor) first launched in the

16  United States in 2011 and has since expanded to ten other countries including the United Kingdom,

17  Canada, Australia, Netherlands, France, Spain, Italy, Germany, Sweden, and Denmark.  Despite

18  this expansion, however, the majority of Nextdoor's revenues are generated in the United States.

19        30.     The value of Nextdoor's advertising space – and hence its business, financial, and

20  operational performance – is ultimately dependent on the size and level of engagement of the

21  Company's user base.  Nextdoor publicly discloses user and engagement performance primarily

22  through two key business metrics.  First, Nextdoor reports Weekly Active User metrics or "WAU,"

23  which it defines as "a Nextdoor user who opens our application, logs on to our website, or engages

24  with an email with monetizable content at least once during a defined 7-day period."  In addition,

25  Nextdoor reports average revenue per weekly active user or "ARPU," which the Company defines

26  as total revenue in a certain geography during a period divided by the average of the number of

27  WAUs in the specified geography during the same period.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                          - 6 -

1       31.    Beginning in 2020, demand for Nextdoor Private's community-based platform rose

2 dramatically as shelter-in-place mandates and other social distancing restrictions led people to

3 increasingly seek social connection and pertinent information regarding their communities from

4 Nextdoor Private's products.  As a result, Nextdoor Private grew rapidly in 2020 with WAUs

5 growing nearly 37% from 19.5 million in 2019 to nearly 27 million in 2020.  ARPU during the

6 same period also grew by 10% from $4.23 to $4.62.

7       32.    On July 6, 2021, amid these seemingly favorable market trends, Nextdoor Private

8 announced that it would become a publicly traded company through a merger with KV Acquisition

9 Co.  Following the Merger announcement, defendants lauded Nextdoor Private's purportedly

10 "phenomenal" growth, stating that the platform was in "1 in 3 U.S. households," and boasting that

11 Nextdoor Private had amassed "27M+ Weekly Active Neighbors" and "60M+ Verified

12 Neighbors."  Defendants further represented that Nextdoor Private's outsized growth was poised

13 to continue, claiming the company had a "***huge runway***" ahead of it, and that it could grow its user

14 base "4.5x" in existing markets alone.  Speaking during a July 2021 conference call, defendant

15 Friar represented that Nextdoor Private's total addressable market remained "***large and still***

16 ***untapped***," noting that the company could grow in the "near term" adding "150 million households

17 globally, just doing what we do today."  During the same call, defendant Doyle further represented

18 that Nextdoor Private was "really early to monetization" and expressed "great confidence" the

19 company's revenue growth "***c[ould] be sustained into the future***."

20       33.    During a July 7, 2021 interview on *CNBC*, defendant Friar stated that Nextdoor

21 Private would be able to "monetize and will grow a phenomenal revenue stream" after the Merger.

22 Defendant Khosla stated "the metrics and trends really run away . . . we loved the fact that there's

23 so many different growth factors the company can take in the future."  Cohost David Faber asked

24 whether Nextdoor Private's growth had "sort of peaked in 2020/'21 in terms of the revenue number

25 maybe in part because of the pandemic" and whether this was a "concern for you as you try to sell

26 the deal to your spac shareholders?"  Defendant Khosla responded that "***it isn't a concern for***

27 ***me[,] we see accelerating growth***."  Defendant Friar concurred, adding: "***[F]rom a business***

28

1    *perspective, we're seeing terrific momentum. . . .  [W]e're seeing phenomenal trends in q1 and*

2    *q2 of 2021, we saw accelerating ARPU.*"

3        34.    Similarly, in a July 8, 2021 interview given to *Cheddar News*, defendant Friar

4    represented that Nextdoor Private had "quite a runway" remaining in the United States and

5    represented to investors that it was "not an if" whether Nextdoor Private could take the platform

6    to the global stage but a "when."

7        35.    During Nextdoor Private's "Investor Day" held on September 20, 2021, defendant

8    Doyle highlighted the "extraordinary" user growth Nextdoor Private had purportedly experienced

9    since the onset of the COVID-19 pandemic and represented to investors that such growth had been

10    "sustained . . . since that time."  Based on the company's claimed "outperformance" in the second

11    quarter of 2021, defendant Doyle announced that Nextdoor Private was raising its revenue

12    guidance for fiscal 2021 and 2022 by $3 million, amounting to annual revenue growth of 47% and

13    40%, respectively.

14        36.    On October 26, 2021 – just seven days prior to the special meeting during which

15    KV Acquisition Co. shareholders would vote to approve the Merger – Nextdoor Private issued a

16    press release announcing select financial results for the third quarter of 2021.  Based purportedly

17    on the "momentum in Q3," Nextdoor Private represented that revenue growth continued to

18    "*further accelerate.*"

19        37.    After KV Acquisition Co. shareholders approved the Merger at a special meeting

20    held on November 2, 2021, the Merger was completed on November 5, 2021.

21        38.    Unbeknownst to investors, however, the apparent surge in demand for Nextdoor's

22    platform was ephemeral and a temporary result of the COVID-19 pandemic to the detriment of

23    future periods.  Indeed, the market for the Company's platform was materially smaller than

24    represented to investors and the Company's most important market (the United States) was already

25    largely saturated by the start of the Class Period, impairing the Company's ability to monetize

26    users, grow its U.S. WAUs, or increase ARPU.  As a result, defendants' statements regarding

27    Nextdoor's 2022 revenue trajectory lacked any reasonable basis in fact and the Company was

28    tracking below the purported trajectory by tens of millions of dollars.

39.     Then, on March 1, 2022, Nextdoor reported its financial results for the fourth quarter and full year ending December 31, 2021 – the same quarter during which the Merger was completed.   Contrary to defendants' prior claims that accelerating growth trends were being sustained, the Company reported that the revenue growth rate in the fourth quarter had declined sequentially by 18% to 48% year-over-year growth, down from the 66% growth rate in the most recent quarter reported to investors in advance of the November 2, 2021 special meeting.   In addition,  Nextdoor reported quarterly ARPU of $1.65, revealing that the ARPU growth rate in the quarter had declined substantially by 26% to just 12% year-over-year growth from 38% growth in the third quarter, which indicated that the Company's ability to monetize its platform was faltering. On this news, the price of Nextdoor common stock declined approximately 14%, from $6.24 on March 1, 2022 to $5.39 on March 4, 2022.

