**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff*

*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| FRANKIE J. ADAMO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEXTDOOR HOLDINGS, INC., SARAH J. FRIAR, MICHAEL DOYLE, VINOD KHOSLA, SAMIR KAUL, PETER BUCKLAND, KHOSLA VENTURES LLC, and KHOSLA VENTURES SPAC SPONSOR II LLC<br><br>Defendants. | CASE NO.  5:24-cv-01213-EJD<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ...................................................................... 1

III.    PARTIES ........................................................................................................ 2

IV.     INTRODUCTION .......................................................................................... 4

V.      BACKGROUND ............................................................................................ 6

VI.     DEFENDANTS' CONDUCT DURING THE CLASS PERIOD ..................... 12

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS ISSUED DURING THE CLASS PERIOD ................................. 31

        A.      July 6, 2021 ....................................................................................... 31

        B.      July 9, 2021 ....................................................................................... 34

        C.      September 20, 2021 ........................................................................... 35

        D.      October 21, 2021 ............................................................................... 36

        E.      May 10, 2022 ..................................................................................... 37

        F.      August 9, 2022 .................................................................................. 37

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................... 38

IX.     NO SAFE HARBOR ..................................................................................... 42

X.      LOSS CAUSATION ..................................................................................... 42

        A.      March 1, 2022 ................................................................................... 44

        B.      May 10, 2022 ..................................................................................... 44

        C.      August 9, 2022 .................................................................................. 45

        D.      November 8, 2022 ............................................................................. 45

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE ............................... 46

XII.    CLASS ACTION ALLEGATIONS ............................................................... 47

XIII.   COUNT I ...................................................................................................... 48

XIV.    COUNT II ..................................................................................................... 49

XV.     COUNT III .................................................................................................... 51

Lead Plaintiff Keith Hollingsworth ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Nextdoor Holdings, Inc. f/k/a Khosla Ventures Acquisition Co. II ("Nextdoor" or the "Company") and securities analyst reports, press releases, and other public statements issued by, or about, the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a securities fraud class action on behalf of all purchasers of the publicly traded Class A common stock of Nextdoor between July 6, 2021 and November 8, 2022, inclusive (the "Class Period"). Lead Plaintiff seeks to pursue remedies against the Company and certain of the Company's officers and directors under §10(b), and SEC Rule 10b-5 promulgated thereunder, §14(a), and §20(a) of the Securities Exchange Act of 1934 ("1934 Act").

## II. JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b), 14(a), and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R.§240.10b-5.

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

4. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b), because the Company maintains its corporate headquarters in and conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

**III.　PARTIES**

6.　　Lead Plaintiff Keith Hollingsworth, as set forth in a previously filed Certification (ECF No. 32-4), purchased Nextdoor Class A common stock during the Class Period and was damaged thereby.

7.　　Defendant Nextdoor is headquartered in San Francisco, California. Shares of Nextdoor Class A common stock trade on the New York Stock Exchange ("NYSE") under the ticker symbol "KIND." Prior to the Merger (defined below), Nextdoor Class A common stock traded on the NASDAQ under the ticker symbol "KVSB."

8.　　Defendant Sarah J. Friar ("Friar") served as Chief Executive Officer ("CEO"), President, and as a member of the Board of Directors (the "Board") of Nextdoor, Inc. ("Nextdoor Private") from December 2018 until the Merger in November 2021. Following the Merger, defendant Friar served as Nextdoor's CEO, President, and Chairperson of the Company's Board until her resignation in February 2024.

9.　　Defendant Michael Doyle ("Doyle") served as Chief Financial Officer ("CFO") of Nextdoor Private from August 2018 until the Merger in November 2021. Following the Merger, defendant Doyle served as CFO of Nextdoor until his resignation in November 2023.

10.　　Defendant Vinod Khosla ("Khosla") is the founder of Nextdoor and was a member of its management team prior to the Merger.

11.　　Defendant Samir Kaul ("Kaul") served as CEO of Nextdoor prior to the Merger.

12.　　Defendant Peter Buckland ("Buckland") served as Chief Operating Officer ("COO"), CFO, Treasurer, and Secretary of Nextdoor prior to the Merger.

13.　　Defendant Khosla Ventures LLC ("Khosla Ventures") is a venture capital firm owned and controlled by defendants Khosla, Kaul, and Buckland.

14. Defendant Khosla Ventures SPAC Sponsor II LLC ("KV SPAC Sponsor") served as the blank check sponsor of Nextdoor, and is owned and controlled by defendants Khosla, Kaul, Buckland, and Khosla Ventures.

15. Defendants Khosla, Khosla Ventures, KV SPAC Sponsor, Kaul, and Buckland are collectively referred to herein as the "Sponsor Defendants."

16. Defendants Friar, Doyle, Khosla, Kaul, and Buckland are collectively referred to herein as the "Individual Defendants."

17. The Sponsor Defendants and Individual Defendants are collectively referred to herein as "Defendants."

18. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company and/or Nextdoor Private at the highest levels and was privy to confidential proprietary information concerning these companies and their business, operations, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company and/or Nextdoor Private, and approved or ratified these statements, in violation of the federal securities laws.

19. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and traded on the NASDAQ and later the NYSE, which are both governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company and/or Nextdoor Private, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company and Nextdoor Private during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV.    INTRODUCTION

21.     Nextdoor operates a "hyperlocal" online social networking platform that connects neighbors, local public agencies, and local businesses via the internet. Most users go to Nextdoor for discrete, one-off searches for local services or information. For example, users may go to Nexdoor to find a local plumber, or find information about the start time of a local bake sale.

22.     In 2020, Nextdoor experienced explosive growth due to the COVID-19 pandemic. As much the United States stayed home, Americans had a new, temporary need to look for local goods and services and to gain local information. Accordingly, user growth that might have occurred over years was pulled forward and compressed into this unusual period.

23.     In 2021, a SPAC called Khosla Ventures Acquisition Co. II acquired Nexdoor in a merger and took the Company public. As part of that process, Nextdoor wildly and repeatedly inflated the shareholders' reasonable expectations about the potential value of the Nextdoor platform and business model. Nextdoor made the majority of these representations as part of its solicitation of proxy votes for the merger.

24.     To convince shareholders to vote for the merger, Defendants attempted to paint Nextdoor as the next hit social media company, like Twitter or Snap. Defendants repeatedly compared Nextdoor's users and average revenue per user directly to those of Twitter and Snap,

and suggested that Nextdoor could grow its users and monetize its platform even more successfully than those companies.  Nextdoor expressed "great confidence," that it could achieve 40% revenue growth for years to come.  Nextdoor also represented that it could realistically grow its user base to 200 million households in the near term.

25.     In fact, Defendants knew fully well that differences in the nature of the content on Nextdoor's platform structurally prevent Nextdoor from ever equaling or exceeding the monetization levels of purportedly peer platforms like Twitter and Snap.  Unlike Twitter and Snap, which attract users to scroll through unlimited feed of globally interesting posts, Nextdoor attracts users for discrete, single-purpose visits, like finding a plumber.  Accordingly, Nextoor does not, and structurally cannot, hold users' attention on each visit like Twitter and Snap do—average visitors to Twitter and Snap spend over 30 minutes per visit, while visitors to Nextdoor spend about two minutes per visit.  The longer a platform can hold a user's attention, the more ad impressions it can show them, and the higher average revenue per user the platform can generate.  Accordingly, even if Nextdoor were to acquire the same or more users than Twitter or Snap, Nextdoor could never realistically hope to generate comparable average revenue per user as those platforms, absent a fundamental change in the nature of the content of the platform (which Nextdoor has never proposed).

26.     Yet Nextdoor also misrepresented its user base and its ability to grow that user base.  Nextdoor counts "daily active users" ("DAU") and "weekly active users" ("WAU") as "the count of unique neighbors who have started a session or opened a content email over the trailing" day or 7 days.  Yet Nextdoor never disclosed to shareholders that *half* of its DAUs and WAUs were of the latter sort—users who merely opened Nextdoor's marketing emails yet never actually visited Nextdoor's website or app.  Accordingly, half of its users were not "active users" of its online product in any meaningful sense.

27.     Even worse, Nextdoor was fully aware that the COVID-19 pandemic had pulled forward demand for its product, such that the U.S. market for Nextdoor's platform was largely saturated by the time of Nextdoor's merger.  Indeed, by the time of the merger, Nextdoor's national

marketing campaigns were converting only 7% of targeted customers into users in the U.S.  The rapid, sweeping growth Nextdoor promised shareholders was objectively not sustainable.

28.    The truths about Nextdoor's misrepresentations took months to be absorbed by the market through a series of partial disclosures of the truth and through materializations of the risks of disappointing results concealed by those misrepresentations.  On March 1, May 10, August 9 and November 8, 2022, the Company repeatedly revealed lower growth figures and financial results than shareholders and the market had anticipated based on the Company's misleading statements about its growth.  All told, ***Nextdoor lost 90% of its value*** during the Class Period.

29.    Through these actions, Defendants caused investors in Nextdoor tremendous losses and violated Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934.  Plaintiffs sue to recover these losses.

## V.    BACKGROUND

30.    Nextdoor began as Khosla Ventures Acquisition Co. II ("KV Acquisition Co."), a blank check company formed by the Sponsor Defendants.  A blank check company is sometimes referred to as a special purpose acquisition vehicle, or "SPAC," and does not initially have any operations or business of its own.  Rather, it raises money from investors in an initial public offering ("IPO") and then uses the proceeds from the offering to acquire business or operational assets, usually from a private company that does not publicly report financial or operating results.  As a result, investors in blank check companies rely on the skill, transparency, and honesty of the blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound target company that offers attractive risk-adjusted returns for investors.

31.    On March 26, 2021, KV Acquisition Co. completed its IPO.  In the IPO, the Sponsor Defendants sold 41.6 million shares of Class A common stock (including a partial overallotment) at $10 per share, generating total gross proceeds of $416 million.

32.    Although KV Acquisition Co. did not identify any target at the time of the IPO, the IPO offering documents claimed KV Acquisition Co.'s search would focus on target businesses with a "large market opportunity" that possessed a "highly differentiated" proprietary technology.

The IPO offering lauded the management team's purported expertise in business transactions, representing that KV Acquisition Co. would rely on their "decades of combined experience in sourcing transactions, understanding and conducting due diligence on new breakthrough technologies and developing management teams in order" to consummate a business combination with an "exceptional business."

33.    The IPO offering documents specified acquisition criteria that KV Acquisition Co. would purportedly use to "guide[]" its evaluation of potential targets, including the following: (i) "Large and Growing Addressable Market"; (ii) "Proprietary Technology Advantage"; (iii) "Scaling Business with Compelling Growth Opportunity"; and (iv) "World Class Management Teams."

34.    In the event KV Acquisition Co. did not complete an initial business combination, it was obligated to redeem 100% of its outstanding public shares equal to the aggregate trust proceeds plus interest. Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction. If enough shareholders redeemed their shares, a deal would not be economically feasible.

