**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff*

*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| FRANKIE J. ADAMO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEXTDOOR HOLDINGS, INC., SARAH J. FRIAR, MICHAEL DOYLE, VINOD KHOSLA, SAMIR KAUL, PETER BUCKLAND, KHOSLA VENTURES LLC, and KHOSLA VENTURES SPAC SPONSOR II LLC<br><br>Defendants. | CASE NO.  5:24-cv-01213-EJD<br><br>**PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT(ECF NOS. 71 AND 73)**<br><br>**CLASS ACTION** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1

II.     FACTUAL BACKGROUND .......................................................................................... 3

        A.      Nextdoor's Key Business Metrics ....................................................................... 3

        B.      Defendants Misled Investors about Nextdoor's Active Users and Structural
                Ability to Grow Like Twitter and Snap to Close the Merger ............................... 3

        C.      After the Merger, Defendants Continued to Mislead Investors to Believe that
                Nextdoor Had Vastly More Genuinely Active Users than It Did .......................... 5

        D.      Over a Series of Corrective Disclosures, Nextdoor Revealed that It Had Misled
                Investors about the Engagement of Its "Active Users" and Its Structural Capacity
                to Grow Like Twitter and Snap ........................................................................... 7

III.    LEGAL STANDARDS .................................................................................................. 9

IV.     NEXTDOOR MISLED INVESTORS ABOUT HOW MANY GENUINELY ACTIVE
        USERS IT HAD, AND ABOUT ITS STRUCTURAL ABILITY TO GROW LIKE
        TWITTER AND SNAP .................................................................................................. 9

        A.      Nextdoor Misled Investors About How Many Genuinely Active Users It Had .... 9

        B.      Defendants Misled Investors About Whether Nextdoor Could Grow Like Twitter
                or Snap ............................................................................................................... 15

V.      NEXTDOOR MADE THE ALLEGED MISSTATEMENTS WITH SCIENTER ......... 18

VI.     THE AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ... 21

VII.    PLAINTIFF HAS STANDING TO SUE FOR PRE-MERGER STATEMENTS .......... 23

VIII.   THE AMENDED COMPLAINT STATES A CLAIM UNDER SECTION 20(A) ........ 25

IX.     CONCLUSION ............................................................................................................ 25

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **Amended Complaint or AC** | Amended Class Action Complaint (September 10, 2024) (ECF No. 65) |
| **Class Period** | July 6, 2021 to November 8, 2022 |
| **Company** | Nextdoor Holdings, Inc. f/k/a Khosla Ventures Acquisition Co. II |
| **Complaint** | Complaint for Violations of the Federal Securities Laws (February 28, 2024) (ECF No. 1) |
| **DAU** | daily active user |
| **Defendants** | Nextdoor Holdings, Inc., Sarah J. Friar, Michael Doyle, Vinod Khosla, Samir Kaul, Peter Buckland, Khosla Ventures LLC and Khosla Ventures SPAC Sponsor II LLC |
| **Defs.' Ex.** | Exhibit to Declaration of Andrew C. Johnson in Support of Nextdoor Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint (November 12, 2024) (ECF No. 71-2) |
| **FE** | former employee |
| **Individual Defendants** | Sarah J. Friar, Michael Doyle, Vinod Khosla, Samir Kaul and Peter Buckland |
| **Khosla** | Vinod Khosla |
| **Khosla Ventures** | Khosla Ventures Acquisition Co. II |
| **Khosla Defendants** | Vinod Khosla, Khosla Ventures LLC, Khosla Ventures SPAC Sponsor II LLC, Samir Kaul, and Peter Buckland |
| **Khosla's Motion or K Mem.** | Khosla Defendants' Notice of Motion and Motion to Dismiss Amended Class Action Complaint; Memorandum of Points and Authorities in Support Thereof; Joinder in Nextdoor Defendants' Motion to Dismiss (November 12, 2024) (ECF No. 73) |
| **Lead Plaintiff or Plaintiff** | Keith Hollingsworth |
| **Nextdoor** | Nextdoor Holdings, Inc. f/k/a Khosla Ventures Acquisition Co. II |
| **Nextdoor Private** | Nextdoor, Inc. |
| **Nextdoor's Motion or ND Mem.** | Nextdoor Defendants' Notice of Motion and Motion to Dismiss Plaintiff's Amended Class Action Complaint (November 12, 2024) (ECF No. 71) |
| **Nextdoor Defendants** | Nextdoor Holdings, Inc., Sarah J. Friar, and Michael Doyle |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u–4) |
| **SEC** | United States Securities and Exchange Commission |
| **Van Decl.** | Declaration of Austin P. Van in Support of Plaintiff's Omnibus Opposition to Defendants' Motions to Dismiss the Amended Complaint, filed herewith. |
| **WAU** | weekly active user |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfus v. Pyramid Tech. Corp.*,
764 F. Supp. 598 (N.D. Cal. 1991) ...................................................................................25

*Basic v. Levinson*,
485 U.S. 224 (1988) ........................................................................................................22

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................................9, 13

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) .....................................................................................................23, 24

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
No. 19-cv-06361, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ............................................10

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019).............................................................................19, 21

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ..............................................................................................9

*In re Allied Nev. Gold Corp. Sec. Litig.*,
743 F. App'x 887 (9th Cir. 2018) ......................................................................................14

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...........................................................................................18, 19

*In re Apollo Grp. Inc. Sec. Litig.*,
509 F. Supp. 2d 837 (D. Ariz. 2007) ..................................................................................22

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ..............................................................................................9

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .............................................................................................21

*In re CarLotz, Inc. Sec. Litig.*,
No. 21-CV-5906, 2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024)..........................................24

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................................................25

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ............................................................................................9

*In re Intuitive Surg. Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ...................................................................................10

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .............................................................................................15

*In re Stable Rd. Acquisition Corp.*,
    No. CV 21-5744-JFW ((SHKX), 2022 WL 2762213 (C.D. Cal. July 13,
    2022). ...................................................................................................................................19

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) ......................................................................................9, 11, 12

*Jedrzejczyk v. Skillz Inc.*,
    No. 21-CV-03450-RS, 2023 WL 2333891 (N.D. Cal. Mar. 1, 2023) ...................................15

*Maiman v. Talbott*,
    No. SACV 09-0012 AG (ANx), 2010 U.S. Dist. LEXIS 142712 (C.D. Cal.
    Aug. 9, 2010) .......................................................................................................................18

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
    54 F.4th 82 (2d Cir. 2022) .............................................................................................24, 25

*No. 84 Emp.–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...............................................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..............................................................................................................14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).............................................................................................................18

*Vignola v. FAT Brands, Inc.*,
    No. CV-18-7469 PSG, 2019 WL 6888051 (C.D. Cal. Dec. 17, 2019)...................................14

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017)..........................................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...............................................................................................21

**Statutes**

15 U.S.C. 78t(a) ...............................................................................................................3, 25

15 U.S.C. §78j(b).................................................................................................3, 23, 24, 25

15 U.S.C. § 78n..................................................................................................................3, 25

15 U.S.C. § 78u-4(e) ..............................................................................................................23

PSLRA ...............................................................................................................................15

**Rules**

Fed. R. Civ. P. 23 .............................................................................................................25

## I.       INTRODUCTION

Nextdoor operates a "hyperlocal" online social networking platform that connects neighbors via the internet for discrete, one-off searches for local services or information.  In 2021, a SPAC called Khosla Ventures acquired Nextdoor Private in a merger and took the Company public.  During the Class Period, which spans before and after the merger, Defendants misled investors about two fundamental aspects of Nextdoor's business.