40.     Nextdoor would ultimately go on to report three consecutive quarters of disappointing financial and operational results, including two sequential quarters of WAU decline within the Company's critically important U.S. market, as well as drastically cutting revenue guidance for fiscal 2022 to $210.5 million at the midpoint, well below the up to $256 million represented to investors during the Class Period.   Although defendants stated during the Class Period that Nextdoor could sustain "hyper growth" for "multiple years," Nextdoor ultimately reported that ARPU had actually *declined 9%* for fiscal 2022.   As a result, the price of Nextdoor Class A common stock declined precipitously from the trading high immediately following the close of the Merger of $18.59 per share to just $2.06 per share at the end of the Class Period, causing investors in Nextdoor to suffer millions of dollars in financial losses and economic damages under the federal securities laws.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

41.     The Class Period begins on July 6, 2021.   On that date, Nextdoor and Nextdoor Private jointly issued a press release before market close announcing the Merger ("July 2021 Release").   The July 2021 Release claimed the Merger transaction would "accelerate[] Nextdoor's growth plans" and that the value of the combined company would equal approximately $4.3

1   billion.   The July 2021 Release quoted defendant Friar who highlighted Nextdoor Private's

2   purported "growth potential" and "strong network effects," stating in pertinent part as follows:

3       "*Our business strengthens as we scale, benefitting from strong network effects,
        and we believe the proposed transaction with KVSB accelerates the growth
4       potential of our platform*."

5       42.    That same day, Nextdoor filed with the SEC a current report on Form 8-K regarding

6   the Merger.   The current report attached as an exhibit an Investor Presentation, dated as of July 6,

7   2021 ("July 2021 Investor Presentation").   The July 2021 Investor Presentation highlighted

8   Nextdoor Private's purportedly broad user base, stating that the company was in "~1 in 3 U.S.

9   Households," had "60M+ Verified Neighbors," and "27M+ Weekly Active Neighbors," and that

10  it had many vectors for "sustained revenue growth."   The July 2021 Investor Presentation

11  represented that Nextdoor Private's total addressable market included 312 million households, and

12  that the company could grow its user base by "4.5x" in existing markets alone.   The July 2021

13  Investor Presentation also represented that Nextdoor Private's growth was "sustainable," stating

14  that the company had a "[s]trong foundation for continued revenue growth."

15      43.    The July 2021 Investor Presentation further highlighted Nextdoor Private's

16  "significant monetization potential," claiming there was ample runway for growth at current

17  ARPU and U.S. daily active users ("DAUs"), as depicted in the following presentation slide:



44.     Also on July 6, 2021, Nextdoor hosted a conference call with investors to discuss the Merger.    During her prepared remarks, defendant Friar highlighted Nextdoor Private's purported market opportunity, describing it as "large and still untapped," and claimed that the company could grow in the "near term," adding "150 million households globally, just doing what we do today and continuing to expand."

45.     Defendant Doyle similarly highlighted Nextdoor's user base, claiming the company had achieved "tremendous growth" that was "sustained" with "deepening engagement" through 2021, stating in pertinent part as follows:

> ***We have a growing base of engaged and monetized users***.  We have more than 60 million verified neighbors on the platform.  To illustrate the composition of that member base, we have almost 15% of our members coming from markets outside the U.S.  We're really excited at the level of organic growth that we're able to achieve.  We had 68% of our members come to the platform organically in 2020.  This is due to the strength of the brand, word-of-mouth and a great deal of earned media that we bring behind the purpose and the mission of Nextdoor.
>
> ***With this tremendous growth in verified members on the platform, we have the opportunity to really drive engagement***.  And that's something that we saw demonstrated in 2020 and is ***sustained in 2021 as well, where we had deepening engagement across all cohorts of users***.  We were able to increase the frequency of sessions of active users on the platform and also the depth of sessions, the amount of content that users consume and also create, which set us up for driving monetization opportunities with our advertisers, creating a larger, unique audience that's more engaged, that's generating more supply that allows us to do creative things and achieve the campaign objectives of the advertisers and businesses on the platform.

46.     During the call, defendant Friar also emphasized that Nextdoor Private had only "just . . . started" on its monetization efforts and claimed that the company should surpass the monetization levels of Twitter, stating in pertinent part as follows:

> Nextdoor as a platform has just begun its monetization journey.  In fact, when I joined about 2.5 years ago, we had just begun to tap into advertising.  Today, if you look at our scale, we're about 1/3 the size of Twitter.  And yet, if you look at our ARPU, we're at about 1/6 the ARPU.  Of course, there is no structural reason why Nextdoor should undermonetize.  In fact, if you think about either the video where you saw the wonderful California-based restaurant that was getting recommendations from us or if you think about what Vinod said about the value of a link on Nextdoor, I could perhaps (inaudible) ***that Nextdoor should, in fact, over-monetize relative to those platforms***.  So this tells me ***we're just getting started***.  And even with that top-of-the-funnel growth of new users, we should be able to drive healthy revenue growth as we scale our ARPU.

47.    Defendant Doyle similarly highlighted the purported size of Nextdoor Private's market opportunity, claiming that the company had a "huge runway" ahead of it and that it was "really early to monetization." Defendant Doyle stated he had "great confidence" the Company could grow revenue in excess of 40% through 2022 and that such growth could be "sustained into the future," stating in pertinent part as follows:

> *The tailwind of product-driven growth and increased engagement and the monetization opportunities that I've described give us great confidence in our ability to achieve revenue growth rates year-on-year of more than 40%, here shown through 2022, driving us to almost $250 million of revenue. And we believe these are levels that can be sustained into the future.*

> *        *        *

> We talked a lot about the focus on revenue. *And for us, those drivers of ARPU that I just walked through give us great confidence in our ability to achieve greater than 40% year-on-year revenue growth in the next several years*. We also want to talk about the investment we're making in the business. We're very much in investment mode, *knowing there's a huge opportunity in front of us*. An investment for us is really in product and growing the team. We have around 550 employees in the business. The majority of those focused on product development and engineering. And that is where our focus will remain and really driving the product forward and bringing more benefit to the entire ecosystem.

48.    On July 6, 2021, Nextdoor filed with the SEC on Form 425 an article published by *The Financial Times*. The news article quoted defendant Friar who emphasized Nextdoor Private's growth prospects, stating: "'We think we're a company that can maintain hyper growth over multiple years.'"