35.    However, if KV Acquisition Co. was successful in completing an initial business combination within the allotted time frame, the Sponsor Defendants and various company insiders would be richly rewarded. Specifically, KV SPAC Sponsor received 10 million founder shares for a nominal purchase price (consisting of Class B and Class K shares), equaling 15% to 30% of Nextdoor's outstanding common stock on a converted basis following the Merger, subject to certain triggering events. Notably, the upper limit of this range was substantially higher than the 20% equity commonly allotted to sponsors in SPAC transactions. Defendant KV SPAC Sponsor held these founder shares for the benefit of Defendants Khosla Ventures, Khosla, Kaul, and Buckland. If the Sponsor Defendants failed to complete a merger within the allotted time, they would need to essentially return the money raised in the IPO to investors, causing them to forfeit these potentially lucrative benefits. The aggregate market value of the Sponsor Defendants'

founder shares, as stated in the joint proxy statement/prospectus for the Merger, was over $103 million based upon the closing price of $10.13 per share on NASDAQ on September 29, 2021 (the most recent practicable date prior to the date of the proxy statement/prospectus).  As a result, the Sponsor Defendants were highly incentivized to complete an initial business combination and to convince shareholders to approve the Merger.

36.    On July 6, 2021, KV Acquisition Co. and Nextdoor Private jointly announced they had entered into a merger agreement.  Pursuant to the agreement, KV Acquisition Co. would contribute all remaining cash from its IPO to the combined business and KV Acquisition Co. and shareholders would receive the right to receive shares of Nextdoor in exchange for their shares of Acquisition Co. (the "Merger").  In addition, the company raised $270 million in a private investment in public equity ("PIPE") offering, making the total cash contribution to the Merger $686 million.  At the time of the Merger, Defendants stated the pro forma equity value of the combined company would be $4.3 billion.

37.    Self-proclaimed as the "neighborhood network," Nextdoor operates a hyperlocal online social networking platform that connects neighbors, public agencies, and businesses via the internet.  Nextdoor purports to facilitate this online community through various features and technological functions including, *inter alia*, a news feed where "neighbors" (*i.e.*, users) can view posts, discussions, and pictures from other neighbors, as well as notifications, comments, and groups.  At bottom, these features enable users to exchange information, services, and goods.

38.    Following the Merger, virtually all of Nextdoor's revenues are generated through advertising sales.  Nextdoor purports to offer a differentiated advertising solution that allows its clients to deploy local level marketing campaigns at scale.  Nextdoor's advertising clients range from large national brands to small and mid-sized businesses.

39.    Nextdoor Private's platform (later acquired by Nextdoor) first launched in the United States in 2011 and has since expanded to ten other countries including the United Kingdom, Canada, Australia, Netherlands, France, Spain, Italy, Germany, Sweden, and Denmark.  Despite this expansion, however, the majority of Nextdoor's revenues are generated in the United States.

1    40.    The value of Nextdoor's advertising space – and hence its business, financial, and operational performance – is ultimately dependent on the size and level of engagement of the Company's user base.  Nextdoor publicly discloses purported user and engagement performance primarily through two key business metrics.  First, Nextdoor reports Weekly Active User metrics or "WAU," which it defines as "a Nextdoor user who opens our application, logs on to our website, or engages with an email with monetizable content at least once during a defined 7-day period." In addition, Nextdoor reports average revenue per weekly active user or "ARPU," which the Company defines as total revenue in a certain geography during a period divided by the average of the number of WAUs in the specified geography during the same period.

41.    Beginning in 2020, demand for Nextdoor Private's community-based platform rose dramatically as shelter-in-place mandates and other social distancing restrictions led people to increasingly seek social connection and pertinent information regarding their communities from Nextdoor Private's products.  As a result, Nextdoor Private grew rapidly in 2020 with WAUs growing nearly 37% from 19.5 million in 2019 to nearly 27 million in 2020.  ARPU during the same period also grew by 10% from $4.23 to $4.62.

42.    On July 6, 2021, amid these seemingly favorable market trends, Nextdoor Private announced that it would become a publicly traded company through a merger with KV Acquisition Co.  Following the Merger announcement, Defendants lauded Nextdoor Private's purportedly "phenomenal" growth, stating that the platform was in "1 in 3 U.S. households," and boasting that Nextdoor Private had amassed "27M+ Weekly Active Neighbors" and "60M+ Verified Neighbors." Defendants further represented that Nextdoor Private's outsized growth was poised to continue, claiming the company had a "***huge runway***" ahead of it, and that it could grow its user base "4.5x" in existing markets alone.  Speaking during a July 2021 conference call, Defendant Friar represented that Nextdoor Private's total addressable market remained "***large and still untapped***," noting that the company could grow in the "near term" adding "150 million households globally, just doing what we do today."  During the same call, Defendant Doyle further represented that

Nextdoor Private was "really early to monetization" and expressed "great confidence" the company's revenue growth "*c[ould] be sustained into the future*."

43.    During a July 7, 2021 interview on *CNBC*, Defendant Friar stated that Nextdoor Private would be able to "monetize and will grow a phenomenal revenue stream" after the Merger. Defendant Khosla stated "the metrics and trends really run away . . . we loved the fact that there's so many different growth factors the company can take in the future."  Cohost David Faber asked whether Nextdoor Private's growth had "sort of peaked in 2020/'21 in terms of the revenue number maybe in part because of the pandemic" and whether this was a "concern for you as you try to sell the deal to your spac shareholders?"  Defendant Khosla responded that "*it isn't a concern for me[,] we see accelerating growth*."  Defendant Friar concurred, adding: "*[F]rom a business perspective, we're seeing terrific momentum. . . . [W]e're seeing phenomenal trends in q1 and q2 of 2021, we saw accelerating ARPU*."

44.    Similarly, in a July 8, 2021 interview given to *Cheddar News*, Defendant Friar represented that Nextdoor Private had "quite a runway" remaining in the United States and represented to investors that it was "not an if" whether Nextdoor Private could take the platform to the global stage but a "when."

45.    During Nextdoor Private's "Investor Day" held on September 20, 2021, Defendant Doyle highlighted the "extraordinary" user growth Nextdoor Private had purportedly experienced since the onset of the COVID-19 pandemic and represented to investors that such growth had been "sustained . . . since that time."  Based on the company's claimed "outperformance" in the second quarter of 2021, Defendant Doyle announced that Nextdoor Private was raising its revenue guidance for fiscal 2021 and 2022 by $3 million, amounting to annual revenue growth of 47% and 40%, respectively.

46.    On October 26, 2021 – just seven days prior to the special meeting during which KV Acquisition Co. shareholders would vote to approve the Merger – Nextdoor Private issued a press release announcing select financial results for the third quarter of 2021.  Based purportedly

on the "momentum in Q3," Nextdoor Private represented that revenue growth continued to "**further accelerate**."

47.    After KV Acquisition Co. shareholders approved the Merger at a special meeting held on November 2, 2021, the Merger was completed on November 5, 2021.

48.    Unbeknownst to investors, however, the apparent surge in demand for Nextdoor's platform was ephemeral and a temporary result of the COVID-19 pandemic to the detriment of future periods.  Indeed, the market for the Company's platform was materially smaller than represented to investors and the Company's most important market (the United States) was already largely saturated by the start of the Class Period, impairing the Company's ability to monetize users, grow its U.S. WAUs, or increase ARPU.  As a result, Defendants' statements regarding Nextdoor's 2022 revenue trajectory lacked any reasonable basis in fact.

49.    Then, on March 1, 2022, Nextdoor reported its financial results for the fourth quarter and full year ending December 31, 2021 – the same quarter during which the Merger was completed.  Contrary to Defendants' prior claims that accelerating growth trends were being sustained, the Company reported that the revenue growth rate in the fourth quarter had declined sequentially by 18% to 48% year-over-year growth, down from the 66% growth rate in the most recent quarter reported to investors in advance of the November 2, 2021 special meeting.  In addition, Nextdoor reported quarterly ARPU of $1.65, revealing that the ARPU growth rate in the quarter had declined substantially by 26% to just 12% year-over-year growth from 38% growth in the third quarter, which indicated that the Company's ability to monetize its platform was faltering.  On this news, the price of Nextdoor common stock declined approximately 14%, from $6.24 on March 1, 2022 to $5.39 on March 4, 2022.

50.    Nextdoor would ultimately go on to report three consecutive quarters of disappointing financial and operational results, including two sequential quarters of WAU decline within the Company's critically important U.S. market, as well as drastically cutting revenue guidance for fiscal 2022 to $210.5 million at the midpoint, well below the up to $256 million represented to investors during the Class Period.  Although Defendants stated during the Class

Period that Nextdoor could sustain "hyper growth" for "multiple years," Nextdoor ultimately reported that ARPU had actually ***declined 9%*** for fiscal 2022. As a result, the price of Nextdoor Class A common stock declined precipitously from the trading high immediately following the close of the Merger of $18.59 per share to just $2.06 per share at the end of the Class Period, causing investors in Nextdoor to suffer millions of dollars in financial losses and economic damages under the federal securities laws.

## VI.    DEFENDANTS' CONDUCT DURING THE CLASS PERIOD

51.    The Class Period begins on July 6, 2021. On that date, Nextdoor and Nextdoor Private jointly issued a press release before market close announcing the Merger ("July 2021 Release"). The July 2021 Release formed part of the proxy materials. The July 2021 Release claimed the Merger transaction would "accelerate[] Nextdoor's growth plans" and that the value of the combined company would equal approximately $4.3 billion. The July 2021 Release quoted Defendant Friar who highlighted Nextdoor Private's purported "growth potential" and "strong network effects," stating in pertinent part as follows:

> "***Our business strengthens as we scale, benefitting from strong network effects, and we believe the proposed transaction with KVSB accelerates the growth potential of our platform***."

52.    That same day, Nextdoor filed with the SEC a current report on Form 8-K regarding the Merger. This Form 8-K formed part of the proxy materials. The current report attached as an exhibit an Investor Presentation, dated as of July 6, 2021 ("July 2021 Investor Presentation"). The July 2021 Investor Presentation highlighted Nextdoor Private's purportedly broad user base, stating that the company was in "~1 in 3 U.S. Households," had "60M+ Verified Neighbors," and "27M+ Weekly Active Neighbors," and that it had many vectors for "sustained revenue growth." The July 2021 Investor Presentation represented that Nextdoor Private's total addressable market included 312 million households, and that the company could grow its user base by "4.5x" in existing markets alone. The July 2021 Investor Presentation also represented that Nextdoor Private's growth was "sustainable," stating that the company had a "[s]trong foundation for continued revenue growth."

53.     In fact, Nextdoor's capacity for expansion faced severe limits that Defendants concealed in these materials to investors.  A former employee ("FE1") has stated that Nextdoor gained a spike in users during 2020 that declined by the start of 2021 and never returned.  FE1 worked at Nextdoor from December 2019 to December 2022 as Marketing Science Lead.  FE1 worked out of the company's headquarters office in San Francisco.  FE1 reported to Vice President—Global Head of Growth Marketing Miren Desai.  According to FE1, not only did growth in users slow following the COVID pandemic, but the users the Company gained "were much less engaged on the platform."

54.     This user base explosion related to COVID-19 pulled forward user growth that might have occurred naturally over years into this period, leaving the U.S. market saturated—by mid-2021, users that were going to sign up or be enticed to join Nextdoor already had done so.