*First*, Nextdoor created the impression that vastly more customers were genuinely engaging with their platform on a daily or weekly basis than actually were.  For example, Defendant Friar informed investors that "weekly active users" were "engage[d]" in Nextdoor and were mostly "active daily," when in fact, half of "weekly active users" were not engaged in Nextdoor in any meaningful sense and were not active on the platform at all—they were simply checking their emails.  While Nextdoor defined, for example, "weekly active users" as users who visited Nextdoor's website or app or opened a content email per day, crucially, Nextdoor never disclosed to shareholders that *half* of its so called "active users" were of the latter sort—users who merely opened Nextdoor's marketing emails yet never actually visited or engaged with Nextdoor's website or app.  In short, Nextdoor never told investors that *half* its purported "active users" were just email "spam" recipients.

Defendants certainly knew those statements were misleading because Defendants knew that *half* of their "active users" were not actually active in any meaningful sense.  A former employee has stated that executives, including Individual Defendants, received daily, weekly, and monthly "executive reports" with data on daily, weekly and monthly active users, and *percentage of users that were on-platform versus off-platform*.  In fact, a former employee has even stated that employees openly questioned whether the Company should be defining "active users" in this blatantly misleading way at weekly companywide meeting attended by Individual Defendants.

*Second*, in promoting the merger to investors, Defendants portrayed Nextdoor as the next big hit startup company like Twitter or Snap by directly comparing Nextdoor to those companies and suggesting that there were no structural barriers to its skyrocketing like they did.  Yet direct comparisons of Nextdoor's monetization potential to that of Twitter and Snap were materially

misleading because, for two structural reasons, Nextdoor could not reasonably expect to obtain average revenue per user comparable to Twitter's and Snap's. *One*, as multiple former employees have stated, Nextdoor only attracts users for one-off, discrete tasks, and so does not hold users' attention on each visit like Twitter and Snap do and cannot reasonably expect to obtain comparable average revenue per user. *Two*, Nextdoor also could not expect to obtain average revenue per user comparable to these entities because, as noted above, unlike Twitter's and Snap's users, half of Nextdoor's "users" merely open Nextdoor emails rather than engaging with Nextdoor's platform, and so view far fewer ad impressions.

Here again, the inference that Defendants were aware that, for structural reasons, the Company could not obtain average revenue per user comparable to Twitter and Snap, is overwhelming. As noted above, the Individual Defendants knew that half of the Company's "active users" were in fact mostly individuals checking their emails, who were not genuinely engaged with the platform. Accordingly, the Individual Defendants recognized that the Company would in effect have to obtain *twice* as much revenue from each user of the website or app to make up for the lower revenue from users who counted as users merely because they checked their emails. Moreover, Defendants were well aware that Nextdoor does not, and structurally cannot, hold users' attention on each visit like Twitter and Snap do. Defendant Friar herself noted on a March 2022 earnings call that users come to Nextdoor platform for discrete tasks like finding a plumber or financial adviser.

The truth about Nextdoor's misrepresentations took months to be absorbed by the market through a series of partial disclosures. On March 1, May 10, August 9 and November 8, 2022, the Company repeatedly revealed declining ARPU growth rates and declining weekly active users, which revealed that Nextdoor's users were mostly not genuinely "active users" durably engaged in the Nextdoor community and that Nextdoor would not be able to obtain average revenue per user at all comparable to its purported peers. All told, *Nextdoor lost 90% of its value* during the Class Period.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 5:24-CV-01213)

In their combined fifty pages of briefing, Defendants attempt a litany of arguments. Some of Defendants points are well taken and perhaps helpfully narrow this case to its crux.[1] Yet Defendants devote surprisingly little space to addressing the central claims outlined above. What they do say about these claims is cursory and unpersuasive. These claims should proceed. Investors were misled about central aspects of Nextdoor. They have a right to have a jury determine as much.

## II.   FACTUAL BACKGROUND

### A.   Nextdoor's Key Business Metrics

The value of Nextdoor's advertising space—and hence its business, financial, and operational performance—is ultimately dependent on the size and level of engagement of the Company's user base. AC ¶ 40. Nextdoor publicly discloses purported user and engagement performance primarily through two key business metrics. *Id. First*, Nextdoor reports Weekly Active User metrics or "WAU," which it defines as "a Nextdoor user who opens our application, logs on to our website, or engages with an email with monetizable content at least once during a defined 7-day period." *Id. Second*, Nextdoor reports average revenue per weekly active user or "ARPU," which the Company defines as total revenue during a period divided by the average of the number of WAUs during the same period. *Id.*

### B.   Defendants Misled Investors about Nextdoor's Active Users and Structural Ability to Grow Like Twitter and Snap to Close the Merger

On July 6, 2021, Defendants filed with the SEC a current report on Form 8-K regarding the Merger, which included an investor presentation, dated as of July 6, 2021. AC ¶ 52. The July

---

[1] In this brief, Plaintiff defends claims under Sections 10(b) and 20(a) as pleaded in the AC based on the misstatements and omission addressed below. While Plaintiff reserves all rights to amend the complaint to include additional claims and allegations, at this time Plaintiff does not intend to pursue claims under Section 14 of the Securities Act, or claims under Section 10(b) of the Exchange Act based on misstatements and omission that are not addressed in this opposition, against any Defendant.

2021 investor presentation highlighted Nextdoor Private's purportedly broad user base, stating that the company had "27M+ Weekly Active Neighbors" and that it had many vectors for "sustained revenue growth." *Id.*  Importantly, the July 2021 Investor Presentation argued for Nextdoor's potential to grow its users and average revenue per user in a chart titled "significant monetization potential" that directly compared Nextdoor's ARPU and DAU data to those of Twitter and Snap. AC ¶¶ 57-58.  Investors and analysts understood this chart to imply that Nextdoor was claiming that it could grow in a way that was comparable to Twitter and Snap.  AC ¶ 58.  For example, analysts at Tech Crunch wrote about this slide:  "The argument here is that the company has lots of room to grow on the monetization front as it expands its user base.  Snap shows that the company can generate more average revenue per user (ARPU) over time, and Twitter shows that a larger user base may help with that hunt."  *Id.*

The same day, July 6, 2021, Khosla Ventures and Nextdoor Private hosted a conference call with investors to discuss the proposed merger.  AC ¶ 67.  In discussing the chart, Defendant Friar claimed that the company should surpass the monetization levels of Twitter:

> Nextdoor as a platform has just begun its monetization journey.  In fact, when I joined about 2.5 years ago, we had just begun to tap into advertising.  Today, if you look at our scale, we're about 1/3 the size of Twitter. And yet, if you look at our ARPU, we're at about 1/6 the ARPU.  Of course, **there is no structural reason why Nextdoor should undermonetize**. In fact, if you think about either the video where you saw the wonderful California-based restaurant that was getting recommendations from us or if you think about what Vinod said about the value of a link on Nextdoor, **I could perhaps (inaudible) that Nextdoor should, in fact, overmonetize relative to those platforms**. So this tells me we're just getting started. And even with that top-of-the-funnel growth of new users, we should be able to drive healthy revenue growth as we scale our ARPU.