49.    Also on July 6, 2021, Nextdoor filed with the SEC on Form 425 a transcript of an interview defendants Friar and Khosla gave to correspondents at *CNBC*'s "Squawk on the Street" program. Defendant Friar stated that Nextdoor Private would be able to "monetize and will grow a phenomenal revenue stream" after the Merger. Defendant Khosla stated "the metrics and trends really run away . . . we loved the fact that there's so many different growth factors the company can take into the future." Cohost David Faber asked whether growth had "sort of peaked in 2020/'21  in terms of the revenue number maybe in part because of the pandemic" and whether this was a "concern for you as you try to sell the deal to your SPAC shareholders?" Defendant Khosla responded that "it isn't a concern for me[,] we see accelerating growth." Defendant Friar

added that Nextdoor Private was experiencing "phenomenal trends" and "accelerating ARPU," stating in pertinent part as follows:

> *[F]rom a business perspective, we're seeing terrific momentum*.  We saw our DAU, daily active users, *grow 50% year-over-year last year*.  [T]hat's always the starting point of any platform network business then you mentioned ARPU, *we're seeing phenomenal trends in q1 and q2 of 2021, we saw accelerating ARPU*.  [I]t's really driven by, one, more engagement from the members on the platform; number two, our adtech platforms getting more sophisticated, and these proceeds will invest in data science and machine learning; and three, we're finding not supply driven ways to drive revenue, particularly around local commerce and businesses, and interesting ad formats that you can't get anywhere else.

50.    On July 9, 2021, Nextdoor filed with the SEC on Form 425 a transcript of an interview defendant Friar gave to correspondents at *Australia Start Up Daily*.  During the interview, defendant Friar was asked about Nextdoor Private's plans for expanding its existing user base.  In response, defendant Friar claimed the company's user base was undergoing growth, driven by Nextdoor Private's "natural network effect," stating in pertinent part as follows:

> So you're right in the US.  We have gotten up to one in 3 households on the platform.  Nextdoor is a platform that has a natural network effect so as more people come to the platform.  The platform gets better and better for the people on the platform and so we just *know there's an underpinning growth rate happening in markets like the US, but then of course Australia, International, is an important next level of growth too*.  We're in 11 countries in total around the world.

51.    Also on July 9, 2021, Nextdoor filed with the SEC on Form 425 a transcript of an interview defendant Friar gave to *Cheddar News*.  When asked whether Nextdoor Private could continue to grow its user base, defendant Friar claimed the Company had "quite a runway" in the United States and assured investors that it was "not an if" whether Nextdoor Private could expand the platform globally but rather a "when," stating in pertinent part as follows:

> [Y]es so today we're in 11 countries.  [W]hat we see in the u.s. is nextdoor is truly network business.  [T]he more people that join the platform, the richer the content. more engaged members are and so growth bigats growth.  *[S]o we know first of all there's just still quite a runway in the u.s. as i say everyone is a neighbor i would like that to be all households*.  [O]utside the u.s. we're beginning to build in many countries.  [UK] where in one in 6 households.  [W]e know to bring that up to use only one in 3.  [C]anada is our youngest country and our fastest growing it's been incredible to see canadian neighbors using the platform to particularly right now as they they look for vaccines.  [A]nd of course we want to take this global next door should be a global platform.  [W]e know we resonate around the world and *so it's really more of when not an if we take the whole platform to a global stage*.

1    52.    On September 20, 2021, Nextdoor Private hosted an "investor day" to discuss the

2    company's business and financial prospects. During the presentation, defendant Friar highlighted

3    Nextdoor Private's "growing" user base, claiming "[t]oday, we're ubiquitous in the United States

4    and growing globally." She continued: "As of Q2, Nextdoor is in almost 1 in 3 U.S. households.

5    Globally we have over 63 million verified neighbors on the platform that grew 17% year-over-

6    year and over 29 million weekly active neighbors." Defendant Friar highlighted the platform's

7    purported "stickiness" and "strong network effects" as drivers of Nextdoor Private's purported

8    "ongoing" growth, stating in pertinent part as follows:

9        We've already created an incredible product market fit. When neighbors come to
         Nextdoor, 3 months in, 75% of them are still on the platform. 6 months in, that's
10       65%. And by 24 months in, that line begins to asymptote at well above 50%, and
         we're proud that our retention rate is estimated to be 20 points higher than leading
11       peers. ***We know that, when people come, they come with intent and they stay.
         That stickiness is a really big piece of our ongoing growth***. We also have strong
12       network effects. In a young neighborhood with 5% to 10% of the households in
         that neighborhood on the platform, we see good engagement, but as we move up
13       into our top quartile of neighborhood penetration, we start to see engagement levels
         that are over 2x what we see in the beginning. ***This is because more content on
14       the platform drives more engagement, which drives more people to join, which
         drives more content. That's our flywheel of growth***.

15
16    53.    Defendant Doyle similarly applauded Nextdoor Private's growth trends, claiming

17    the company's "extraordinary" user growth following the COVID-19 pandemic had been

18    "sustained . . . since that time," stating in pertinent part as follows:

19       Between the second quarter of 2018 and the second quarter of 2021, ***our
         most recently reported quarter, we grew weekly active users by 123%***. Our growth
20       in WAU has been driven by our value proposition, a compelling combination of
         utility and community, and our product innovations and launches that have led to
21       both increased engagement from our neighbors and top-of-the-funnel growth. Our
         extraordinary growth and engagement in the second quarter of 2020 was
22       accelerated by the pandemic, when neighbors found real value in Nextdoor. ***We
         are very pleased with our sustained growth in WAU since that time***, which now
23       exceeds 29 million.

24    54.    During the call, defendant Friar represented Nextdoor Private had entered into a

25    "hyper growth and build phase" and that the company had "many vectors for sustained revenue

26    growth." Defendant Doyle similarly claimed that Nextdoor Private was in the early stages of

27    monetization, representing that the company was "just getting started" in terms of its ARPU

28    growth and that Nextdoor Private "should exceed the monetization level" of Twitter and Snap.

Defendant Doyle further claimed that Nextdoor Private's total addressable market was "large" and "under penetrated," stating in pertinent part as follows:

> Our total addressable market is both large and under penetrated.  Everyone is a neighbor.   We believe our near-term opportunity **is to grow to more than 200 million households and the long-term opportunity is to grow to over 300 million**.  And this is just in our existing markets.  We will continue to expand in new markets as well.