55.     According to FE1, this saturation is demonstrated by the Company's marketing campaign results in 2021 and 2022 following the pandemic.  By that time, Nextdoor's "average campaign" targeting new users targeted around 450,000 people but converted only around 7% of those people into users.

56.     Another former employee ("FE2"), has confirmed this statistic.  FE2 worked for Nextdoor from May 2019 to April 2022 in Growth Engineering.  In that role, FE2 worked on creating new features for the app within the growth team. According to FE2, "during COVID, there was a huge spike in registrations; there was a huge spike in daily active users."  However, "after COVID we never saw another big event that grew out the platform—regardless of the new branding, the new functionality, investment, and acquisition expense on marketing and big events, we never saw a second wave, the only wave we got was COVID."  FE2 confirmed that the company's average campaign to acquire users targeted around 450,000 people but converted only around 7% of those targeted into users.

57.     The July 2021 Investor Presentation further highlighted Nextdoor Private's "significant monetization potential," claiming there was ample runway for growth at current ARPU and U.S. daily active users ("DAUs"), as depicted in the following presentation slide:

1



2

3

4

5

6

7

8

9

10

11

12    58.    In this chart, Defendants argued for Nextdoor's potential to grow its users and

13    average revenue per user by comparing those figures directly to those of Twitter and Snap.

14    Investors and analysts understood this chart to imply that Nextdoor was claiming that it could grow

15    in a way that was comparable to Twitter and Snap.  For example, analysts at Tech Crunch wrote

16    about this slide:  "The argument here is that the company has lots of room to grow on the

17    monetization front as it expands its user base.  Snap shows that the company can generate more

18    average revenue per user (ARPU) over time, and Twitter shows that a larger user base may help

19    with that hunt."

20    59.    In fact, Defendants knew fully well that differences in the nature of the content on

21    Nextdoor's platform structurally prevent Nextdoor from ever equaling or exceeding the

22    monetization levels of purported peer platforms like Twitter and Snap.  Unlike Twitter and Snap,

23    which attract users to scroll through unlimited feed of globally interesting posts, Nextdoor attracts

24    users for discrete, single-purpose visits, like finding a plumber.  Another former employee ("FE3")

25    has explained that Nextdoor is a site designed for specific tasks rather than aimless browsing.  FE3

26    worked for Nextdoor from December 2021 to September 2022 as a member of its Government and

27    Non-Profit Advertising Team.  FE3 has a sales and advertising role in which FE3 worked with

28

advertisers to "get them to come to the platform to purchase ads to serve their target audiences." FE3 worked remotely from Washington, D.C. According to FE3:

> Nextdoor is not a content site where people are really trying to spend time on it. It's kind of like a site where people come to find something they need, and then they're gone. You want to catch users' attention as best you can, as quickly as possible, because they're not going to stick around very long. That's a problem for growth.

60.    Similarly, another former employee ("FE4") has noted that Nextdoor is not a site where users go to linger. FE4 worked for Nextdoor from August 2013 to November 2023 as a Boundary Specialist, Cartography Operations Manager and Data Scientist. FE4's role mostly involved customer support via email and assisting Nextdoor members with issues they were having with their use of the platform. According to FE4, "People didn't really scroll through the Nextdoor feed." Another former employee ("FE5") agrees. FE5 worked for Nextdoor from October 2019 to October 2021 as a Client Partner—Home Services, Entertainment and Travel. She was hired to open new categories for the company's advertising operation, specifically in entertainment. FE5 stated that FE5 was "sure" that Nextdoor users spent significantly less time on the platform than users spent on the platforms Twitter and Snap, and stated that there was "no way" that the content of Nextdoor was robust enough to hold users attention for as long as Twitter's did.

61.    Indeed, in arguing for why Nextdoor "really perform[s] well across the whole gamut of different advertisers," Defendant Friar stated on an earnings call in March 2022: "People are coming looking for the plumber. They're looking for maybe someone to help them do their gutters in that moment. They're looking for a great [local] financial adviser."

62.    Accordingly, Nextdoor does not, and structurally cannot, hold users' attention on each visit like Twitter and Snap do. According to data from surveys conducted by third-party analytics firm Statista, average visitors to Twitter and Snap spend over 30 minutes per visit. In contrast, data compiled by third-party analytics company similarweb shows that visitors to Nextdoor spend about two minutes per visit. The longer a platform can hold a user's attention, the more ad impressions it can show them, and the higher average revenue per user the platform can generate. Accordingly, even if Nextdoor were to acquire the same or more users than Twitter or

Snap, Nextdoor could never realistically hope to generate comparable average revenue per user as those platforms, absent a fundamental change in the nature of the content of the platform (which Nextdoor has never proposed).

63.    Yet Nextdoor also misrepresented its user base and its ability to grow that user base. Nextdoor counts "daily active users" ("DAU") and "weekly active users" ("WAU") as "the count of unique neighbors who have started a session or opened a content email over the trailing" day or 7 days.  Yet Nextdoor never disclosed to shareholders that *half* of its DAUs and WAUs were of the latter sort—users who merely opened Nextdoor's marketing emails yet never actually visited Nextdoor's website or app.  Accordingly, half of its users were not "active users" of its online product in any meaningful sense.

64.    A former employee ("FE6") has confirmed that roughly half of Nextdoor's "active users" were not even accessing the website or app, and that this practice of counting as active users persons who merely open their email was highly unusual in the industry and so would not have been expected by investors.  FE6 worked for Nextdoor from March 2001 to October 2023 as a member of the Product Growth Team.  FE6 worked out of the company's San Francisco office and remotely.  FE6 reported to Head of Product, Neighbor Experience Michael Pao, who reported to Defendant Friar.  According to FE6, Nextdoor's definition of active users "includes both on-platform and off-platform" users, and so includes those who, for example, "open a Nextdoor digest email, even if did not use the Nextdoor application."  According to FE6, up to 50% of Nextdoor's Weekly Active Users were "off-platform" users that merely opened an email from Nextdoor.  FE6 believed this way of defining active user was highly unusual and stated, "I could not find another company doing that."  According to FE6, "a lot of folks" within Nextdoor "thought we should just count the app usage," a view that according to FE6 existed "for years" within the company. According to FE6, Nextdoor employees expressed such concerns about the definition of users at weekly companywide meetings attended by CEO Friar and the company's senior leadership team, including a question "why do we count this [activity as active users]?"  Moreover, according to FE6, Individual Defendants as well all C-level executives were well aware that about half of

"active users" were not actually visiting the app or the website—they received daily, weekly, and monthly "executive reports" that contained data include the percentage users that were on-platform versus off-platform.  FE6 noted that "anyone else [at Nextdoor] who wanted to sign up" could receive the executive reports.

65.    Another former employee ("FE7") has confirmed that roughly 50% of Nextdoor's purported "active users" were off-platform.  FE7 worked for Nextdoor from October 2019 to October 2021 as a Client Partner—Home Services, Entertainment and Travel.  FE7 worked out of the Los Angeles office.  According to FE7, around 50% of Nextdoor's "active users" were off-platform users who opened Nextdoor emails but did not actually use Nextdoor's website or app.

66.    In statements to investors throughout the remainder of the Class Period, Defendants continued to mislead investors about their ability to sustain hypergrowth, about the size and true nature of their active users, and about their ability to achieve monetization comparable to or greater than that of Twitter and Snap.

67.    On July 6, 2021, Nextdoor hosted a conference call with investors to discuss the Merger.  During her prepared remarks, Defendant Friar highlighted Nextdoor Private's purported market opportunity, describing it as "large and still untapped," and claimed that the company could grow in the "near term," adding "150 million households globally, just doing what we do today and continuing to expand."

68.    Defendant Doyle similarly highlighted Nextdoor's user base, claiming the company had achieved "tremendous growth" that was "sustained" with "deepening engagement" through 2021, stating in pertinent part as follows:

> ***We have a growing base of engaged and monetized users***. We have more than 60 million verified neighbors on the platform. To illustrate the composition of that member base, we have almost 15% of our members coming from markets outside the U.S. We're really excited at the level of organic growth that we're able to achieve. We had 68% of our members come to the platform organically in 2020. This is due to the strength of the brand, word-of-mouth and a great deal of earned media that we bring behind the purpose and the mission of Nextdoor.
>
> ***With this tremendous growth in verified members on the platform, we have the opportunity to really drive engagement***. And that's something that we saw demonstrated in 2020 and is ***sustained in 2021 as well, where we had deepening engagement across all cohorts of users***. We were able to increase the frequency of sessions of active users on the platform and also the depth of sessions, the amount

of content that users consume and also create, which set us up for driving monetization opportunities with our advertisers, creating a larger, unique audience that's more engaged, that's generating more supply that allows us to do creative things and achieve the campaign objectives of the advertisers and businesses on the platform.

69.    During the call, Defendant Friar also emphasized that Nextdoor Private had only "just . . . started" on its monetization efforts and claimed that the company should surpass the monetization levels of Twitter, stating in pertinent part as follows:

Nextdoor as a platform has just begun its monetization journey. In fact, when I joined about 2.5 years ago, we had just begun to tap into advertising. Today, if you look at our scale, we're about 1/3 the size of Twitter. And yet, if you look at our ARPU, we're at about 1/6 the ARPU. Of course, there is no structural reason why Nextdoor should undermonetize. In fact, if you think about either the video where you saw the wonderful California-based restaurant that was getting recommendations from us or if you think about what Vinod said about the value of a link on Nextdoor, I could perhaps (inaudible) *that Nextdoor should, in fact, overmonetize relative to those platforms*. So this tells me *we're just getting started*. And even with that top-of-the-funnel growth of new users, we should be able to drive healthy revenue growth as we scale our ARPU.

70.    Defendant Doyle similarly highlighted the purported size of Nextdoor Private's market opportunity, claiming that the company had a "huge runway" ahead of it and that it was "really early to monetization."  Defendant Doyle stated he had "great confidence" the Company could grow revenue in excess of 40% through 2022 and that such growth could be "sustained into the future," stating in pertinent part as follows:

The tailwind of product-driven growth and increased engagement and the monetization opportunities that I've described give us great confidence in our ability to achieve revenue growth rates year-on-year of more than 40%, here shown through 2022, driving us to almost $250 million of revenue. And we believe these are levels that can be sustained into the future.

**We're pleased to be seeing an acceleration in ARPU growth rates really driven by 3 different levers.  The first is on deepening engagement, so driving a greater number of sessions per active user, as well as deepening each session in the form of greater consumption of and creation of content.  The second is on ad delivery**, so this is really on the optimization of the supply we have on the platform, driving fill rates higher, having better targeting, driving performance and ultimately CPMs, higher yield on the platform**, as well as owning the relationships with the advertisers directly**.  And then the third lever is on sources of revenue that are not directly tied to the growth of impressions.