AC ¶ 114; Defs.' Ex. 11 at 5 (emphasis added).

In fact, Defendants knew full well that differences in the nature of the content on Nextdoor's platform structurally prevent Nextdoor from ever equaling or exceeding the monetization levels of purported peer platforms like Twitter and Snap.  AC ¶ 59.  Unlike Twitter and Snap, which attract users to scroll through an unlimited feed of globally interesting posts, Nextdoor attracts users for discrete, single-purpose visits, like finding a plumber.  *Id.*  As FE3 has explained, Nextdoor is a site designed for specific tasks rather than aimless browsing:  "It's kind of like a site where people come to find something they need, and then they're gone."  *Id.*  FE4

also noted that Nextdoor is not a site where users go to linger, and FE5 stated FE5 was "sure" that Nextdoor users spent significantly less time on the platform than users spent on Twitter and Snap. AC ¶ 60. Indeed, in arguing for why Nextdoor "really perform[s] well across the whole gamut of different advertisers," Defendant Friar stated on an earnings call in March 2022: "People are coming looking for the plumber. They're looking for maybe someone to help them do their gutters in that moment. They're looking for a great [local] financial adviser." AC ¶ 61. Data from surveys conducted by third-party analytics firm Statista show that average visitors to Twitter and Snap spend over 30 minutes per visit, while data from similarweb shows that visitors to Nextdoor spend about two minutes per visit. AC ¶ 62.

The longer a platform can hold a user's attention, the more ad impressions it can show them, and the higher average revenue per user the platform can generate. *Id.* Accordingly, even if Nextdoor were to acquire the same or more users than Twitter or Snap, Nextdoor could never realistically hope to generate comparable average revenue per user as those platforms, absent a fundamental change in the nature of the content of the platform (which Nextdoor has never proposed). *Id.*

C.      **After the Merger, Defendants Continued to Mislead Investors to Believe that Nextdoor Had Vastly More Genuinely Active Users than It Did**

Following the Merger, Nextdoor continued to artificially inflate the value of the Company by misleading investors to believe, in effect, that its base of users who were genuinely active on the platform was twice as large as it actually was. AC ¶ 66.

On May 10, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter. AC ¶ 100. During the call, Defendant Friar represented that the Company's users remained "highly engaged" and that its product strategy was "working," stating in pertinent part as follows:

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through building an active valued community. It's working. In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

*Id.* Defendant Doyle similarly represented that Nextdoor was seeing "healthy demand" from its advertisers and "deeper engagement" from its users. AC ¶ 101.

On August 9, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the second quarter. AC ¶ 106. During the call, Defendant Friar assured investors that Nextdoor was observing "durable" engagement trends among the Company's most active users and that those trends "show[ed]" that the Company's efforts to address user engagement were "working," stating in pertinent part as follows:

> Weekly active users, or WAU, grew 26% year-over-year to approximately 37 million. We're seeing durable engagement trends amongst our most active users. In Q2, over 50% of weekly active users were active daily. Across all regions, growth in total sessions accelerated 10 points quarter-over-quarter. These trends show that our focus on engagement through the introduction of new machine learning models for increased personalization, more engaging notification, a simplified user experience and welcoming platform initiatives is working. With the progress we've made on engagement, we are now shifting more of our product focus to new neighbor growth. Today, we have over 75 million Verified Neighbors on the platform, and we're just scratching the surface of our global total addressable market.

*Id.*

In these statements, Nextdoor created the impression that vastly more customers were genuinely engaging with their platform on a daily or weekly basis than actually were. AC ¶ 135. Nextdoor counts "daily active users" and "weekly active users" as "the count of unique neighbors who have started a session or opened a content email over the trailing" day or 7 days. AC ¶ 63. Yet Nextdoor never disclosed to shareholders that *half* of its DAUs and WAUs were of the latter sort—users who merely opened Nextdoor's marketing emails yet never actually visited Nextdoor's website or app. *Id.* For example, Defendant Friar's May 10, 2022 statement implied that "weekly active users" were being "active" in the Nextdoor "community," when in fact, half of those "weekly active users" were not meaningfully active in the Nextdoor community at all—they were just checking their emails. AC ¶ 133.

FE6 confirmed that roughly half of Nextdoor's "active users" were not even accessing the website or app, and that this practice of counting as active users persons who merely open their email was highly unusual in the industry and so would not have been expected by investors. AC ¶ 64. According to FE6, up to 50% of Nextdoor's Weekly Active Users were "off-platform" users

6

that merely opened an email from Nextdoor. *Id.* FE6 believed this way of defining active user was highly unusual and stated, "I could not find another company doing that." *Id.* According to FE6, "a lot of folks" within Nextdoor "thought we should just count the app usage," a view that according to FE6 existed "for years" within the company. *Id.* According to FE6, Nextdoor employees expressed such concerns about the definition of users at weekly companywide meetings attended by CEO Friar and the company's senior leadership team, including a question "why do we count this [activity as active users]?" *Id.* Moreover, according to FE6, Individual Defendants as well as all C-level executives were well aware that about half of "active users" were not actually visiting the app or the website because they received daily, weekly, and monthly "executive reports" that contained data include the percentage of users that were on-platform versus off-platform. *Id.* FE6 noted that "anyone else [at Nextdoor] who wanted to sign up" could receive the executive reports. *Id.*

FE7 also confirmed that roughly 50% of Nextdoor's purported "active users" were off-platform. AC ¶ 65. According to FE7, around 50% of Nextdoor's "active users" were off-platform users who opened Nextdoor emails but did not actually use Nextdoor's website or app. *Id.*

**D.     Over a Series of Corrective Disclosures, Nextdoor Revealed that It Had Misled Investors about the Engagement of Its "Active Users" and Its Structural Capacity to Grow Like Twitter and Snap**

In a series of disclosures on March 1, 2022, May 10, 2022, August 9, 2022 and November 8, 2022, Nextdoor revealed that its active user base was not genuinely engaged and that the Company was structurally incapable of growing like Twitter or Snap. AC ¶ 153. *First*, on March 1, 2022, Nextdoor reported quarterly ARPU of $1.65, and so revealed that the ARPU growth rate in the quarter had declined substantially by 26% to just 12% year-over-year growth from 38% growth in the third quarter. AC ¶ 154. This decline gave investors an initial sign that the Company's ability to monetize its platform was faltering and that it would not be able to obtain average revenue per user at all comparable to its purported peers Twitter and Snap. AC ¶ 90. This news caused Nextdoor stock to fall by approximately 14%, from $6.24 per share on March 1, 2022 to $5.39 per share on March 4, 2022 on unusually heavy trading volume. AC ¶ 155.