55.    Based upon Nextdoor Private's purported "outperformance" in the second quarter, defendant Doyle stated that Nextdoor Private was raising its revenue guidance for fiscal 2021 and expressed "confidence" in delivering "sustained growth" even without proceeds from the Merger, suggesting that even greater growth could be achieved with the transaction's proceeds, stating in pertinent part as follows:

> Our outperformance in Q2 has allowed us to increase our full year revenue estimate by $3 million, taking us to $181 million and increasing our 2021 expected growth rate to 47% year-on-year.  **The tailwind of product-driven growth, increasing engagement and new monetization opportunities gives us confidence in our ability to deliver sustained growth.  We have also increased our revenue expectation in 2022 by $3 million to $252 million.  Importantly, this plan does not assume the use of proceeds from this transaction, which we can deploy to further accelerate growth**.

56.    On October 21, 2021, Nextdoor filed with the SEC a proxy statement/prospectus on Form 424B3 for the Merger which was signed by defendants Khosla, Kaul, and Buckland ("October 2021 Prospectus").  The October 2021 Prospectus highlighted Nextdoor Private's purported "[g]lobal flywheel of growth," stating that the company would "continue to drive growth and engagement."  The October 2021 Prospectus represented that the COVID-19 pandemic had "amplified" engagement trends and changed consumer behavior "for good," leading to positive impacts that were "real and lasting" for Nextdoor Private's business, stating in pertinent part as follows:

> Our need to be connected to neighbors was amplified during the pandemic – and **that need is real and lasting**.  For the three months ended June 30, 2021, neighbors who engaged with Nextdoor daily posted 2.1 times more often than in the same prior year period.  As the world reopens, consumer behavior is changed for good, with an increased focus on local.

57.    The October 2021 Prospectus also claimed that Nextdoor Private's total addressable market was "[l]arge and growing," stating that the company's total global digital

advertising market was "estimated at $355 billion in 2020" and expected to grow "71% to $607 billion by 2024." The October 2021 Prospectus further stated that although Nextdoor Private had "grown rapidly since [its] inception" the company was still in the "early stages of monetization" and that it possessed "many vectors for sustained revenue growth." The October 2021 Prospectus represented that Nextdoor Private's revenue was projected to grow from $178 million in 2021 to $249 million in 2022 (representing 40% annual growth) and its ARPU was expected to grow from $5.93 in 2021 to $6.47 in 2022 (representing 9% annual growth).

58.    On October 26, 2021, Nextdoor Private issued a press release announcing select financial results for the third quarter ending September 30, 2021 – the quarter immediately before the Merger – which was filed with the SEC by Nextdoor ("September 2021 Release"). The September 2021 Release reported that the company's quarterly revenues increased 66% year-over-year to $52.7 million, its ARPU increased 38% year-over-year to $1.61, and its WAU increased 20% year-over-year to 33 million. The September 2021 Release claimed that these financial "highlights" demonstrated Nextdoor Private's "continued growth at scale." The September 2021 Release quoted defendant Friar, who applauded Nextdoor's Q3 financial "'highlights,'" stating the results demonstrated "'growth at scale of our community of neighbors, businesses, and public services, and our ability to drive increased monetization.'"

59.    Also on October 26, 2021, Nextdoor Private hosted a conference call to discuss the company's opportunity, business model, financials, and production via a LinkedIn Live stream. During the call defendant Friar touted Nextdoor Private's third quarter financial results and financial guidance, stating in pertinent part as follows:

> Our revenue grew 66% year-over-year. So that was – on par with what we saw in Q2. So **the business is really humming right now**. And we also raised our overall growth guidance. ***So we've been on a roll through 2021***. When we did our PIPE back in July, we said 44% year-over-year growth for the year in 2021. In September, we raised that again, the 47%. And, now, we're guiding to say we'll grow faster than we did in 2020 – 20 – 2020 which was 49% year-over-year.

60.    Defendant Doyle similarly claimed that the company's third quarter financial results demonstrated Nextdoor Private's "success" at driving growth at scale and monetization efforts, as well as the company's ability to "sustain a very high rate of growth." Defendant Doyle

1    similarly highlighted Nextdoor Private's purportedly improving engagement trends, stating he was

2    "excited at the momentum that creates in the remainder of the year and into – into the next."

3    Defendant Doyle also emphasized Nextdoor Private's revenue growth trajectory, stating that he

4    was "excited" by the "rate of revenue growth."

5          61.    On November 10, 2021 (after the Merger was consummated), Nextdoor filed with

6    the SEC on Form 8-K a letter to shareholders announcing the Company's financial results for the

7    third quarter ending September 30, 2020 ("3Q21 Letter").  The 3Q21 Letter reported that during

8    the quarter Nextdoor Private's WAUs had increased by 20% year-over-year to 33 million and its

9    ARPU had increased by 38% year-over-year to $1.61.  Based on these results, the 3Q21 Letter

10    highlighted Nextdoor Private's "significant momentum," purported "growth at scale," and "ability

11    to drive increased monetization."  The 3Q21 Letter emphasized that Nextdoor Private (now

12    Nextdoor) was experiencing "[c]ontinued customer demand" and claimed the Company had an

13    "effective" strategy "proven" at "delivering sustained growth."  The 3Q21 Letter further stated

14    that Nextdoor's purported "strong network effects" were "increasing," driving sustained growth.

15          62.    Also on November 10, 2021, Nextdoor held a conference call with analysts and

16    investors to discuss the Company's financial and operational results for the third quarter.  During

17    the call, defendant Friar continued to claim that Nextdoor's opportunity was "large" and that prior

18    growth was "repeatable," stating in pertinent part as follows:

19          ***Our total addressable market is large and global**.  In the third quarter,
international WAUs represented 18% of total, an increase from 15% in the prior

20          year quarter.  We're seeing retention and engagement in line with the United States,
which highlights thast the utility of our platform is globally relevant.  For example,

21          in our most recently launched market, Canada, we saw WAU growth of over 100%
year-over-year in Q3, ***giving us confidence that our strategy is scalable and***

22          ***repeatable***.

23          63.    Defendant Doyle represented that Nextdoor had experienced "strong performance

24    across all advertising verticals" and claimed that strength in the quarter reflected "growth in [the]

25    community, both in total members and in engagement."  In response to a question regarding

26    Nextdoor's engagement metrics, defendant Friar stated Nextdoor was "quite proud" of its reported

27    20% WAU growth, noting that competing social media platforms experienced a "downtick" after

28

1  lapping strong comparable periods due COVID-19 impacts, whereas Nextdoor, in contrast,

2  experienced its "highest level of WAUs ever."