We talked a lot about the focus on revenue. **And for us, those drivers of ARPU that I just walked through give us great confidence in our ability to achieve greater than 40% year-on-year revenue growth in the next several years**. We also want to talk about the investment we're making in the business. We're very much in investment mode, knowing there's a huge opportunity in front of us. An investment for us is really in product and growing the team. We have around 550

employees in the business. The majority of those focused on product development and engineering. And that is where our focus will remain and really driving the product forward and bringing more benefit to the entire ecosystem. We talked a lot about the focus on revenue. ***And for us, those drivers of ARPU that I just walked through give us great confidence in our ability to achieve greater than 40% year-on-year revenue growth in the next several years***. We also want to talk about the investment we're making in the business. We're very much in investment mode, ***knowing there's a huge opportunity in front of us***. An investment for us is really in product and growing the team. We have around 550 employees in the business. The majority of those focused on product development and engineering. And that is where our focus will remain and really driving the product forward and bringing more benefit to the entire ecosystem.

71.    In addition to continuing to mislead investors about the Company's ability to sustain hypergrowth, about the size and true nature of its active users, and about its ability to achieve monetization comparable to or greater than that of Twitter and Snap, Defendant Doyle misled investors in the above statements about yet another aspect of Nextdoor—Nextdoor's ad management.  Doyle claimed that one of the three levers used by the Company to accelerate ARPU growth was "owning the relationships with the advertisers directly" with respect to "ad delivery." But in fact, Nextdoor does not, and has never, had a proprietary ad delivery system.  Instead, Nextdoor relies on third-party software Google Ad Manager to manage its delivery of ads to consumers on its platform.  In this way, Nextdoor is actually severely disadvantaged relative to social media platform peers that directly control their ad delivery system—with direct control, a Company has fuller access to data about what customers view and their interaction with that ad, including "conversions" based on that ad (e.g., visiting a site, putting an item in a cart, making a purchase).

72.    Another former employee ("FE8") has confirmed that Nextdoor's use of Google Ad Manager to manage its ad delivery system caused serious problems for the Company's value proposition for advertisers.  FE8 worked for Nextdoor from October 2020 to July 2024 as an Ad Operations Manager and Account Manager.  FE8 reported to Account Management Lead Diana Donn.  FE8's roles involved maintaining existing business relationships and working with advertisers such as Verizon, Altice, CDC and Visionworks.  According to FE8, Nextdoor tracked ad impressions through the Google Ad Manager server that the company used to manage its ad business and tracked how long users spend on the Nextdoor platform.  However, beyond this basic

information, Nextdoor was unable to provide advertisers with key information that Nextdoor would be able to provide were it to own its ad delivery system. For example, Nextdoor was unable based on Google Ad Manager data to show "simple stuff" like "geographically, where ads might be showing." While one of the selling points of Nextdoor was its purported ability to "target" users "by zip code," "it was very difficult to accurately report out when advertisers asked" how they were performing in specific zip code, due to the use of Google Ad Manager rather than a proprietary ad delivery system. According to FE8, given these problems, Nextdoor's ad platform was "not up to the standard" with which "the Company was trying to brand itself."

73. According to another former employee ("FE9"), Nextdoor's use of Google Ad Manager rather than a proprietary ad delivery system meant that the Company lacked data to show advertisers whether their ads were performing well. FE9 worked for Nextdoor from November 2013 to November 2022 as Engineering Lead, Head of Product—Neighborhood Vitality. FE9 worked on various projects including business pages and recommendations and web and mobile client infrastructure. FE9 had a hand in "writing or touching" about 50% of the platform's "customer-facing code." FE9 reported to Chief Technology Officer Antonio Silveira, who reported to Defendant Friar. According to FE9, Google Ad Manager was "geared toward web placements," while Nextdoor is primarily a mobile app. Nextdoor's use of Google Ad Manager meant the Company lacked sufficient data to show "attribution," to attribute actions following a user's viewing of an ad to that user. Attribution "gives credit [to ads] for conversions based on how people engage with your various ads." In FE9's view, the decision to use Google Ad Manager rather than a proprietary system "set us back years." Also, there was "a lot of duck taping to get that to work in mobile."

74. On July 6, 2021, Nextdoor filed with the SEC on Form 425 an article published by *The Financial Times*. The news article quoted Defendant Friar who emphasized Nextdoor Private's growth prospects, stating: "'We think we're a company that can maintain hyper growth over multiple years.'"

75.    Also on July 6, 2021, Nextdoor filed with the SEC on Form 425 a transcript of an interview Defendants Friar and Khosla gave to correspondents at *CNBC*'s "Squawk on the Street" program.  Defendant Friar stated that Nextdoor Private would be able to "monetize and will grow a phenomenal revenue stream" after the Merger.  Defendant Khosla stated that "the metrics and trends really run away . . . we loved the fact that there's so many different growth factors the company can take into the future."  Cohost David Faber asked whether growth had "sort of peaked in 2020/'21 in terms of the revenue number maybe in part because of the pandemic" and whether this was a "concern for you as you try to sell the deal to your SPAC shareholders?"  Defendant Khosla responded that "it isn't a concern for me[,] we see accelerating growth."  Defendant Friar added that Nextdoor Private was experiencing "phenomenal trends" and "accelerating ARPU," stating in pertinent part as follows:

> *[F]rom a business perspective, we're seeing terrific momentum*. We saw our DAU, daily active users, *grow 50% year-over-year last year*. [T]hat's always the starting point of any platform network business then you mentioned ARPU, *we're seeing phenomenal trends in q1 and q2 of 2021, we saw accelerating ARPU*. [I]t's really driven by, one, more engagement from the members on the platform; number two, our adtech platforms getting more sophisticated, and these proceeds will invest in data science and machine learning; and three, we're finding not supply driven ways to drive revenue, particularly around local commerce and businesses, and interesting ad formats that you can't get anywhere else.

76.    These statements made on July 6, 2021 formed part of the proxy statement later memorialized in the October 21, 2021 Proxy Statement.

77.    Also on July 9, 2021, Nextdoor filed with the SEC on Form 425 a transcript of an interview Defendant Friar gave to *Cheddar News*.  When asked whether Nextdoor Private could continue to grow its user base, Defendant Friar claimed the Company had "quite a runway" in the United States and assured investors that it was "not an if" whether Nextdoor Private could expand the platform globally but rather a "when," stating in pertinent part as follows:

> [Y]es so today we're in 11 countries. [W]hat we see in the u.s. is nextdoor is truly network business. [T]he more people that join the platform, the richer the content. more engaged members are and so growth bigats growth. ***[S]o we know first of all there's just still quite a runway in the u.s. as i say everyone is a neighbor i would like that to be all households***. [O]utside the u.s. we're beginning to build in many countries. [UK] where in one in 6 households. [W]e know to bring that up to use only one in 3. [C]anada is our youngest country and our fastest growing it's been incredible to see canadian neighbors using the platform to particularly right now as they they look for vaccines. [A]nd of course we want to take this global next door

should be a global platform. [W]e know we resonate around the world and *so it's really more of when not an if we take the whole platform to a global stage*.

78.    On September 20, 2021, Nextdoor Private hosted an "investor day" to discuss the company's business and financial prospects.  During the presentation, Defendant Friar highlighted Nextdoor Private's "growing" user base, claiming "[t]oday, we're ubiquitous in the United States and growing globally."  She continued:  "As of Q2, Nextdoor is in almost 1 in 3 U.S. households. Globally we have over 63 million verified neighbors on the platform that grew 17% year-over-year and over 29 million weekly active neighbors."  Defendant Friar highlighted the platform's purported "stickiness" and "strong network effects" as drivers of Nextdoor Private's purported "ongoing" growth, stating in pertinent part as follows:

> We've already created an incredible product market fit. When neighbors come to Nextdoor, 3 months in, 75% of them are still on the platform. 6 months in, that's 65%. And by 24 months in, that line begins to asymptote at well above 50%, and we're proud that our retention rate is estimated to be 20 points higher than leading peers. *We know that, when people come, they come with intent and they stay. That stickiness is a really big piece of our ongoing growth*. We also have strong network effects. In a young neighborhood with 5% to 10% of the households in that neighborhood on the platform, we see good engagement, but as we move up into our top quartile of neighborhood penetration, we start to see engagement levels that are over 2x what we see in the beginning. *This is because more content on the platform drives more engagement, which drives more people to join, which drives more content. That's our flywheel of growth*.

79.    Defendant Doyle similarly applauded Nextdoor Private's growth trends, claiming the company's "extraordinary" user growth following the COVID-19 pandemic had been "sustained . . . since that time," stating in pertinent part as follows:

> Between the second quarter of 2018 and the second quarter of 2021, *our most recently reported quarter, we grew weekly active users by 123%*. Our growth in WAU has been driven by our value proposition, a compelling combination of utility and community, and our product innovations and launches that have led to both increased engagement from our neighbors and top-of-the-funnel growth. Our extraordinary growth and engagement in the second quarter of 2020 was accelerated by the pandemic, when neighbors found real value in Nextdoor. *We are very pleased with our sustained growth in WAU since that time*, which now exceeds 29 million.

80.    During the call, Defendant Friar represented Nextdoor Private had entered into a "hyper growth and build phase" and that the company had "many vectors for sustained revenue growth."  Defendant Doyle similarly claimed that Nextdoor Private was in the early stages of monetization, representing that the company was "just getting started" in terms of its ARPU

growth and that Nextdoor Private "should exceed the monetization level" of Twitter and Snap. Defendant Doyle further claimed that Nextdoor Private's total addressable market was "large" and "under penetrated," stating in pertinent part as follows:

> Our total addressable market is both large and under penetrated. Everyone is a neighbor. We believe our near-term opportunity **is to grow to more than 200 million households and the long-term opportunity is to grow to over 300 million**. And this is just in our existing markets. We will continue to expand in new markets as well.

81.    Based upon Nextdoor Private's purported "outperformance" in the second quarter, Defendant Doyle stated that Nextdoor Private was raising its revenue guidance for fiscal 2021 and expressed "confidence" in delivering "sustained growth" even without proceeds from the Merger, suggesting that even greater growth could be achieved with the transaction's proceeds, stating in pertinent part as follows:

> Our outperformance in Q2 has allowed us to increase our full year revenue estimate by $3 million, taking us to $181 million and increasing our 2021 expected growth rate to 47% year-on-year. **The tailwind of product-driven growth, increasing engagement and new monetization opportunities gives us confidence in our ability to deliver sustained growth. We have also increased our revenue expectation in 2022 by $3 million to $252 million. Importantly, this plan does not assume the use of proceeds from this transaction, which we can deploy to further accelerate growth**.

82.    On October 21, 2021, Nextdoor filed with the SEC a proxy statement/prospectus on Form 424B3 for the Merger which was signed by Defendants Khosla, Kaul, and Buckland ("October 2021 Proxy").   The October 2021 Proxy highlighted Nextdoor Private's purported "[g]lobal flywheel of growth," stating that the company would "continue to drive growth and engagement."  The October 2021 Proxy represented that the COVID-19 pandemic had "amplified" engagement trends and changed consumer behavior "for good," leading to positive impacts that were "real and lasting" for Nextdoor Private's business, stating in pertinent part as follows:

> Our need to be connected to neighbors was amplified during the pandemic– and **that need is real and lasting**. For the three months ended June 30, 2021, neighbors who engaged with Nextdoor daily posted 2.1 times more often than in the same prior year period. As the world reopens, consumer behavior is changed for good, with an increased focus on local.