*Second*, on May 10, 2022, Nextdoor revealed that the Company's global WAUs growth had increased just 1% sequentially (from 32% year-over-year growth in the fourth quarter of 2021 to 33% year-over-year growth in the first quarter of 2022) and that U.S. WAUs had actually suffered a *sequential decline* of approximately one hundred thousand users. AC ¶ 156. Analysts at Morgan Stanley emphasized this startling decline, stating that Nextdoor had "A User Problem." *Id.* This decline partially revealed that Nextdoor's users were not genuinely engaged to the extent that Nextdoor's misleading statements about its "active users" had led investor to believe. *Id.* This news caused Nextdoor stock to fall by approximately 8%, from $3.19 per share on May 10, 2022 to $2.93 per share on May 11, 2022, on unusually heavy trading volume. AC ¶ 157.

*Third*, on August 9, 2022, Nextdoor revealed that Nextdoor's U.S. WAUs had declined for the second quarter in a row to 29.2 million and that the Company's ARPU growth had turned negative in the quarter, contracting by 6% year-over-year. AC ¶ 158. This decline likewise further revealed that Nextdoor's users were mostly not genuinely "active users" in an engaged community and that Nextdoor would not be able to obtain average revenue per user at all comparable to its purported peers. *Id.* This news caused Nextdoor stock to fall by 25%, from $3.60 per share on August 9, 2022 to $2.70 per share on August 10, 2022, on unusually heavy trading volume. AC ¶ 159.

*Finally*, on November 8, 2022, Nextdoor revealed, among other things, that the Company's quarterly ARPU growth was increasingly *negative*, contracting by 12% compared to the prior year quarter. AC ¶ 160. This decline was a final revelation to investors that the Company would not be able to achieve average revenue per user at all comparable to Twitter and Snap. *Id.* On this news, the price of Nextdoor Class A common stock fell from $2.32 per share on November 8, 2022 to $2.06 per share on November 9, 2022, or approximately 11%, on unusually heavy trading volume. AC ¶ 161.

In total, the price of Nextdoor Class A common stock fell nearly 90% from the $18.59 per share price high immediately after the Merger, causing the Class to suffer over $100 million dollars in losses and economic damages under the federal securities laws. AC ¶ 109.

## III.    LEGAL STANDARDS

On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s] them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017).  When ruling on a motion to dismiss a securities case, any "skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

## IV.    NEXTDOOR MISLED INVESTORS ABOUT HOW MANY GENUINELY ACTIVE USERS IT HAD, AND ABOUT ITS STRUCTURAL ABILITY TO GROW LIKE TWITTER AND SNAP

A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ," the question of "[w]hether a statement is misleading and whether adverse facts were adequately disclosed . . . should be left to the trier of fact." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

### A.    Nextdoor Misled Investors About How Many Genuinely Active Users It Had

From the start of the Class Period, Nextdoor misled investors to believe that the number of users who were genuinely engaging with its platform regularly was much larger than it actually was, by at least a factor of two.  On July 6, 2021, Khosla Ventures filed an investor presentation on Form 8-K that included a chart comparing daily active users of Nextdoor to those of Twitter and Snap and indicating that it had 12 million "daily active users."  AC ¶ 110.  On May 10, 2022, Nextdoor held a conference call with analysts and investors at which Defendant Friar stated:

> Our community is active and becoming increasingly active.  Our product strategy in 2022 is centered on strengthening engagement through building an active valued community.  It's working.  In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 5:24-CV-01213)

AC ¶ 132.   Similarly, on August 9, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the second quarter.   On the call, AC ¶ 134, Defendant Friar stated:

> Weekly active users, or WAU, grew 26% year-over-year to approximately 37 million.  We're seeing durable engagement trends amongst our most active users.  In Q2, over 50% of weekly active users were active daily.  Across all regions, growth in total sessions accelerated 10 points quarter-over-quarter.  These trends show that our focus on engagement through the introduction of new machine learning models for increased personalization, more engaging notification, a simplified user experience and welcoming platform initiatives is working.

These statements were misleading because they created the impression that vastly more customers were genuinely engaging with their platform on a daily or weekly basis than actually were.   While Nextdoor defined "daily active users" and "weekly active users" as "the count of unique neighbors who have started a session or opened a content email over the trailing" day or 7 days, AC ¶ 63, Nextdoor never disclosed to shareholders that *half* of its DAUs and WAUs were of the latter sort—users who merely opened Nextdoor's marketing emails yet never actually visited Nextdoor's website or app.  A user's merely opening an email is materially different from visiting a website or app.  The former activity requires nothing more than checking emails and engages the user for a fleeting period, permitting only a very limited number of advertising impressions, if any.  In contrast, the latter form of engagement may last for minutes or hours and generate scores of advertising impressions.  The online services industry commonly understands "active users" to include only the latter sort of users, users who actually engage with the Company's website or app.  AC ¶ 64.  Accordingly, *half* of Nextdoor's users were not "active users" of its online product as that term is commonly understood, or in any other meaningful sense—they were just Nextdoor spam email recipients.  Nextdoor never revealed this fact to investors.[2]

---

[2] Nextdoor Defendants accuse Plaintiff of "puzzle pleading," ND Mem. at 11, but that charge certainly does not apply here.  The AC lists each misstatement in separate paragraphs, and provides a tailored explanation immediately following each such statement detailing what about that statement is false or misleading.  AC ¶¶ 110-35; *In re Intuitive Surg. Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014); *Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361, 2020 WL

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 5:24-CV-01213)

Each of the above misstatements was all the more misleading in context. In Defendant Friar's May 10, 2022 misstatements, Friar stated, "[o]ur community is active and becoming increasingly active" and that the company was "building an active valued community" as shown by the fact that "over half of weekly active users were active daily." AC ¶ 100. In this way, Friar unmistakably implied that "weekly active users" were being "active" in the Nextdoor "community," when in fact, half of those "weekly active users" were not meaningfully active in the Nextdoor community at all—they were just checking their emails.

Similarly, in Defendant Friar's August 9, 2022 misstatements, Friar stated that the company was "seeing durable engagement trends amongst our most active users," including that "over 50% of weekly active users were active daily." AC ¶ 134. In this statement, Friar implied that the "weekly active users" were "engage[d]" in Nextdoor and were mostly "active daily," when in fact, half of "weekly active users" were not engaged in Nextdoor in any meaningful sense and were not active on the platform at all—they were simply checking their emails.

Finally, in Khosla Ventures and Nextdoor Private's joint July 6, 2021investor presentation, the chart stating that Nextdoor had 12 million "U.S. DAU" or "daily active users" was titled "A verified daily audience with significant monetization potential." AC ¶ 57. The chart also used the same phrase "U.S. DAU" to compare Nextdoor daily active users to Twitter and Snap daily active users. *Id.* By comparing Nextdoor, Twitter and Snap Daily active users in the same chart using the same descriptive phrase, Defendants unmistakably suggested that Nextdoor users were at least roughly comparable to Twitter and Snap daily active users. In fact, Nextdoor defined daily active users in a way that was wholly unique in the industry and nothing like the way Twitter and Snap defined daily active users. AC ¶ 64. Crucially, unlike Twitter and Snap daily active users, half of Nextdoor daily active users were not active users at all—they merely checked their emails. Likewise, the "daily audience" for Nextdoor was wholly unlike the daily audience for Twitter and

4569846, at *5 (N.D. Cal. Aug. 7, 2020) (rejecting puzzle pleading argument even though complaint is "long, confusing, and meandering," such that "it is difficult to locate the main points within it," because defendants could still "figure[e] out what statements are alleged to be false").