3      64.    The statements referenced in ¶¶41-63 above were materially false and/or

4  misleading when made because they failed to disclose the following adverse facts pertaining to

5  Nextdoor and Nextdoor Private's business, operations, and financial condition, which were known

6  to defendants or recklessly disregarded by them as follows:

7          (a)    that Nextdoor's financial results prior to the Merger had been temporarily

8  inflated by the ephemeral effects of the COVID-19 pandemic, which had pulled forward demand

9  for Nextdoor's platform and cannibalized future advertising revenue growth;

10          (b)    that, rather than being sustained, such growth trends had already begun

11  reversing at the start of the Class Period;

12          (c)    that Nextdoor's total addressable market was materially smaller than the

13  312 million households represented to investors;

14          (d)    that, by the start of the Class Period, Nextdoor's most important market –

15  the U.S. market – was already substantially saturated, impairing the Company's ability to monetize

16  users and increase its ARPU or U.S. WAUs;

17          (e)    that, as a result of (a)-(d) above, Nextdoor's revenue guidance for fiscal year

18  2022 had no reasonable basis in fact and the Company was tracking tens of millions of dollars

19  below the revenue trajectory provided to investors.

20      65.    Then, on March 1, 2022, Nextdoor issued a shareholder letter reporting its financial

21  results for the fourth quarter and full year ending December 31, 2021 – the same quarter during

22  which the Merger was completed (the "4Q21 Letter"). Contrary to defendants' prior claims that

23  accelerating growth trends were being sustained, the Company reported that the revenue growth

24  rate in the fourth quarter had declined sequentially by 18% to 48% year-over-year growth, down

25  from the 66% growth rate in the most recent quarter reported to investors in advance of the

26  November 2, 2021 special meeting for the Merger. In addition, Nextdoor reported quarterly ARPU

27  of $1.65, revealing that the ARPU growth rate in the quarter had sdeclined substantially by 26%

28

to just 12% year-over-year growth from 38% growth in the third quarter, which indicated that the Company's ability to monetize its platform was faltering.

66.     On this news, the price of Nextdoor Class A common stock declined approximately 14%, from $6.24 per share on March 1, 2022 to $5.39 per share on March 4, 2022 on unusually heavy trading volume.  However, the price of Nextdoor Class A common stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the truth regarding the Company's business, financial, and operational performance.

67.     The 4Q21 Letter represented that engagement on Nextdoor's platform had reached an "all-time high" in the fourth quarter and that the Company was undergoing "accelerating growth," stating in pertinent part as follows:

> In Q4, 52% of neighbors globally were active weekly, reflecting an increase of 5 percentage points year-over-year and an all-time high. . . .
>
> **We finished 2021 with significant momentum**.  In Q4, WAU grew 32% year-over-year and 9% quarter-over-quarter, **continuing the trajectory of accelerating growth** and reflecting the early effects of our product focus on creating an Active Valued Community.  In fact, through the second half of 2021, we added more WAU than in any other equivalent period in Nextdoor's history.
>
> **We accelerated full year revenue growth from 49% in 2020 to 56% in 2021**.  Healthy demand across customer sizes, verticals, and campaign objectives drove our 48% year-over-year revenue growth in Q4.  ARPU grew 12% year-over-year in Q4 to $1.65, contributing to strong full year 2021 ARPU growth of 33%. ARPU growth reflected a combination of higher neighbor engagement and higher eCPMs5.  **Sustained revenue growth at scale, coupled with a 6 point improvement in Q4 adjusted EBITDA margin and an 18 point improvement in 2021 adjusted EBITDA margin, demonstrates our path to long-term profitability, even as we remain in investment mode**.

(Footnote omitted.)

68.     The 4Q21 Letter also raised the Company's 2022 revenue guidance, stating: "Revenue is expected to be between $254M-$256M.  This is an increase from our prior full year 2022 guidance of $252M."

69.     Also on March 1, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the fourth quarter and full year. During the call, defendant Friar highlighted Nextdoor's "best-in-class" organic user base growth, stating that "when we look at 2022, what you see is shifting a little bit more of our paid marketing

1    spend into international because we feel really good about what the product pipeline is doing to

2    build growth and engagement in the U.S."

3        70.    On March 15, 2022, Nextdoor filed with the SEC its annual report on Form 10-K

4    for the fiscal year ending December 31, 2021, which was signed by defendants Friar and Doyle

5    who also certified that the document was accurate and free from fraud (the "2021 Form 10-K").

6    The 2021 Form 10-K repeated the key financial metrics contained in the 4Q21 Letter detailed

7    above.

8        71.    The statements referenced in ¶¶67-70 above were materially false and/or

9    misleading when made because they failed to disclose adverse facts pertaining to the Company's

10    business, operations, and financial condition, which were known to defendants or recklessly

11    disregarded by them as stated in ¶64.

12        72.    Then, on May 10, 2022,  Nextdoor filed with the SEC its quarterly report on Form

13    10-Q announcing the Company's financial results for the first quarter ended March 31, 2022

14    ("1Q22 Form 10-Q").  The 1Q22 Form 10-Q revealed a startling deterioration in Nextdoor's

15    WAUs during the quarter, reporting that the Company's global WAUs growth had increased just

16    1% sequentially (from 32% year-over-year growth in the fourth quarter of 2021 to 33% year-over-

17    year growth in the first quarter of 2022) and that U.S. WAUs had actually ***suffered a sequential***

18    ***decline*** of approximately one hundred thousand users.  In a subsequently published report, analysts

19    at Morgan Stanley emphasized this startling decline, stating Nextdoor had "A User Problem" and

20    noting that WAU trends were "weighing on the multiple the market [was] willing to pay."

21        73.    On this news, the price of Nextdoor Class A common stock fell from $3.19 per

22    share on May 10, 2022 to $2.93 per share on May 11, 2022, or approximately 8%, on unusually

23    heavy trading volume.  However, the price of Nextdoor Class A common stock continued to be

24    artificially inflated as defendants continued to make material misstatements and omissions and to

25    conceal the full truth regarding the Company's business, operations, and financial results.