83.    The October 2021 Proxy also claimed that Nextdoor Private's total addressable market was "[l]arge and growing," stating that the company's total global market was "estimated

at $355 billion in 2020" and expected to grow "71% to $607 billion by 2024." The October 2021 Proxy further stated that although Nextdoor Private had "grown rapidly since [its] inception" the company was still in the "early stages of monetization" and that it possessed "many vectors for sustained revenue growth." The October 2021 Proxy represented that Nextdoor Private's revenue was projected to grow from $178 million in 2021 to $249 million in 2022 (representing 40% annual growth) and its ARPU was expected to grow from $5.93 in 2021 to $6.47 in 2022 (representing 9% annual growth).

84.    On October 26, 2021, Nextdoor Private issued a press release announcing select financial results for the third quarter ending September 30, 2021 – the quarter immediately before the Merger – which was filed with the SEC by Nextdoor ("September 2021 Release"). The September 2021 Release reported that the company's quarterly revenues increased 66% year-overyear to $52.7 million, its ARPU increased 38% year-over-year to $1.61, and its WAU increased 20% year-over-year to 33 million. The September 2021 Release claimed that these financial "highlights" demonstrated Nextdoor Private's "continued growth at scale." The September 2021 Release quoted Defendant Friar, who applauded Nextdoor's Q3 financial "'highlights,'" stating the results demonstrated "'growth at scale of our community of neighbors, businesses, and public services, and our ability to drive increased monetization.'"

85.    Also on October 26, 2021, Nextdoor Private hosted a conference call to discuss the company's opportunity, business model, financials, and production via a LinkedIn Live stream. During the call Defendant Friar touted Nextdoor Private's third quarter financial results and financial guidance, stating in pertinent part as follows:

> Our revenue grew 66% year-over-year. So that was – on par with what we saw in Q2. So **the business is really humming right now**. And we also raised our overall growth guidance. ***So we've been on a roll through 2021***. When we did our PIPE back in July, we said 44% year-over-year growth for the year in 2021. In September, we raised that again, the 47%. And, now, we're guiding to say we'll grow faster than we did in 2020 – 20 – 2020 which was 49% year-over-year.

86.    Defendant Doyle similarly claimed that the company's third quarter financial results demonstrated Nextdoor Private's "success" at driving growth at scale and monetization efforts, as well as the company's ability to "sustain a very high rate of growth." Defendant Doyle

similarly highlighted Nextdoor Private's purportedly improving engagement trends, stating he was "excited at the momentum that creates in the remainder of the year and into – into the next." Defendant Doyle also emphasized Nextdoor Private's revenue growth trajectory, stating that he was "excited" by the "rate of revenue growth."

87.    On November 10, 2021 (after the Merger was consummated), Nextdoor filed with the SEC on Form 8-K a letter to shareholders announcing the Company's financial results for the third quarter ending September 30, 2020 ("3Q21 Letter").  The 3Q21 Letter reported that during the ARPU had increased by 38% year-over-year to $1.61.  Based on these results, the 3Q21 Letter highlighted Nextdoor Private's "significant momentum," purported "growth at scale," and "ability to drive increased monetization."  The 3Q21 Letter emphasized that Nextdoor Private (now Nextdoor) was experiencing "[c]ontinued customer demand" and claimed the Company had an "effective" strategy "proven" at "delivering sustained growth."  The 3Q21 Letter further stated that Nextdoor's purported "strong network effects" were "increasing," driving sustained growth.

88.    Also on November 10, 2021, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the third quarter.  During the call, Defendant Friar continued to claim that Nextdoor's opportunity was "large", and that prior growth was "repeatable," stating in pertinent part as follows:

> ***Our total addressable market is large and global***. In the third quarter, international WAUs represented 18% of total, an increase from 15% in the prior year quarter. We're seeing retention and engagement in line with the United States, which highlights that the utility of our platform is globally relevant. For example, in our most recently launched market, Canada, we saw WAU growth of over 100% year-over-year in Q3, ***giving us confidence that our strategy is scalable and repeatable***.

89.    Defendant Doyle represented that Nextdoor had experienced "strong performance across all advertising verticals" and claimed that strength in the quarter reflected "growth in [the] community, both in total members and in engagement."  In response to a question regarding Nextdoor's engagement metrics, Defendant Friar stated Nextdoor was "quite proud" of its reported 20% WAU growth, noting that competing social media platforms experienced a "downtick" after lapping strong comparable periods due COVID-19 impacts, whereas Nextdoor, in contrast, experienced its "highest level of WAUs ever."

90.    Then, on March 1, 2022, Nextdoor issued a shareholder letter reporting its financial results for the fourth quarter and full year ending December 31, 2021 – the same quarter during which the Merger was completed (the "4Q21 Letter").  Contrary to Defendants' prior claims that accelerating growth trends were being sustained, the Company reported that the revenue growth rate in the fourth quarter had declined sequentially by 18% to 48% year-over-year growth, down from the 66% growth rate in the most recent quarter reported to investors in advance of the November 2, 2021 special meeting for the Merger.  In addition, Nextdoor reported quarterly ARPU of $1.65, revealing that the ARPU growth rate in the quarter had declined substantially by 26% to just 12% year-over-year growth from 38% growth in the third quarter, which indicated that the Company's ability to monetize its platform was faltering.

91.    On this news, the price of Nextdoor Class A common stock declined approximately 14%, from $6.24 per share on March 1, 2022 to $5.39 per share on March 4, 2022 on unusually heavy trading volume.

92.    The 4Q21 Letter represented that engagement on Nextdoor's platform had reached an "all-time high" in the fourth quarter and that the Company was undergoing "accelerating growth," stating in pertinent part as follows:

> In Q4, 52% of neighbors globally were active weekly, reflecting an increase of 5 percentage points year-over-year and an all-time high. . . .
>
> **We finished 2021 with significant momentum**. In Q4, WAU grew 32% year-over-year and 9% quarter-over-quarter, **continuing the trajectory of accelerating growth** and reflecting the early effects of our product focus on creating an Active Valued Community. In fact, through the second half of 2021, we added more WAU than in any other equivalent period in Nextdoor's history.
>
> **We accelerated full year revenue growth from 49% in 2020 to 56% in 2021**. Healthy demand across customer sizes, verticals, and campaign objectives drove our 48% year-over-year revenue growth in Q4. ARPU grew 12% year-over-year in Q4 to $1.65, contributing to strong full year 2021 ARPU growth of 33%. ARPU growth reflected a combination of higher neighbor engagement and higher eCPMs5. **Sustained revenue growth at scale, coupled with a 6 point improvement in Q4 adjusted EBITDA margin and an 18 point improvement in 2021 adjusted EBITDA margin, demonstrates our path to long-term profitability, even as we remain in investment mode**.

(Footnote omitted.)

93.     The 4Q21 Letter also raised the Company's 2022 revenue guidance, stating: "Revenue is expected to be between $254M-$256M.  This is an increase from our prior full year 2022 guidance of $252M."

94.     Also on March 1, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the fourth quarter and full year. During the call, Defendant Friar highlighted Nextdoor's "best-in-class" organic user base growth, stating that "when we look at 2022, what you see is shifting a little bit more of our paid marketing spend into international because we feel really good about what the product pipeline is doing to build growth and engagement in the U.S."

95.     On March 15, 2022, Nextdoor filed with the SEC its annual report on Form 10-K for the fiscal year ending December 31, 2021, which was signed by Defendants Friar and Doyle who also certified that the document was accurate and free from fraud (the "2021 Form 10-K"). The 2021 Form 10-K repeated the key financial metrics contained in the 4Q21 Letter detailed above.

96.     Then, on May 10, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the first quarter ended March 31, 2022 ("1Q22 Form 10-Q").  The 1Q22 Form 10-Q revealed a startling deterioration in Nextdoor's WAUs during the quarter, reporting that the Company's global WAUs growth had increased just 1% sequentially (from 32% year-over-year growth in the fourth quarter of 2021 to 33% year-over-year growth in the first quarter of 2022) and that U.S. WAUs had actually *suffered a sequential decline* of approximately one hundred thousand users.  In a subsequently published report, analysts at Morgan Stanley emphasized this startling decline, stating Nextdoor had "A User Problem" and noting that WAU trends were "weighing on the multiple the market [was] willing to pay."

97.     On this news, the price of Nextdoor Class A common stock fell from $3.19 per share on May 10, 2022 to $2.93 per share on May 11, 2022, or approximately 8%, on unusually heavy trading volume.

98.     Also on May 10, 2022, Nextdoor filed with the SEC a letter to shareholders discussing the Company's financial results for the first quarter ("1Q22 Letter"). The 1Q22 Letter reported that quarterly revenue grew 48% year-over-year to $51 million, WAUs grew 33% year-over-year to 36.7 million, and ARPU grew 12% year-over-year to $1.39. The 1Q22 Letter assured investors that Nextdoor's users were "increasingly engaged" and that the Company was experiencing "increased advertiser demand." The 1Q22 Letter broadened the Company's 2022 revenue guidance to a range of $252 million to $256 million.

99.     In addition, the 1Q22 Form 10-Q repeated the key financial metrics contained in the 1Q22 Letter detailed above. The Form 10-Q also stated that Nextdoor had achieved 29.4 million U.S. WAUs during the quarter. Defendants Friar and Doyle signed the 1Q22 Form 10-Q and also certified that the document was accurate and free from fraud.

100.     Also on May 10, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter. During the call, Defendant Friar represented that the Company's users remained "highly engaged" and that its product strategy was "working," stating in pertinent part as follows:

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through building an active valued community. ***It's working***. In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

> Everyone is a neighbor. ***Our continued strength in international growth underscores that this is a global opportunity***, solidifying our confidence in the opportunity ahead. In Q1, international WAU grew 55% year-over-year, accelerating quarter-over-quarter from 47% in Q4 and year-over-year from 39% in Q1 of 2021. In international, engagement metrics surpassed even the U.S. with 55% of neighbors active weekly. In 2022, we will remain focused on driving growth and engagement in our existing international markets.

101.     Defendant Doyle similarly represented that Nextdoor was seeing "healthy demand" from its advertisers and "deeper engagement" from its users.

102.     Then, on August 9, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the second quarter ended June 30, 2022 ("2Q22 Form 10-Q"). The 2Q22 Form 10-Q revealed that Nextdoor's platform continued to

materially decline, reporting that revenue growth slowed to just 19% year-over-year during the quarter and that Nextdoor's U.S. WAUs had declined for the second quarter in a row to 29.2 million. The 2Q22 Form 10-Q further reported that the Company's ARPU growth had turned negative in the quarter, contracting by 6% year-over-year. During the corresponding conference call, Defendant Doyle revealed the Company was slashing its revenue guidance for fiscal 2022 by more than $31 million at the midpoint, or approximately 12%, to a range of $220 million to $225 million.

103.    On this news, the price of Nextdoor Class A common stock fell from $3.60 per share on August 9, 2022 to $2.70 per share on August 10, 2022, or approximately 25%, on unusually heavy trading volume.