Snap. Moreover, in the same chart, Nextdoor's footnote stating that "[c]omparison is illustrative as each company calculates daily active users differently," AC ¶ 57, further misled investors to believe that the daily active users were roughly comparable such that "compar[ing]" them could be useful to "illustrat[e]" Nextdoor's "verified daily audience."

Each of these statements was misleading because *half* of Nextdoor's "active users" were not genuinely active on Nextdoor at all, but merely checked their emails. Multiple former employees have confirmed as much. AC ¶¶ 64-65. According to FE6, up to 50% of Nextdoor's Weekly Active Users were "off platform" users that merely opened an email from Nextdoor. AC ¶ 64. A second former employee, FE7, likewise confirmed that roughly 50% of Nextdoor's "active users" were "off platform" users who merely opened Nextdoor emails without actually visiting Nextdoor's website or app or otherwise engaging meaningfully with Nextdoor. AC ¶ 65.

Each of the above misstatements was particularly likely to mislead investors in Nextdoor because, as a former employee has confirmed, usual industry practice is not to include as "active users" persons who merely open an email. AC ¶ 64. According to FE6, Nextdoor's way of defining users was highly unusual in Nextdoor's industry. *Id*. FE6 stated, "I could not find another company doing that." *Id*. Indeed, many individuals within Nextdoor appear to have recognized that Nextdoor's practice of including users who merely open their emails as "active users" was problematic—according to FE6, "a lot of folks" within Nextdoor "thought we should just count the app usage," a view that had been prevalent "for years." *Id*.

As half of Nextdoor's "active users" merely opened their emails and did not meaningfully engage with Nextdoor in any way, Defendants' statements asserting, for example, that Nextdoor had an "active community" that was "weekly active" based on its "active user" count were misleading for failure to disclose that half of its active users were not meaningfully active.

In their motions, Defendants argue that because Nextdoor defined "weekly active users" as users that visit the Nextdoor website, open the app, *or* open a Nextdoor email, Nextdoor's statements above could not have misled investors to believe that most of its "active users" were genuinely active users. ND Mem. at 16. Defendants are mistaken. *First*, as Defendants never disclosed how many users Nextdoor counted as active merely for checking their emails, investors

reasonably assumed that Nextdoor was using the term "active user" as that term is commonly understood, both in the industry and by English speakers generally, and so believed that the majority of Nextdoor's "active users" were actively using Nextdoor's product. *Berson*, 527 F.3d at 985 (a statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'").  That is, investors reasonably resolved the ambiguity in Nextdoor's definition of "active users" by assuming Nextdoor's usage of the term was generally in line with industry usage of that term.  AC ¶ 64. *Second*, as explained above, the context in which Defendants referenced "active users" also misled investors to believe that Nextdoor used this term to describe genuine engagement with the Nextdoor platform.  Nextdoor described "active users" as constituting an "active community" with "durable engagement" of users that were "active daily." *See, e.g.,* AC ¶¶ 106, 134.  In this context, investors would not have understood that in truth, half of what Nextdoor was describing as an "active community" with "durable engagement" of users that were "active daily" was not an active community at all but instead a set of individuals simply opening their emails.

Nextdoor Defendants also sweep their July 6, 2021, May 10 and August 8, 2022 statements together with other misstatements and claim they are all statements of opinion, but they fail to explain how any of the statements on these particular dates was an opinion.  ND Mem. at 12. Rightly so—none were opinion statements.  As explained above, each of these statements created an impression about a falsifiable fact—they created the impression that vastly more customers were genuinely engaging with their platform on a daily or weekly basis than actually were.  For example, in Friar's May 10, 2022 misstatement implying that "weekly active users" were being "active" in the Nextdoor "community," and in her August 9, 2022 misstatement implying that the "weekly active users" were "engage[d]" in Nextdoor and were mostly "active daily," Defendant Friar was not opining—she was creating an impression of a state of affairs that differed materially from the *factual* state of affairs.  In fact, half of those "weekly active users" were not meaningfully active or engaged in the Nextdoor community at all.  Likewise, the July 6, 2021 investor presentation chart comparing Nextdoor active users to Twitter and Snap Daily active users using

the same descriptive y-axis label was not an opinion, it was a chart unmistakably suggesting that, as a factual matter, Nextdoor active users were comparable to Twitter and Snap active users.

Even if these statements were somehow statements of opinion (they are not), these statements would nevertheless be actionable because they omit material information that conflict with what a reasonable person would take from these statements. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (an opinion statement is actionable if it "omits material facts about the issuer's . . . knowledge," and "those facts conflict with what a reasonable investor would take from the statement itself"); *In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x 887, 887-88 (9th Cir. 2018); *Vignola v. FAT Brands, Inc.*, No. CV-18-7469 PSG (PLAx), 2019 WL 6888051, at *9 (C.D. Cal. Dec. 17, 2019). As explained above, reasonable investors would take from Defendants' May 10 and August 8, 2022 statements that Nextdoor's "active users" were far more engaged in Nextdoor than they actually were, when Defendants knew full well that half of those "active users" were not meaningfully engaged in the Nextdoor community at all. Similarly, reasonable investors would take from Nextdoor's July 6, 2021 investor presentation that Nextdoor daily active users could be reasonably compared to Twitter and Snap daily active users, when in fact, half of Nextdoor's users were not actively using Nextdoor's product at all.[3]

Defendants also claim sweepingly that "Statement Nos. 1-13" were forward looking, were accompanied by meaningful cautionary language, and were not made with actual knowledge, but Defendants fail to explain how any of Defendants' July 6, 2021, May 10 and August 8, 2022 statements in particular were forward looking. ND Mem. at 14. In any event, Defendants are wrong on all three accounts. Defendants' July 6, 2021, May 10 and August 8, 2022 statements suggesting that Nextdoor's "active users" were far more engaged in Nextdoor than they actually were concerned how engaged Nextdoor's customers currently were, not how engaged they would

---

[3] Moreover, even if Nextdoor's misstatements were opinions (they were not), the AC alleges that Defendants did not believe these statements by alleging that Defendants knew these statements were misleading. AC ¶¶ 25, 59, 136-38, 149, 173.

be in the future.  Even if any of these misstatements were forward looking (they are not), they were not accompanied by any meaningful cautionary language.  Defendants recite boilerplate cautionary language broadly covering "risks and difficulties," but such boilerplate cautionary language is insufficient as a matter of law to qualify Defendants' misstatement above for safe-harbor under the PSLRA.  *Zaghian v. Farrell*, 675 F. App'x 718, 719–20 (9th Cir. 2017) (PSLRA safe harbor requires "meaningful" cautionary language that "identif[ies] important factors that could cause actual results to differ materially from those in the forward-looking statement," not a "boilerplate warning" that does not "sufficiently address the harm that resulted.") (internal citations omitted).  Moreover, Defendants made each of the above misstatements with knowledge that they were false or misleading, as argued below.  *See infra* Part V.