26        74.    Also on May 10, 2022, Nextdoor filed with the SEC a letter to shareholders

27    discussing the Company's financial results for the first quarter ("1Q22 Letter").  The 1Q22 Letter

28    reported that quarterly revenue grew 48% year-over-year to $51 million, WAUs grew 33% year-

over-year to 36.7 million, and ARPU grew 12% year-over-year to $1.39.  The 1Q22 Letter assured investors that Nextdoor's users were "increasingly engaged" and that the Company was experiencing "increased advertiser demand."  The 1Q22 Letter broadened the Company's 2022 revenue guidance to a range of $252 million to $256 million.

75.     In addition, the 1Q22 Form 10-Q repeated the key financial metrics contained in the 1Q22 Letter detailed above.  The Form 10-Q also stated that Nextdoor had achieved 29.4 million U.S. WAUs during the quarter.  Defendants Friar and Doyle signed the 1Q22 Form 10-Q and also certified that the document was accurate and free from fraud.

76.     Also on May 10, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter.  During the call, defendant Friar represented that the Company's users remained "highly engaged" and that its product strategy was "working," stating in pertinent part as follows:

> Our community is active and becoming increasingly active.  Our product strategy in 2022 is centered on strengthening engagement through building an active valued community.  ***It's working***.  In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

> Everyone is a neighbor.  ***Our continued strength in international growth underscores that this is a global opportunity***, solidifying our confidence in the opportunity ahead.  In Q1, international WAU grew 55% year-over-year, accelerating quarter-over-quarter from 47% in Q4 and year-over-year from 39% in Q1 of 2021.  In international, engagement metrics surpassed even the U.S. with 55% of neighbors active weekly.  In 2022, we will remain focused on driving growth and engagement in our existing international markets.

77.     Defendant Doyle similarly represented that Nextdoor was seeing "healthy demand" from its advertisers and "deeper engagement" from its users.

78.     The statements referenced in ¶¶74-77 above were materially false and/or misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as stated in ¶64.

79.     Then, on August 9, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the second quarter ended June 30, 2022

("2Q22 Form 10-Q").  The 2Q22 Form 10-Q revealed that Nextdoor's platform continued to materially decline, reporting that revenue growth slowed to just 19% year-over-year during the quarter and that Nextdoor's U.S. WAUs had declined for the second quarter in a row to 29.2 million.  The 2Q22 Form 10-Q further reported that the Company's ARPU growth had turned negative in the quarter, contracting by 6% year-over-year.  During the corresponding conference call, defendant Doyle revealed the Company was slashing its revenue guidance for fiscal 2022 by more than $31 million at the midpoint, or approximately 12%, to a range of $220 million to $225 million.

80.    On this news, the price of Nextdoor Class A common stock fell from $3.60 per share on August 9, 2022 to $2.70 per share on August 10, 2022, or approximately 25%, on unusually heavy trading volume.  However, the price of Nextdoor Class A common stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the truth regarding the Company's business, operations, and financial results.

81.    Also on August 9, 2022, Nextdoor filed with the SEC on Form 8-K a letter to shareholders discussing the Company's financial results for the second quarter ended June 30, 2022 ("2Q22 Letter").  The 2Q22 Letter reported that Nextdoor's global WAUs grew 26%, which purportedly "reflect[ed] ongoing momentum internationally."   The 2Q22 Letter attributed Nextdoor's financial and operational headwinds to "complex macroeconomic conditions" and indicated that users were turning to Nextdoor's platform as they previously had in 2020 and 2021, stating in pertinent part as follows:

> We have said this before, and it bears repeating: the power of local is unparalleled.  We saw this in 2020 as neighbors helped keep each other safe during the start of the COVID-19 pandemic.  We saw this in 2021 as neighbors gathered with their communities and supported their local businesses when the world started to reopen.  *We see this again now*.  Neighbors are using the platform to find jobs and side hustles.  They are using our classifieds surface, For Sale & Free, with an increasing frequency, to find cheaper alternatives to buying new and helping others in need – in fact, in Q2 2022, over 25% of all items in For Sale & Free were marked as free.  They are finding ways to help those less fortunate by raising money and other donations.  This neighbor behavior continues to affirm our value proposition and bolsters the foundation upon which we will continue to build, globally, the neighborhood network.

(Footnote omitted.)

82.    In addition, the 2Q22 Form 10-Q repeated the key financial metrics contained in the 2Q22 Letter detailed above.  The Form 10-Q also stated that Nextdoor had achieved 29.2 million U.S. WAUs during the quarter.  Defendants Friar and Doyle signed the 2Q22 Form 10-Q and also certified that the document was accurate and free from fraud.

83.    Also on August 9, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the second quarter.  During the call, defendant Friar assured investors that Nextdoor was observing "durable" engagement trends among the Company's most active users and that those trends "show[ed]" that the Company's efforts to address user engagement were "working," stating in pertinent part as follows:

> Weekly active users, or WAU, grew 26% year-over-year to approximately 37 million.  **_We're seeing durable engagement trends amongst our most active users_**.  In Q2, over 50% of weekly active users were active daily.  Across all regions, growth in total sessions accelerated 10 points quarter-over-quarter.  **_These trends show that our focus on engagement through the introduction of new machine learning models for increased personalization, more engaging notification, a simplified user experience and welcoming platform initiatives is working_**.  With the progress we've made on engagement, we are now shifting more of our product focus to new neighbor growth.  Today, we have over 75 million Verified Neighbors on the platform, and **_we're just scratching the surface of our global total addressable market_**.

84.    The statements referenced in ¶¶81-83 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as stated in ¶64.

85.    Then, on November 8, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the third quarter ended September 30, 2022 ("3Q22 Form 10-Q").  The 3Q22 Form 10-Q revealed that Nextdoor's business continued to deteriorate, as it had in every quarter since the Merger.  Specifically, the 3Q22 Form 10-Q reported that Nextdoor's revenues during the quarter declined sequentially by $1 million to $54 million, representing just 2% year-over-year growth,  and that the Company's quarterly ARPU growth was increasingly negative, contracting by 12% compared to the prior year quarter.  During the

1  corresponding conference call, defendant Doyle reported that Nextdoor was reducing revenue

2  guidance again by an additional $12 million, warning investors that Nextdoor now expected fiscal

3  2022 revenues of just $210.5 million at the midpoint – far below the up to $256 million figure

4  provided to investors during the Class Period.