104.    Also on August 9, 2022, Nextdoor filed with the SEC on Form 8-K a letter to shareholders discussing the Company's financial results for the second quarter ended June 30, 2022 ("2Q22 Letter"). The 2Q22 Letter reported that Nextdoor's global WAUs grew 26%, which purportedly "reflect[ed] ongoing momentum internationally." The 2Q22 Letter attributed Nextdoor's financial and operational headwinds to "complex macroeconomic conditions" and indicated that users were turning to Nextdoor's platform as they previously had in 2020 and 2021, stating in pertinent part as follows:

> We have said this before, and it bears repeating: the power of local is unparalleled. We saw this in 2020 as neighbors helped keep each other safe during the start of the COVID-19 pandemic. We saw this in 2021 as neighbors gathered with their communities and supported their local businesses when the world started to reopen.
>
> ***We see this again now***. Neighbors are using the platform to find jobs and side hustles. They are using our classifieds surface, For Sale & Free, with an increasing frequency, to find cheaper alternatives to buying new and helping others in need – in fact, in Q2 2022, over 25% of all items in For Sale & Free were marked as free. They are finding ways to help those less fortunate by raising money and other donations. This neighbor behavior continues to affirm our value proposition and bolsters the foundation upon which we will continue to build, globally, the neighborhood network.

(Footnote omitted.)

105.    In addition, the 2Q22 Form 10-Q repeated the key financial metrics contained in the 2Q22 Letter detailed above. The Form 10-Q also stated that Nextdoor had achieved 29.2

million U.S. WAUs during the quarter.  Defendants Friar and Doyle signed the 2Q22 Form 10-Q and also certified that the document was accurate and free from fraud.

106.    Also on August 9, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the second quarter.  During the call, Defendant Friar assured investors that Nextdoor was observing "durable" engagement trends among the Company's most active users and that those trends "show[ed]" that the Company's efforts to address user engagement were "working," stating in pertinent part as follows:

> Weekly active users, or WAU, grew 26% year-over-year to approximately 37 million.  ***We're seeing durable engagement trends amongst our most active users***.  In Q2, over 50% of weekly active users were active daily.  Across all regions, growth in total sessions accelerated 10 points quarter-over-quarter.  ***These trends show that our focus on engagement through the introduction of new machine learning models for increased personalization, more engaging notification, a simplified user experience and welcoming platform initiatives is working***.  With the progress we've made on engagement, we are now shifting more of our product focus to new neighbor growth.  Today, we have over 75 million Verified Neighbors on the platform, and ***we're just scratching the surface of our global total addressable market***.

107.    Then, on November 8, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the third quarter ended September 30, 2022 ("3Q22 Form 10-Q").  The 3Q22 Form 10-Q revealed that Nextdoor's business continued to deteriorate, as it had in every quarter since the Merger.  Specifically, the 3Q22 Form 10-Q reported that Nextdoor's revenues during the quarter declined sequentially by $1 million to $54 million, representing just 2% year-over-year growth, and that the Company's quarterly ARPU growth was increasingly negative, contracting by 12% compared to the prior year quarter. During the corresponding conference call, Defendant Doyle reported that Nextdoor was reducing revenue guidance again by an additional $12 million, warning investors that Nextdoor now expected fiscal 2022 revenues of just $210.5 million at the midpoint – far below the up to $256 million figure provided to investors during the Class Period.

108.    On this news, the price of Nextdoor Class A common stock fell from $2.32 per share on November 8, 2022 to $2.06 per share on November 9, 2022, or approximately 11%, on unusually heavy trading volume.

109.    In total, the price of Nextdoor Class A common stock fell nearly 90% from the $18.59 per share price high immediately after the Merger, causing Lead Plaintiff and the Class (defined below) to suffer millions of dollars in losses and economic damages under the federal securities laws.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

### A.    July 6, 2021

110.    The Class Period begins on July 6, 2021, when Nextdoor filed the July 2021 Investor Presentation.  The July 2021 Investor Presentation represented that Nextdoor Private's growth was "sustainable," stating that the company had a "[s]trong foundation for continued revenue growth."   The July 2021 Investor Presentation stated that Nextdoor Private had "significant monetization potential" based on a comparison of its ARPU and U.S. daily active users ("DAUs") with those of Twitter (k/n/a/ X) and Snap.



111.    The statements above were materially false and misleading because:  (1) Nextdoor, due to the nature of the content of the platform, does not hold users' attention on each visit like Twitter and Snap do, and so cannot reasonably expect to obtain average revenue per use comparable to Twitter and Snap; (2) Nextdoor already had saturated the U.S. market and pulled forward demand for Nextdoor's platform during the COVID-19 pandemic, so Nextdoor could not reasonably expect to grow its U.S daily average users to a level comparable to Twitter and Snap; (3) the majority of Nextdoor's "users" did not actually visit Nextdoor's website or app each week, but rather merely clicked on marketing emails from Nextdoor, so the majority of Nextdoor's 60 million users were not meaningfully "engaged" with the platform in the way that Twitter and Snap users were engaged.

112.    Also on July 6, 2021, Nextdoor hosted a conference call with investors.  During this conference call, Defendant Doyle also stated as follows regarding Nextdoor's user base:

> **We have a growing base of engaged and monetized users. We have more than 60 million verified neighbors on the platform.**
>
> With this tremendous growth in verified members on the platform, we have the opportunity to really drive engagement. And that's something that we saw demonstrated in 2020 and is **sustained in 2021 as well, where we had deepening engagement across all cohorts of users**. We were able to increase the frequency of sessions of active users on the platform and also the depth of sessions, the amount of content that users consume and also create, which set us up for driving monetization opportunities with our advertisers, creating a larger, unique audience that's more engaged, that's generating more supply that allows us to do creative things and achieve the campaign objectives of the advertisers and businesses on the platform.

113.    The statements above were materially false and misleading because:  (1) Nextdoor already had saturated the U.S. market and pulled forward demand for Nextdoor's platform during the COVID-19 pandemic, so it was not "sustain[ing] its growth in users on the platform in 2021; (2) the majority of Nextdoor's "users" did not actually visit Nextdoor's website or app each week, but rather merely clicked on marketing emails from Nextdoor, so the majority of Nextdoor's 60 million users were not meaningfully "engaged" with the platform.

114.    During the July 6, 2021 conference call, Defendant Friar also stated:

> Nextdoor as a platform has just begun its monetization journey. In fact, when I joined about 2.5 years ago, we had just begun to tap into advertising. Today, **if you look at our scale, we're about 1/3 the size of Twitter. And yet, if you look at our**

*ARPU, we're at about 1/6 the ARPU. Of course, there is no structural reason why Nextdoor should undermonetize.* In fact, if you think about either the video where you saw the wonderful California-based restaurant that was getting recommendations from us or if you think about what Vinod said about the value of a link on Nextdoor, I could perhaps posit that *Nextdoor should, in fact, overmonetize relative to those platforms.* So this tells me *we're just getting started.* And even with that top-of-the-funnel growth of new users, we should be able to drive healthy revenue growth as we scale our ARPU.

115.    The statements above were materially false and misleading because: (1) Nextdoor, due to the nature of the content of the platform, does not hold users' attention on each visit like Twitter and Snap do, and so cannot reasonably expect to obtain average revenue per use comparable to Twitter and Snap—this is a structural reason why Nextdoor should undermonetize (and not overmonetize) relative to Twitter and Snap; (2) Nextdoor already had saturated the U.S. market and pulled forward demand for Nextdoor's platform during the COVID-19 pandemic, so Nextdoor could not reasonably expect to grow its U.S daily average users to a level comparable to Twitter and Snap; (3) the majority of Nextdoor's "users" did not actually visit Nextdoor's website or app each week, but rather merely clicked on marketing emails from Nextdoor, so comparisons of its "users" to those of Twitter and Snap are misleading.

116.    During the same conference call, Defendant Doyle stated:

The tailwind of product-driven growth and increased engagement and the monetization opportunities that I've described give us great confidence in our ability to achieve revenue growth rates year-on-year of more than 40%, here shown through 2022, driving us to almost $250 million of revenue. And we believe these are levels that can be sustained into the future.

**We're pleased to be seeing an acceleration in ARPU growth rates really driven by 3 different levers. The first is on deepening engagement, so driving a greater number of sessions per active user, as well as deepening each session in the form of greater consumption of and creation of content. The second is on ad delivery,** so this is really on the optimization of the supply we have on **the platform,** driving fill rates higher, having better targeting, driving performance and ultimately CPMs, higher yield on the platform**, as well as owning the relationships with the advertisers directly.** And then the third lever is on sources of revenue that are not directly tied to the growth of impressions.

We talked a lot about the focus on revenue. **And for us, those drivers of ARPU that I just walked through give us great confidence in our ability to achieve greater than 40% year-on-year revenue growth in the next several years.** We also want to talk about the investment we're making in the business. We're very much in investment mode, knowing there's a huge opportunity in front of us. An investment for us is really in product and growing the team. We have around 550 employees in the business. The majority of those focused on product development and engineering. And that is where our focus will remain and really driving the product forward and bringing more benefit to the entire ecosystem.

117.    The statements above were materially false and misleading because:  (1) Nextdoor, due to the nature of the content of the platform, attracts users for discrete, single-purpose visits, and so cannot reasonably expect to "deepen[] engagement" materially over time without changing the nature of the platform, or to have "great confidence" in obtaining average revenue per user growth of 40% per year for "several years"; (2) Nextdoor already had saturated the U.S. market and pulled forward demand for Nextdoor's platform during the COVID-19 pandemic, so the company could not reasonably have "great confidence" that ARPU growth of 40% per year was sustainable; (3) the majority of Nextdoor's "users" did not actually visit Nextdoor's website or app each week, but rather merely clicked on marketing emails from Nextdoor; (4) Nextdoor did not "own[] the relationships with the advertisers directly"—Nextdoor used third-party Google Ad Manager—so Nextdoor's purported "acceleration in ARPU growth" could not have been "driven" by that "lever."

118.    Also on July 6, 2021, Nextdoor filed with the SEC on Form 425 a transcript of an interview Defendants Friar and Khosla gave to correspondents at *CNBC*'s "Squawk on the Street" program.  Cohost David Faber asked whether growth had "sort of peaked in 2020/'21 in terms of the revenue number maybe in part because of the pandemic" and whether this was a "concern for you as you try to sell the deal to your SPAC shareholders?"  Defendant Khosla responded that "it isn't a concern for me[,] we see accelerating growth."

119.    The statements above were materially false and misleading because Nextdoor already had saturated the U.S. market and pulled forward demand for Nextdoor's platform during the COVID-19 pandemic, so the company's growth was not sustainable and was in fact a serious concern due to the consequences of the pandemic.

**B.    July 9, 2021**

120.    Also on July 9, 2021, Nextdoor filed with the SEC on Form 425 a transcript of an interview Defendant Friar gave to *Cheddar News*.  Defendant Friar stated:

> [W]hat we see in the U.S. is nextdoor is truly network business. [T]he more people that join the platform, the richer the content. more engaged members are and so growth begats growth. ***[S]o we know first of all there's just still quite a runway in the U.S. as I say everyone is a neighbor I would like that to be all households***.