Defendants also sweepingly claim that "Statement Nos. 1-13" are statements of "optimism," ND Mem. at 15-16, but they fail to explain how statements failing to disclose that "active users" include off-platform users amount to such statements.  Defendants cite to *Jedrzejczyk v. Skillz Inc.*, No. 21-CV-03450-RS, 2023 WL 2333891, at *6 (N.D. Cal. Mar. 1, 2023), but Defendants' statements are nothing like the vague statements that were at issue there.  Defendants' statements implied that the vast majority of their "active users" were genuinely engaged in the Nextdoor community, and that there were no structural barriers to growing APRU like Twitter or Snap.  *See supra* Part IV.  Both of those implications are falsifiable.  In any event, "general statements of optimism, when taken in context, may form the basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).  Here, Defendants knew that half of the Company's "active users" were not active in any meaningful sense, and that the Company was structurally incapable of growing its ARPU like Twitter's or Snap's.  *See infra*, Part V.

### B.    Defendants Misled Investors About Whether Nextdoor Could Grow Like Twitter or Snap

Defendants also misled investors to believe that there were no structural reasons why Nextdoor could not generate average revenue per user like Twitter and Snap.  On July 6, 2021,

Khosla Ventures filed on SEC Form 8-K an investor presentation that stated that Nextdoor Private had "significant monetization potential" based on comparisons of its ARPU and U.S. daily active users with those of Twitter and Snap.[4]  AC ¶ 57.

Investors and analysts understood this chart to imply that Nextdoor was claiming that it could grow in a way that was comparable to Twitter and Snap.  For example, analysts at Tech Crunch wrote about this slide:  "The argument here is that the company has lots of room to grow on the monetization front as it expands its user base.  Snap shows that the company can generate more average revenue per user . . . over time, and Twitter shows that a larger user base may help with that hunt."  AC ¶ 58.

This direct comparison of Nextdoor's monetization potential to that of Twitter and Snap was materially misleading because, for structural reasons, Nextdoor could not reasonably expect to obtain average revenue per user comparable to Twitter's and Snap's.  This was so for at least two reasons.

*First*, Nextdoor, due to the nature of the content of the platform, does not hold users' attention on each visit like Twitter and Snap do, and so cannot reasonably expect to obtain comparable average revenue per user.  Differences in the nature of the content on Nextdoor's platform structurally prevent Nextdoor from ever equaling or exceeding the monetization levels of purported peer platforms like Twitter and Snap.  Unlike Twitter and Snap, which attract users to scroll through unlimited feed of globally interesting posts, Nextdoor attracts users for discrete, single-purpose visits, like finding a plumber.

---

[4] Khosla Defendants argue that the AC fails to plead "that any Khosla Defendant had ultimate authority over the statements at the investor presentation."  K Mem. at 11.  Khosla Defendants signed and filed the July 6, 2021 investor presentation with the SEC on Form 8-K, and the presentation itself is introduced by Defendant Khosla.  The Khosla Defendants certainly had "ultimate authority" over their own documents and filings.  The Kholsa Defendants also argue that the AC attributes their July 6, 2021 8-K filing to "Nextdoor," K Mem. at 11, but the AC defines "Nextdoor" to include the entity formerly known as Khosla Ventures prior to the Merger.  AC ¶ 7.

Multiple former employees confirmed that Nextdoor is used for brief, one-off visits. FE3 explained that Nextdoor is a site designed for specific tasks rather than aimless browsing. According to FE3, "Nextdoor is . . . kind of like a site where people come to find something they need, and then they're gone." AC ¶ 59. Similarly, FE4 noted that Nextdoor is not a site where users linger. AC ¶ 60. According to FE4, "People didn't really scroll through the Nextdoor feed." *Id.* FE5 likewise stated that FE5 was "sure" that Nextdoor users spent significantly less time on the platform than users spent on Twitter and Snap, and stated that there was "no way" that the content of Nextdoor was robust enough to hold users' attention for as long as Twitter's did. *Id.* Indeed, data from surveys conducted by third-party analytics firms Statista and similarweb confirm that users spend vastly less time per visit on Nextdoor than on Twitter and Snap—visitors to Nextdoor spend about two minutes per visit, while average visitors to Twitter and Snap spend over 30 minutes per visit.

The AC explains that because Nextdoor cannot hold users' attention on each visit like Twitter and Snap do, the Company cannot reasonably expect to obtain comparable average revenue per user. The longer a platform can hold a user's attention, the more ad impressions it can show them, and the higher average revenue per user the platform can generate. AC ¶ 62. Accordingly, even if Nextdoor were to acquire the same or more users than Twitter or Snap, Nextdoor could never realistically hope to generate comparable average revenue per user as those platforms, absent a fundamental change in the nature of the content of the platform (which Nextdoor has never proposed). AC ¶ 62.

*Second*, Nextdoor also could not expect to obtain average revenue per user comparable to these entities because, unlike Twitter's and Snap's users, half of Nextdoor's "users" merely open Nextdoor emails rather than engaging with Nextdoor's platform. AC ¶ 63. Accordingly, half of Nextdoor's "active users," by definition, do not engage with the platform and generate numerous ad impressions like Twitter's and Snap's users do, so these "[in]active users" of Nextdoor will heavily weigh down Nextdoor's average revenue per user.

The statements in Defendants' July 6, 2021 8-K investor presentation were all the more misleading in context. In presenting the chart, Defendant Friar stated that "there is no structural

reason why Nextdoor should undermonetize" and that she "could perhaps posit that Nextdoor should, in fact, overmonetize relative to [Twitter and Snap]." AC ¶ 114.

In their Motion, Defendants argue first that Nextdoor's "significant monetization potential" chart did not suggest that Nextdoor had the potential to obtain average revenue per user comparable to Twitter's and Snap's. ND Mem. at 17. Defendants' argument is wrong on its face. Indeed, Defendants' own commentary and that of investors shows that Defendants' revised reading is implausible. Defendant Friar's comments presenting this chart explained that the chart made exactly this point—according to Friar, the chart showed that there was no structural reason why Nextdoor should undermonetize relative to Twitter and Snap and that "Nextdoor should, in fact, overmonetize relative to [Twitter and Snap]." AC ¶ 69. Likewise, analysts at Tech Crunch wrote about this chart, for example, that the comparison with "Snap shows that the company can generate more average revenue per user (ARPU) over time . . . ." AC ¶ 58.

## V.    NEXTDOOR MADE THE ALLEGED MISSTATEMENTS WITH SCIENTER

The required inference of scienter "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). A "strong inference" is merely one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. That is, "a tie goes to the Plaintiff." *Maiman v. Talbott*, No. SACV 09-0012 AG (Anx), 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010). Allegations showing "'actual access to the disputed information' . . . support[] a strong inference of scienter." *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008)).

Here, the inference that Defendants were aware that half of the Company's "active users" were in fact individuals checking their emails is overwhelming, and at least as compelling as any alternative inference. *First*, and dispositively, Individual Defendants as well as all C-level executives received daily, weekly, and monthly "executive reports" with data on DAUs, WAUs, Monthly Active Users, revenue, advertising, and the *percentage of users that were on-platform versus off-platform*. AC ¶ 141. FE6 knew that Individual Defendants received these reports and

knew their contents because the reports were routinely sent to a distribution list on which FE6 was included that also included all executives, including the Individual Defendants.