5          86.    On this news, the price of Nextdoor Class A common stock fell from $2.32 per

6  share on November 8, 2022 to $2.06 per share on November 9, 2022, or approximately 11%, on

7  unusually heavy trading volume.

8          87.    In total, the price of Nextdoor Class A common stock fell nearly 90% from the

9  $18.59 per share price high immediately after the Merger, causing plaintiff and the Class (defined

10  below) to suffer millions of dollars in losses and economic damages under the federal securities

11  laws.

12                        **ADDITIONAL SCIENTER ALLEGATIONS**

13          88.    As alleged herein, defendants acted with scienter in that defendants knew, or

14  recklessly disregarded, that the public documents and statements they issued and disseminated to

15  the investing public in the name of Nextdoor and Nextdoor Private, or in their own name, during

16  the Class Period were materially false and misleading.  Defendants knowingly and substantially

17  participated or acquiesced in the issuance or dissemination of such statements and documents as

18  primary violations of the federal securities laws.  Defendants, by virtue of their receipt of

19  information reflecting the true facts regarding Nextdoor and Nextdoor Private, and their control

20  over and/or receipt and/or modification of Nextdoor and Nextdoor Private's materially false and

21  misleading statements, were active participants in the fraud alleged herein.

22          89.    Defendants knew or recklessly disregarded the false and misleading nature of the

23  information they caused to be disseminated to the investing public.  The fraud described herein

24  could not have been perpetuated during the Class Period without the knowledge and complicity

25  of, or at least the reckless disregard by, personnel at the highest levels of the Company, including

26  the Individual Defendants.

27          90.    The Individual Defendants, because of their positions with Nextdoor and/or

28  Nextdoor Private, controlled the contents of Nextdoor and Nextdoor Private's public statements

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                           - 24 -

1    during the Class Period.  The Individual Defendants were each provided with or had access to the

2    information alleged herein to be false and misleading prior to or shortly after its issuance and had

3    the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their

4    positions and access to material, non-public information, the Individual Defendants knew or

5    recklessly disregarded that the adverse facts specified herein had not been disclosed to and were

6    being concealed from the public and that the positive representations that were being made were

7    false and misleading.

8         91.    Nextdoor's platform user base, growth rate, and the size of the Company's total

9    addressable market were among the most important issues facing the Company and the focus of

10    Nextdoor's management, including the Individual Defendants, before, during and after the Merger.

11    The Individual Defendants repeatedly held themselves out as the persons most knowledgeable

12    regarding Nextdoor's use base, related engagement levels, potential for growth in both U.S. and

13    international markets, and advertising demand.

14         92.    In addition, the Individual Defendants also had the motive and opportunity to

15    defraud investors.  For example, the Sponsor Defendants, through KV SPAC Sponsor, received

16    10 million founder shares for nominal consideration that would be rendered worthless if the

17    Merger was not completed.  These founder shares were valued at over $103 million at the time of

18    the Merger.  Similarly, as equity holders of Nextdoor Private, defendants Friar and Doyle also

19    stood to profit financially from the Merger.  According to the Prospectus, defendant Friar was

20    estimated to receive over 15.7 million Nextdoor Class B shares following the Merger and

21    defendant Doyle was estimated to receive over 1.7 million Nextdoor Class B shares following the

22    Merger.  In March 2021, defendant Friar was granted stock options to purchase an aggregate of

23    approximately 1.7 million shares of Nextdoor common stock, roughly 740 thousand of which were

24    set to vest immediately upon closing of the Merger.  During the same month, defendant Doyle was

25    likewise granted stock options to purchase an aggregate of over 180 thousand shares with vesting

26    dates set in 2022 and 2023.  Thus, through the Merger, defendants Friar and Doyle were set to

27    receive significant financial benefits immediately upon the closing of the Merger and/or obtain

28    critically needed liquidity for shares underlying their respective stock and stock option grants in

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 25

1  Nextdoor Private.  Moreover, these defendants received lucrative and high-profile senior

2  management jobs at a publicly traded company in connection with the Merger.  As such, all of the

3  Individual Defendants were heavily incentivized to successfully carry out the Merger and to

4  orchestrate the fraud alleged herein.

5      93.    Defendants' scienter is further underscored by the mandated certifications under

6  the Sarbanes-Oxley Act of 2002 by certain of the Individual Defendants filed during the Class

7  Period as detailed herein, which acknowledged their responsibility to investors for establishing

8  and maintaining controls to ensure that material information about Nextdoor was made known to

9  them and that the Company's disclosure-related controls were operating effectively.

10                                **NO SAFE HARBOR**

11      94.    The "Safe Harbor" warnings accompanying Nextdoor's reportedly forward-

12  looking statements ("FLS") issued during the Class Period were ineffective to shield those

13  statements from liability.  To the extent that projected revenues and earnings were included in the

14  Company's financial reports prepared in accordance with GAAP, including those filed with the

15  SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15

16  U.S.C. §78u-5(b)(2)(A).

17      95.    Defendants are also liable for any false or misleading FLS pled herein because, at

18  the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was

19  authorized and/or approved by an executive officer of Nextdoor who knew that the FLS was false.

20  None of the historic or present tense statements made by defendants were assumptions underlying

21  or relating to any plan, projection, or statement of future economic performance, as they were not

22  stated to be such assumptions underlying or relating to any projection or statement of future

23  economic performance when made, nor were any of the projections or forecasts made by

24  defendants expressly related to or stated to be dependent on those historic or present tense

25  statements when made.

26                        **LOSS CAUSATION AND ECONOMIC LOSS**

27      96.    During the Class Period, as detailed herein, defendants engaged in a scheme to

28  deceive the market and a course of conduct that artificially inflated the prices of Nextdoor common

1    Class A common stock and operated as a fraud or deceit on purchasers of Nextdoor Class A

2    common stock.  As detailed above, when the truth about Nextdoor's misconduct was revealed, the

3    value of Nextdoor Class A common stock declined precipitously as the prior artificial inflation no

4    longer propped up the stock price.  The decline in the price of Nextdoor Class A common stock

5    was the direct result of the nature and extent of defendants' fraud finally being revealed to investors

6    and the market.  The timing and magnitude of the share price decline negate any inference that the

7    losses suffered by plaintiff and other members of the Class were caused by changed market

8    conditions, macroeconomic or industry factors, or company-specific facts unrelated to defendants'

9    fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class

10    members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of

11    Nextdoor publicly traded Class A common stock and the subsequent significant decline in the

12    value of Nextdoor Class A common stock when defendants' prior misrepresentations and other

13    fraudulent conduct were revealed.