121.    The statements above were materially false and misleading because Nextdoor already had saturated the U.S. market and pulled forward demand for Nextdoor's platform during the COVID-19 pandemic, so the company's growth was not sustainable and there was not "quite a runway in the U.S. for obtaining more users."

**C.    September 20, 2021**

122.    On September 20, 2021, Nextdoor Private hosted an "investor day" to discuss the company's business and financial prospects.  Defendant Friar stated:

> Between the second quarter of 2018 and the second quarter of 2021, ***our most recently reported quarter, we grew weekly active users by 123%***. Our growth in WAU has been driven by our value proposition, a compelling combination of utility and community, and our product innovations and launches that have led to both increased engagement from our neighbors and top-of-the-funnel growth. Our extraordinary growth and engagement in the second quarter of 2020 was accelerated by the pandemic, when neighbors found real value in Nextdoor. ***We are very pleased with our sustained growth in WAU since that time***, which now exceeds 29 million.

123.    The statements above were materially false and misleading because:  (1) the majority of Nextdoor's weekly "users" did not actually visit Nextdoor's website or app each week, but rather merely clicked on marketing emails from Nextdoor, so Nextdoor's growth in WAUs was materially misleading and omitted material information necessary to make the statement not misleading; (2) Nextdoor's purported growth in WAUs was primarily growth in users clicking emails rather than in users visiting Nextdoor's site and app, so Nextdoor's growth in WAUs following the pandemic did not "sustain" the pandemic trend of users' genuinely engaging with Nextdoor's websites and apps for "real value."

124.    During the call, Defendant Friar also stated that "one could even make the case that we should exceed the monetization level of our peers."

125.    The statement above was materially false and misleading because Nextdoor, due to the nature of the content of the platform, attracts users for discrete, single-purpose visits—it does not hold users' attention on each visit like Twitter and Snap do—so Nextdoor cannot reasonably be expected to "exceed the monetization level of [its] peers" such as Twitter and Snap.

126.    During the call, Defendant Doyle further stated in pertinent part as follows:

Our total addressable market is both large and under penetrated. Everyone is a neighbor. We believe our near-term opportunity *is to grow to more than 200 million households and the long-term opportunity is to grow to over 300 million*. And this is just in our existing markets. We will continue to expand in new markets as well.

127.    The statements above were materially false and misleading because Nextdoor already had saturated the U.S. market and pulled forward demand for Nextdoor's platform during the COVID-19 pandemic, so the company's "near term opportunity" was not "to grow to more than 200 million households," an increase of 150 million households in the near term.

**D.    October 21, 2021**

128.    On October 21, 2021, Nextdoor filed the October 2021 Proxy. The October 2021 Proxy stated:

Our need to be connected to neighbors was amplified during the pandemic—and that need is real and lasting. For the three months ended June 30, 2021, neighbors who engaged with Nextdoor daily posted 2.1 times more often than in the same prior year period. As the world reopens, consumer behavior is changed for good, with an increased focus on local.

129.    The statements above were materially false and misleading because "neighbors who engaged with Nextdoor daily" constituted a tiny, unusual section of Nextdoor's user base— the majority of Nextdoor's weekly "users" did not actually visit Nextdoor's website or app each week, but rather merely clicked on marketing emails from Nextdoor, and the average user that actually visits Nextdoor's site spend only a couple of minutes on it, so the overwhelming majority of Nextdoor users did not change their behavior "for good" following the pandemic.

130.    The October 2021 Proxy also stated that Nextdoor had a "[l]arge and growing total addressable market." The October 2021 Proxy further stated that the company was "still in the early stages of monetization on our platform and believe there are many vectors for sustained revenue growth."

131.    The statements above were materially false and misleading because: (1) Nextdoor already had saturated the U.S. market and pulled forward demand for Nextdoor's platform during the COVID-19 pandemic, so the company did not have a "growing total addressable market"; (2) Nextdoor, due to the nature of the content of the platform, does not hold users' attention on each visit like Twitter and Snap do, and so cannot reasonably expect to obtain average revenue per use

comparable to Twitter and Snap, so Nextdoor was not "in the early stages of monetization on our platform"—the Company's ability to grow ARPU was already structurally constrained by the nature of content on the platform and had limited future growth potential.

**E.    May 10, 2022**

132.    On May 10, 2022, Nextdoor held a conference call with analysts and investors. During the call, Defendant Friar stated in pertinent part as follows:

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through **building an active valued community. It's working**. **In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily**, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

133.    The statements above were materially false and misleading because the majority of Nextdoor's weekly and daily "users" did not actually visit Nextdoor's website or app each week, but rather merely clicked on marketing emails from Nextdoor, so Nextdoor's growth in DAU and WAU was materially misleading and omitted material information necessary to make the statement not misleading—Nextdoor's "community" was not nearly as "active" as Nextdoor's statements suggested.

**F.    August 9, 2022**

134.    On August 9, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the second quarter.  During the call, Defendant Friar assured investors that Nextdoor was observing "durable" engagement trends among the Company's most active users and that those trends "show[ed]" that the Company's efforts to address user engagement were "working," stating in pertinent part as follows:

> Weekly active users, or WAU, grew 26% year-over-year to approximately 37 million. ***We're seeing durable engagement trends amongst our most active users***. In Q2, over 50% of weekly active users were active daily. Across all regions, growth in total sessions accelerated 10 points quarter-over-quarter. ***These trends show that our focus on engagement through the introduction of new machine learning models for increased personalization, more engaging notification, a simplified user experience and welcoming platform initiatives is working***.

135.    The statements above were materially false and misleading because the majority of Nextdoor's weekly and daily "users" did not actually visit Nextdoor's website or app each week,

but rather merely clicked on marketing emails from Nextdoor, so Nextdoor's growth in DAU and WAU was materially misleading and omitted material information necessary to make the statement not misleading—Nextdoor's users were not nearly as "active" as Nextdoor's statements suggested.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

136.   As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Nextdoor and Nextdoor Private, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Nextdoor and Nextdoor Private, and their control over and/or receipt and/or modification of Nextdoor and Nextdoor Private's materially false and misleading statements, were active participants in the fraud alleged herein.

137.   Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraud described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

138.   The Individual Defendants, because of their positions with Nextdoor and/or Nextdoor Private, controlled the contents of Nextdoor and Nextdoor Private's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were

being concealed from the public and that the positive representations that were being made were false and misleading.

139.    According to FE1, Individual Defendants, and all major executives had direct and continuous access to all major company metrics, including Daily Active Users, Weekly Active Users, and Average Revenue Per Users, via a "very publicly available dashboard" hosted on the platform called Looker.

140.    According to FE6, Nextdoor held weekly companywide meetings that Individual Defendants and senior management regularly attended.  Nextdoor employees expressed concerns about Company's unusual and misleading method of defining active users (as including users who simply open Nextdoor emails) at weekly companywide meetings attended by CEO Friar and the company's senior leadership team, including a question "why do we count this [activity as active users]?"  "A lot of folks" expressed their concerns at company-wide meetings including Individual Defendants that Nextdoor "should just count the app usage" in determining active users.

141.    Moreover, according to FE6, Individual Defendants as well as all C-level executives received daily, weekly, and monthly "executive reports" with data on DAUs, WAUs, Monthly Active Users, revenue, advertising, and importantly, the percentage users that were on-platform versus off-platform.  FE6 knew that Individual Defendants received these reports and their contents because they were routinely sent to a distribution on which FE6 was included that included all executives, including the Individual Defendants.  As the Company's revenue was directly tied to ad impressions, these figures about "revenue" and "advertising" would have included data about ad impressions per visit, and so would have provided these executives with information about the short duration of user visits on the Nextdoor website and app.

142.    FE8 has confirmed that Nextdoor tracked ad impressions, as well as the amount of time users spent on Nextdoor's website and app.  According to FE8, Nextdoor tracked ad impressions through the Google Ad Manager server that the company used to manage its ad business.  According to FE8, this practice of monitoring ad impressions was standard in the

industry, and metrics concerning ad impressions were "definitely being watched by the C-suite." FE8 also confirmed that Nextdoor tracked how long users spend on the Nextdoor platform.

143.   An additional former employee ("FE10") has made clear that Nextdoor senior management, including the Individual Defendants, fixated on being able to claim that the Company was achieving 40% year-over-year revenue growth.  FE10 worked at Nextdoor from May 2020 to April 2022 as a Manager, Data Science and Machine Learning.  FE10's role concerned working with ads and monetization, and FE10 was involved in ad ranking and the development of different advertising products.  FE10 was aware of work with revenue and site traffic forecasts.  According to FE10, in the world of tech startup companies, a company needs to achieve 40% year-over-year revenue growth to be considered a "high-growth" company and targeted for large investments. According to FE10, many of Nextdoor's financial and user projections "were probably reverse engineered" from this objective of obtaining 40% year-over-year revenue growth.  "They tried to engineer everything to be pointed at their revenue objective."   In order to do this, senior management would have been well aware of how changes to definitions in users, or comparison to ARPU of other companies, would impact the Company's ability plausibly to claim that it could achieve 40% year-over-year revenue growth.  For example, the Company calculated that to be able to claim 40% year-over-year revenue growth "would mean this much more traffic monetized at this rate, or current traffic monetized at a much higher rate."  Given the importance of the threshold for investment and public company valuations, 40% year-over-year revenue growth "was a high priority for everyone on the revenue side."  According to FE10, the Company's ambitious numbers were designed by leadership, including Individual Defendants and was "part of Nextdoor's core strategy."

144.   Another former employee ("FE11") has confirmed senior management's fixation on being able to claim 40% year-over-year revenue growth.  FE11 worked at Nextdoor from April 2022 to October 2022 as the People Operations Manager and HR Program Manager.  FE11 managed the Company's compliance program, employee immigration program, and helped build out teams at the Company.  FE11 regularly attended companywide meetings, and confirmed that

senior management, including Individual Defendants, always mentioned the importance of being able to reach 40% year-over-year revenue growth.

145.    Nextdoor's platform user base, growth rate, and the size of the Company's total addressable market were among the most important issues facing the Company and the focus of Nextdoor's management, including the Individual Defendants, before, during and after the Merger. The Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding Nextdoor's user base, related engagement levels, potential for growth in both U.S. and international markets, and advertising demand.

146.    In addition, the Individual Defendants also had the motive and opportunity to defraud investors. For example, the Sponsor Defendants, through KV SPAC Sponsor, received 10 million founder shares for nominal consideration that would be rendered worthless if the Merger was not completed. These founder shares were valued at over $103 million at the time of the Merger. Similarly, as equity holders of Nextdoor Private, Defendants Friar and Doyle also stood to profit financially from the Merger. According to the Proxy, Defendant Friar was estimated to receive over 15.7 million Nextdoor Class B shares following the Merger and Defendant Doyle was estimated to receive over 1.7 million Nextdoor Class B shares following the Merger. In March 2021, Defendant Friar was granted stock options to purchase an aggregate of approximately 1.7 million shares of Nextdoor common stock, roughly 740 thousand of which were set to vest immediately upon closing of the Merger. During the same month, Defendant Doyle was likewise granted stock options to purchase an aggregate of over 180 thousand shares with vesting dates set in 2022 and 2023. Thus, through the Merger, Defendants Friar and Doyle were set to receive significant financial benefits immediately upon the closing of the Merger and/or obtain critically needed liquidity for shares underlying their respective stock and stock option grants in Nextdoor Private. Moreover, these Defendants received lucrative and high-profile senior management jobs at a publicly traded company in connection with the Merger. As such, all of the Individual Defendants were heavily incentivized to successfully carry out the Merger and to orchestrate the fraud alleged herein.