*Second*, Defendants were expressly alerted to concerns from employees that the Company's inclusion of off-platform users in the definition of "active users" was problematic and questionable. According to FE6, Nextdoor held weekly companywide meetings that Individual Defendants and senior management regularly attended. AC ¶ 140. Nextdoor employees expressed concerns about the Company's unusual and misleading method of defining active users (as including users who simply open Nextdoor emails) at weekly companywide meetings attended by CEO Friar and the company's senior leadership team, including a question "why do we count this [activity as active users]?" *Id*. "A lot of folks" expressed their concerns at company-wide meetings including Individual Defendants that Nextdoor "should just count the app usage" in determining active users. *Id*.

*Finally*, knowledge that Nextdoor's "active users" were in fact mostly individuals checking their emails was simply knowledge of the core operations of the Company. It would be "absurd to suggest" that Individual Defendants—both the leaders of Nextdoor and the Khosla Defendants who had to learn the core operations of the Company they acquired—were unaware that half of their user base consisted merely of folks checking their emails rather than genuinely active users of their platform. *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019) ("Allegations regarding management's role in a company may support scienter . . . where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."); *see Alphabet*, 1 F.4th at 706 (9th Cir. 2021); *In re Stable Rd. Acquisition Corp.*, No. CV 21-5744-JFW ((SHKX), 2022 WL 2762213, at *10 (C.D. Cal. July 13, 2022).

Given these facts, there should be no question that the Individual Defendants knew that the Company's "active users" were in fact mostly individuals checking their emails, and that their statements suggesting, for example, that the Company's "active user" count demonstrated the size of the Company's "active community" were therefore misleading.

Separately, the inference that Defendants were aware that, for structural reasons, the Company could not obtain average revenue per user comparable to Twitter and Snap, is likewise overwhelming. *First*, as noted above, the Individual Defendants knew that half of the Company's "active users" were in fact mostly individuals checking their emails, who were not genuinely engaged with the platform. Accordingly, the Individual Defendants recognized that the Company would in effect have to obtain *twice* as much revenue from each user of the website or app to make up for the lower revenue from users who were merely Nextdoor spam email recipients. The inference that Khosla Defendants likewise received this information is unavoidable—detailed information about active users would be among the first information requested by a Company seeking to acquire Nextdoor given that this information is central to valuing the Company.

*Second*, Defendants were well aware that Nextdoor does not, and structurally cannot, hold users' attention on each visit like Twitter and Snap do. The Individual Defendants had direct access to ad impression information showing that, due to the nature of the site, users spent little time per visit on Nextdoor compared to Twitter or Snap. AC ¶¶ 62, 141-42. As the Company's revenue was directly tied to ad impressions, the figures included in the daily "executive reports" about "revenue" and "advertising" would have included data about ad impressions per visit, and so would have provided the Individual Defendants (including the Khosla Defendants) with information about the short duration of user visits on the Nextdoor website and app. AC ¶ 141.

*Third*, Defendant Friar expressly stated that "there is no structural reason why Nextdoor should undermonetize" and that she "could perhaps posit that Nextdoor should, in fact, overmonetize relative to [Twitter and Snap]." AC ¶ 114. In making this statement, Defendant Friar admitted that she had sufficient information to take a position on whether structural considerations hindered Nextdoor's ability to monetize at a rate comparable or superior to Twitter's or Snap's. That Defendant Friar's admitted to having such knowledge strengthens the inference that the other Individual Defendants likewise had such knowledge.

*Finally*, here again, it would be "absurd to suggest" that either the Nextdoor or the Khosla Individual Defendants lacked knowledge that Nextdoor, by its nature, fails to hold users' attention

on each visit like Twitter and Snap do, as knowledge of the nature of Nextdoor's product is knowledge of the core operations of the Company. *Allegiant*, 412 F. Supp. 3d at 1261.

In Nextdoor's Motion, Defendants argue that the statements by former employees cannot support scienter because those former employees had no direct contact with Defendants. ND Mem. at 20. No such rule exists. To rely on statements by former employees, Plaintiff need merely describe the witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (cited by Defendants). Here, the AC details each former employees' position, role at the company, dates of employment, and how the witness learned the facts ascribed to them. AC ¶¶ 53-56, 59-60, 64-65, 72-73, 139-44. With respect to the allegations mentioned above, the AC alleges that FE6 worked for Nextdoor's San Francisco office from March 2001 to October 2023 as a member of the Product Growth Team, and reported to Head of Product, Neighbor Experience Michael Pao, who reported directly to Defendant Friar. The AC explains that FE6 knew that Individual Defendants received daily, weekly, and monthly "executive reports" and knew their contents because the reports were routinely sent to a distribution list on which FE6 was included that also included the Individual Defendants. The AC likewise explains that FE6 knew that Individual Defendants, including Defendant Friar, were alerted to concerns about the Company's definition of "active users" because FE6 attended "weekly" companywide meetings at which Defendant Friar and senior leadership were present at which a participant expressly asked, "why do we count this [activity as active users]?" AC ¶ 140. The former employees' statements are therefore wholly appropriate bases to support a strong inference of scienter.

## VI.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Plaintiff faces a minimal bar in pleading loss causation. To plead loss causation, Plaintiff need only "provide enough factual content to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind,'" which "should not prove burdensome." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)) (cited by Defendants).

Here, Plaintiff pleads that four partial corrective disclosures revealed over time that Defendants' misstatements were misleading by disclosing (1) that Nextdoor's users were not genuinely engaged to the extent that Nextdoor's misleading statements about its "active users" had led investors to believe, and (2) that Nextdoor would not be able to obtain average revenue per user at all comparable to its purported peers Twitter and Snap. As detailed above, *supra* Part II.D, on March 1, May 10, August 9 and November 8, Nextdoor revealed to investors ARPU and WAUs were declining. In this way, the Company revealed over time that its users were not genuinely engaged with Nextdoor's platform to the extent that Nextdoor's misleading statements about its "active users" had led investors to believe, and that the Company would not be able to obtain average revenue per user at all comparable to its purported peers Twitter and Snap.

In their Motion, Defendants argue first that Plaintiff "does not explain how any 'corrective' disclosure' revealed any 'new facts.'" ND Mem. at 24 (quoting *BofI*, 977 F.3d at 790). As detailed above, *supra* Part II.D, each of the four corrective disclosures revealed new facts about the Company's contracting ARPU growth rate and its declining WAUs.