14        97.    At all relevant times, defendants' materially false and misleading statements or

15    omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other

16    Class members.  Those statements were materially false and misleading through their failure to

17    disclose a true and accurate picture of Nextdoor's business, operations, and financial results as

18    alleged herein.  Throughout the Class Period, defendants issued materially false and misleading

19    statements and omitted material facts necessary to make defendants' statements not false or

20    misleading, causing the price of Nextdoor Class A common stock to be artificially inflated.

21    Plaintiff and other Class members purchased Nextdoor Class A common stock at those artificially

22    inflated prices, causing them to suffer damages as complained of herein.

23                    **APPLICABILITY OF PRESUMPTION OF RELIANCE**

24        98.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute*

25    *Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against

26    defendants are predicated upon omissions of material fact for which there was a duty to disclose.

27        99.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to

28    *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the

1 market for Nextdoor Class A common stock was an efficient market at all relevant times by virtue

2 of the following factors, among others:

3       (a)    Nextdoor Class A common stock met the requirements for listing, and was

4 listed and actively traded on the NASDAQ and the NYSE, highly efficient markets;

5       (b)    Nextdoor regularly communicated with public investors via established

6 market communication mechanisms, including the regular dissemination of press releases on the

7 national circuits of major newswire services and other wide-ranging public disclosures, such as

8 communications with the financial press and other similar reporting services; and

9       (c)    Nextdoor was followed by a number of securities analysts employed by

10 major brokerage firms who wrote reports which were distributed to the sales force and certain

11 customers of their respective brokerage firms.  These reports were publicly available and entered

12 the public marketplace.

13       100.    As a result of the foregoing, the market for Nextdoor Class A common stock

14 promptly incorporated current information regarding the Company from publicly available sources

15 and reflected such information in the prices of the stock.  Under these circumstances, all those who

16 transacted in Nextdoor Class A common stock during the Class Period suffered similar injury

17 through their transactions in Nextdoor Class A common stock at artificially inflated prices and a

18 presumption of reliance applies.

19       101.    Without knowledge of the misrepresented or omitted material facts, plaintiff and

20 other Class members purchased or acquired Nextdoor Class A common stock between the time

21 defendants misrepresented and failed to disclose material facts and the time the true facts were

22 disclosed.  Accordingly, plaintiff and other Class members relied, and are entitled to have relied,

23 upon the integrity of the market prices for Nextdoor Class A common stock, and are entitled to a

24 presumption of reliance on defendants' materially false and misleading statements and omissions

25 during the Class Period.

26                              **CLASS ACTION ALLEGATIONS**

27       102.    Plaintiff brings this action on behalf of all purchasers of publicly traded Nextdoor

28 Class A common stock during the Class Period who were damaged thereby (the "Class").

Excluded from the Class are defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which any of the defendants have or had a controlling interest.

103.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nextdoor Class A common stock was actively traded on national securities exchanges, specifically the NASDAQ prior to the Merger and the NYSE after the Merger.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nextdoor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.  Joinder would be highly impracticable.

104.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

105.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)     whether the prices of Nextdoor Class A common stock during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, the proper measure of damages.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

108.    Plaintiff incorporates ¶¶1-107 by reference.

109.    During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

110.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Nextdoor Class A common stock during the Class Period.

111.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nextdoor Class A common stock.  Plaintiff and

1    the Class would not have purchased Nextdoor Class A common stock at the prices they paid, or at

2    all, if they had been aware that the market prices had been artificially and falsely inflated by

3    defendants' misleading statements.

4        112.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

5    other members of the Class suffered damages in connection with their purchases of Nextdoor Class

6    A common stock during the Class Period.

7                                    **COUNT II**

8                        **For Violation of §20(a) of the 1934 Act**
                              **Against All Defendants**
9

10       113.    Plaintiff incorporates ¶¶1-112 by reference.

11       114.    During the Class Period, defendants acted as controlling persons of Nextdoor

     within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to
12
     control public statements about Nextdoor and/or Nextdoor Private, the Individual Defendants had
13
     the power and ability to control the actions of Nextdoor and/or Nextdoor Private and their
14
     employees.  Nextdoor controlled the Individual Defendants and all of its other officers and
15
     employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.
16
                                 **PRAYER FOR RELIEF**
17
         WHEREFORE, plaintiff prays for judgment as follows:
18
         A.      Determining that this action is a proper class action, designating plaintiff as Lead
19
     plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil
20
     Procedure and plaintiff's counsel as Lead Counsel;
21
         B.      Awarding plaintiff and the members of the Class damages and interest;
22
         C.      Awarding plaintiff's reasonable costs, including attorneys' fees; and
23
         D.      Awarding such equitable/injunctive or other relief as the Court may deem just and
24
     proper.
25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                           - 31 -

1

**JURY DEMAND**

2

    Plaintiff demands a trial by jury.

3    DATED:  February 28, 2024                    ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
4                                                  SHAWN A. WILLIAMS

5

6                                                        s/ Shawn A. Williams
                                                     SHAWN A. WILLIAMS
7
                                                   Post Montgomery Center
8                                                  One Montgomery Street, Suite 1800
                                                   San Francisco, CA  94104
9                                                  Telephone:  415/288-4545
                                                   415/288-4534 (fax)
10
                                                   ROBBINS GELLER RUDMAN
11                                                   & DOWD LLP
                                                   BRIAN E. COCHRAN
12                                                 FRANCISCO J. MEJIA
                                                   655 West Broadway, Suite 1900
13                                                 San Diego, CA  92101-8498
                                                   Telephone:  619/231-1058
14                                                 619/231-7423 (fax)

15                                                 ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
16                                                 SAMUEL H. RUDMAN
                                                   58 South Service Road, Suite 200
17                                                 Melville, NY  11747
                                                   Telephone:  631/367-7100
18                                                 631/367-1173 (fax)

19                                                 Attorneys for Plaintiff

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 32

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Frankie J. Adamo ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of February, 2024.

Frankie J. Adamo

NEXTDOOR

SCHEDULE A

SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---------------|---------------------------|-------|
| 11/09/2021 | 300 | $14.06 |
| 11/09/2021 | 200 | $14.07 |

Prices listed are rounded up to two decimal places.