147.    Defendants' scienter is further underscored by the mandated certifications under the Sarbanes-Oxley Act of 2002 by certain of the Individual Defendants filed during the Class Period as detailed herein, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Nextdoor was made known to them and that the Company's disclosure-related controls were operating effectively.

## IX.    NO SAFE HARBOR

148.    The "Safe Harbor" warnings accompanying Nextdoor's reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

149.    Defendants are also liable for any false or misleading FLS pled herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and/or approved by an executive officer of Nextdoor who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## X.    LOSS CAUSATION

150.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

151.    During the Class Period, Lead Plaintiff and the Class purchased Nextdoor Class A common stock at artificially inflated process and were damaged thereby.  As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially

inflated the prices of Nextdoor Class A common stock and operated as a fraud or deceit on purchasers of Nextdoor Class A common stock. As detailed in this Complaint, when the truth about Nextdoor's misconduct was revealed, the value of Nextdoor Class A common stock declined precipitously as the prior artificial inflation no longer propped up the stock price. The decline in the price of Nextdoor Class A common stock was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price decline negate any inference that the losses suffered by Lead Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Nextdoor publicly traded Class A common stock and the subsequent significant decline in the value of Nextdoor Class A common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

152. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Nextdoor's business, operations, and financial results as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Nextdoor Class A common stock to be artificially inflated. Lead Plaintiff and other Class members purchased Nextdoor Class A common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

153. Through a series of partial corrective disclosures, and materializations of concealed risks, over four dates, investors and the market learned that the Defendants had artificially inflated the prices of Nextdoor Class A common stock.

**A.    March 1, 2022**

154.    The truth began to emerge on March 1, 2022, when Nextdoor issued a shareholder letter reporting its financial results for the fourth quarter and full year ending December 31, 2021 – the same quarter during which the Merger was completed (the "4Q21 Letter").  Contrary to Defendants' prior claims that accelerating growth trends were being sustained, the Company reported that the revenue growth rate in the fourth quarter had declined sequentially by 18% to 48% year-over-year growth, down from the 66% growth rate in the most recent quarter reported to investors in advance of the November 2, 2021 special meeting for the Merger.  In addition, Nextdoor reported quarterly ARPU of $1.65, revealing that the ARPU growth rate in the quarter had declined substantially by 26% to just 12% year-over-year growth from 38% growth in the third quarter, which indicated that the Company's ability to monetize its platform was faltering.

155.    On this news, the price of Nextdoor Class A common stock declined approximately 14%, from $6.24 per share on March 1, 2022 to $5.39 per share on March 4, 2022 on unusually heavy trading volume.

**B.    May 10, 2022**

156.    On May 10, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the first quarter ended March 31, 2022 ("1Q22 Form 10-Q").  The 1Q22 Form 10-Q revealed a startling deterioration in Nextdoor's WAUs during the quarter, reporting that the Company's global WAUs growth had increased just 1% sequentially (from 32% year-over-year growth in the fourth quarter of 2021 to 33% year-over-year growth in the first quarter of 2022) and that U.S. WAUs had actually *suffered a sequential decline* of approximately one hundred thousand users.  In a subsequently published report, analysts at Morgan Stanley emphasized this startling decline, stating Nextdoor had "A User Problem" and noting that WAU trends were "weighing on the multiple the market [was] willing to pay."

157.    On this news, the price of Nextdoor Class A common stock fell from $3.19 per share on May 10, 2022 to $2.93 per share on May 11, 2022, or approximately 8%, on unusually heavy trading volume.

### C.    August 9, 2022

158.    On August 9, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the second quarter ended June 30, 2022 ("2Q22 Form 10-Q"). The 2Q22 Form 10-Q revealed that Nextdoor's platform continued to materially decline, reporting that revenue growth slowed to just 19% year-over-year during the quarter and that Nextdoor's U.S. WAUs had declined for the second quarter in a row to 29.2 million. The 2Q22 Form 10-Q further reported that the Company's ARPU growth had turned negative in the quarter, contracting by 6% year-over-year. During the corresponding conference call, Defendant Doyle revealed the Company was slashing its revenue guidance for fiscal 2022 by more than $31 million at the midpoint, or approximately 12%, to a range of $220 million to $225 million.

159.    On this news, the price of Nextdoor Class A common stock fell from $3.60 per share on August 9, 2022 to $2.70 per share on August 10, 2022, or approximately 25%, on unusually heavy trading volume.

### D.    November 8, 2022

160.    On November 8, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the third quarter ended September 30, 2022 ("3Q22 Form 10-Q"). The 3Q22 Form 10-Q revealed that Nextdoor's business continued to deteriorate, as it had in every quarter since the Merger. Specifically, the 3Q22 Form 10-Q reported that Nextdoor's revenues during the quarter declined sequentially by $1 million to $54 million, representing just 2% year-over-year growth, and that the Company's quarterly ARPU growth was increasingly negative, contracting by 12% compared to the prior year quarter. During the corresponding conference call, Defendant Doyle reported that Nextdoor was reducing revenue guidance again by an additional $12 million, warning investors that Nextdoor now expected fiscal 2022 revenues of just $210.5 million at the midpoint – far below the up to $256 million figure provided to investors during the Class Period.

161.    On this news, the price of Nextdoor Class A common stock fell from $2.32 per share on November 8, 2022 to $2.06 per share on November 9, 2022, or approximately 11%, on unusually heavy trading volume.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE

162.    Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

163.    Lead Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Nextdoor Class A common stock was an efficient market at all relevant times by virtue of the following factors, among others:

    a.    Nextdoor Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the NYSE, highly efficient markets;

    b.    Nextdoor regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    c.    Nextdoor was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

164.    As a result of the foregoing, the market for Nextdoor Class A common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in Nextdoor Class A common stock during the Class Period suffered similar injury

1    through their transactions in Nextdoor Class A common stock at artificially inflated prices and a

2    presumption of reliance applies.

3        165.    Without knowledge of the misrepresented or omitted material facts, Lead Plaintiff

4    and other Class members purchased or acquired Nextdoor Class A common stock between the

5    time Defendants misrepresented and failed to disclose material facts and the time the true facts

6    were disclosed.  Accordingly, Lead Plaintiff and other Class members relied, and are entitled to

7    have relied, upon the integrity of the market prices for Nextdoor Class A common stock, and are

8    entitled to a presumption of reliance on Defendants' materially false and misleading statements

9    and omissions during the Class Period.

10   **XII.    CLASS ACTION ALLEGATIONS**

11       166.    Lead Plaintiff brings this action on behalf of all purchasers of publicly traded

12   Nextdoor Class A common stock during the Class Period who were damaged thereby (the "Class").

13   Excluded from the Class are Defendants and their immediate families, the officers and directors

14   of the Company and their immediate families, their legal representatives, heirs, successors, or

15   assigns, and any entity in which any of the Defendants have or had a controlling interest.

16       167.    The members of the Class are so numerous that joinder of all members is

17   impracticable.  Throughout the Class Period, Nextdoor Class A common stock was actively traded

18   on national securities exchanges, specifically the NASDAQ prior to the Merger and the NYSE

19   after the Merger.  While the exact number of Class members is unknown to Lead Plaintiff at this

20   time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there

21   are hundreds or thousands of members in the proposed Class.  Record owners and other members

22   of the Class may be identified from records maintained by Nextdoor or its transfer agent and may

23   be notified of the pendency of this action by mail, using the form of notice similar to that

24   customarily used in securities class actions.  Upon information and belief, these shares are held by

25   hundreds or thousands of individuals located geographically throughout the country.  Joinder

26   would be highly impracticable.

27

28

168.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

169.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

170.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

     b.    whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

     c.    whether the prices of Nextdoor Class A common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

     d.    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

171.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5

### Against All Defendants

172.    Lead Plaintiff incorporates ¶¶1-171 by reference.

173.    During the Class Period, Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

174.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    a.   employed devices, schemes, and artifices to defraud;

    b.   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Nextdoor Class A common stock during the Class Period.

175.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nextdoor Class A common stock. Lead Plaintiff and the Class would not have purchased Nextdoor Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

176.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Nextdoor Class A common stock during the Class Period.

## XIV.   COUNT II

### For Violation of §14(a) of the Exchange Act and Rule 14a-9

### Against All Defendants

177.    Lead Plaintiff incorporates all allegations above by reference that do not expressly allege scienter or fraudulent conduct on the part of Defendants.

178.    This claim does not sound in fraud.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

179.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

180.    By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were or should have been aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

181.    Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants filed a Proxy that (i) made untrue statements of material fact in the Proxy, and (ii) omitted material facts necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Nextdoor shareholders to vote in favor of the Merger and related proposals.  Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

182.    The Proxy was an essential link in the accomplishment of the Merger since it solicited Nextdoor shareholders to vote to approve the Merger, and the solicitation of such votes enabled Defendants to consummate the Merger when Nextdoor shareholders voted to approve the Merger.

183.    The misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Nextdoor stockholder would consider them important in deciding whether to vote in favor of the Merger and related proposals.  In

addition, a reasonable Nextdoor stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Nextdoor shareholders.

184.    As a direct result of the Defendants' dissemination of the false and misleading Proxy, Lead Plaintiff and other members of the Class were deprived of their right to be presented with accurate proxy materials while asked to vote on the Merger, were caused to vote in favor of the Merger, were caused to not exercise their appraisal rights, and were caused to sell their shares for less than the fair value of those shares.

185.    By reason of the misconduct detailed herein, the Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

## XV.    COUNT III

### For Violation of §20(a) of the Exchange Act

### Against All Defendants

186.    Lead Plaintiff incorporates ¶¶1-185 by reference.

187.    During the Class Period, Defendants acted as controlling persons of Nextdoor within the meaning of §20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Nextdoor and/or Nextdoor Private, the Individual Defendants had the power and ability to control the actions of Nextdoor and/or Nextdoor Private and their employees, had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Nextdoor with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Lead Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

188.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

189.    Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Nextdoor, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same.  The individual Defendants were thus directly involved in the making of the Proxy.

190.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval.  The Individual Defendants thus directly participated in the drafting of the Proxy.

191.    Nextdoor controlled the Individual Defendants and all of its other officers and employees.  As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a), by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

    A.  Determining that this action is a proper class action and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

    B.  Awarding Lead Plaintiff and the members of the Class damages and interest;

    C.  Awarding Lead Plaintiff's reasonable costs, including attorneys' fees; and

    D.  Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated:  September 10, 2024                    Respectfully submitted,

POMERANTZ LLP

/s/ Austin P. Van
POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
Austin P. Van
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com

*Counsel for Lead Plaintiff Keith
Hollingsworth and for the Class*

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Lead Plaintiff Keith
Hollingsworth*