Defendants also make particularized argument that the March 1, May 10, and November 8 disclosures are invalid loss causation dates. ND Mem. at 24-25. Notably, Defendants make no such arguments against the August 9, 2022 disclosure date. Defendants argue that the drop on the day following the March 1, 2022 disclosure was not significant, ND Mem. at 25, but the AC clearly pleads that the price declined approximately *14%* over the three days following the disclosure, from $6.24 per share on March 1, 2022 to $5.39 per share on March 4, 2022. AC ¶ 155. That the market took several days to fully absorb the information disclosed on March 1, 2022 is not unusual and is no barrier to pleading loss causation. *See Basic v. Levinson*, 485 U.S. 224, 248 n. 28 (1988) (declining "to adopt any particular theory of how quickly and completely publicly available information is reflected in the market price"); *No. 84 Emp.–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) (declining to adopt "a bright-line rule requiring an immediate market reaction" and instead focusing on the specific facts of each case); *In re Apollo Grp. Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 846 (D. Ariz. 2007). Nextdoor's stock drops on May 10 and November 8, 2022 were also manifestly significant—the stock fell 8%

following the May 10, 2022 disclosure, from $3.19 per share on May 10 to $2.93 per share on May 11, and plummeted 11% following the November 8, 2022 disclosure, from $2.32 per share on November 8 to $2.06 per share on November 9.  AC ¶¶ 157, 161.  Defendants argue that Nextdoor's share price recovered within three days following the May 10, 2022 disclosure, but in fact, it took weeks for the share price to mount a *sustained* recovery—the average share price in the 23 days following the May 10, 2022 disclosure was 2.9, well below the Company's price of $3.19 prior to the disclosure.  *See* Ex. 1 to Van Decl.  Similarly, the average price of Nextdoor during the 90-day PSRLA lookback period, *see* 15 U.S.C. § 78u-4(e), following the November 8, 2022 disclosure was 2.17, well below the Company's closing price of 2.32 the day before that disclosure.  *See* Ex. 2 to Van Decl.  In short, the price drops following the March 1, May 10, and November 8 disclosures were highly significant, and Nextdoor was unable to mount any sustained recovery for weeks or months following these drops.

In any event, Defendants' authority suggesting that a price drop needs to be significant and sustained for the purposes of loss causation has no application where, as here, Defendants continued to make misleading statements at the time of the corrective disclosures.  ND Mem. at 24-25 (citing *Woshos v. Tesla, Inc*. 985 F.3d 1180 (9th Cir. 2021).  Whereas a "quick and sustained price recovery" might "refute[] the inference that the alleged concealment of th[e] particular fact caused any material drop," *id*., a quick and sustained price recovery could just as well be attributed to continuing misrepresentations where, as here, the truth was revealed over a series of partial corrective disclosures.

## VII.    PLAINTIFF HAS STANDING TO SUE FOR PRE-MERGER STATEMENTS

Plaintiff has standing to sue the Khosla Defendants under Section 10(b) for statements Khosla Ventures made prior to merging with Nextdoor Private.  Under the "purchaser-seller rule," standing under Section 10(b) is confined to "purchasers or sellers of the stock in question," where the stock in question is "the security to which the prospectus, representation, or omission relates." *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742-47 (1975).  Here, Plaintiff has standing to sue the Khosla Defendants under Section 10(b) because Plaintiff was a purchaser of Khosla Ventures securities, and Khosla Ventures' "representation[s] or omission[s]" in its July 6,

2021 8-K "relate" to Khosla securities. For example, investors relied on Khosla's comparison of Nextdoor's potential monetization to Twitter and Snap in valuing Khosla Ventures securities because those representations related to the potential future value of Khosla Ventures. AC ¶ 58.

Defendants argue that "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." ND Mem. at 10 (quoting *In re CCIV / LUCID Motors Sec. Litig.*, 110 F.4th 1181, 1185 (9th Cir. 2024)). That is true, yet wholly inapplicable here. Here, Plaintiff does not sue the target company, Nextdoor Private, for any misstatements Nextdoor Private made in the joint July 6, 2021 8-K. Rather, Plaintiff sues the *acquiring* company (Khosla) for alleged misstatements Khosla Defendants made in their own July 6, 2021 8-K. Indeed, neither *Lucid Motors* nor the Second Circuit case it followed, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 88 (2d Cir. 2022), concerned the situation here—where Plaintiff is suing the acquiring entity, the same legal entity from which it purchased securities, for statements that acquiring entity made that impacted the value of its own securities.

Defendants also cite to an unreported, out of circuit district court case, *In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906, 2024 WL 1348749, at *6 (S.D.N.Y. Mar. 29, 2024), to argue that statements by an acquiring entity that concern aspects of a company it is acquiring are not "about" the acquiring company and therefore do not "relate[]" to the acquiring company. K Mem. at 6. As an initial matter, the holding in *In re CarLotz* unfortunately relied on a demonstrable misreading of *Frutarom*—in *Frutarom*, plaintiffs did not pursue any claim against the acquiring company, so *Furtarom* had no occasion to, and at no point did, hold that statements by an acquiring entity that concern aspects of a company it is acquiring are not "about" the acquiring company or do not "relate" to it. *See Frutarom*, 54 F.4th at 82-89. In any event, the rule Defendants ask this court to adopt is unworkable. If statements by an acquiring company about a thing it is acquiring— statements relied on by investors to value that acquiring company—do not "relate" to the acquiring company in satisfaction of the purchaser-seller rule under *Blue Chip*, then a wide gamut of blatantly fraudulent statements clearly targeted by Section 10(b) would be immunized. For

example, a company could tell investors that it is using all of its value to purchase at a bargain price a mountain of pure gold that the company secretly knows is in fact a mountain of fool's gold, yet investors in that company would have no standing to sue for that paradigmatic fraud under Section 10(b) under Defendants' proposed rule. Neither the Ninth Circuit in *Lucid Motors* nor the Second Circuit in *Frutarom* declared such a problematic rule, and this Court should decline to be the first.

Separately, Nextdoor Defendants argue that Plaintiff lacks standing to bring a claim based on Defendants' August 9, 2022 misstatement because Plaintiff's last purchase of Nextdoor stock was on May 11, 2022. ND Mem. at 10-11 (citing ECF No. 31-4). Nextdoor Defendants are mistaken. Although "plaintiff purchased h[is] stock . . . before the [some of the] allegedly fraudulent statements . . . were made," the class period for which he has standing to sue need not be "confined to that period preceding [his] final purchase of . . . stock" because "carving out such a period would be arbitrary." *See Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 606 (N.D. Cal. 1991). Indeed, "once the general standing requirement is satisfied, any additional questions related to particular injuries are relevant only in the context of class certification under Federal Rule of Civil Procedure 23." *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008)) (citing *In re VeriSign, Inc.*, 2005 WL 88969, *4 (N.D. Cal. Jan. 13, 2005)).

**VIII.    THE AMENDED COMPLAINT STATES A CLAIM UNDER SECTION 20(A)**

As Plaintiff has adequately pleaded a claim under Section 10(b), Nextdoor Defendants' only argument for dismissal of Plaintiff's Section 20(a) claim fails. ND Mem. at 25 n.12. Khosla Defendants argue that Plaintiff's Section 20(a) claim is somehow tied exclusively to Plaintiff's Section 14(a) claim, K Mem. at 25, but no such limitation appears in Count III, AC ¶¶ 187-91. Moreover, the AC adequately pleads that the Khosla Defendants were controlling persons of Khosla within the meaning of Section 20(a) by pleading their positions and alleging their ability to control the decision-making of Nextdoor. AC ¶¶ 10-14, 19-20, 138, 187-91.

**IX.    CONCLUSION**

Defendants' Motions should be denied.

Dated:  January 14, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Austin P. Van*
Jeremy A. Lieberman (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024
Telephone:  (310) 405 7190
Facsimile:  (917) 463 1044
jpafiti@pomlaw.com

*Attorneys for Lead Plaintiff*

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 5:24-CV-01213)