COOLEY LLP
PATRICK E. GIBBS (183174)
(pgibbs@cooley.com)
SHANNON M. EAGAN (212830)
(seagan@cooley.com)
TIJANA M. BRIEN (286590)
(tbrien@cooley.com)
ANDREW C. JOHNSON (322069)
(acjohnson@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone:    +1 650 843 5000
Facsimile:    +1 650 849 7400

Attorneys for Defendants
Nextdoor Holdings, Inc., Sarah J. Friar,
and Michael Doyle

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANKIE J. ADAMO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEXTDOOR HOLDINGS, INC., SARAH J. FRIAR, MICHAEL DOYLE, VINOD KHOSLA, SAMIR KAUL, PETER BUCKLAND, KHOSLA VENTURES LLC, and KHOSLA VENTURES SPAC SPONSOR II LLC,<br><br>Defendants. | Case No. 5:24-cv-01213-EJD<br><br>**CLASS ACTION**<br><br>**NEXTDOOR DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**<br><br>Date:        March 20, 2025<br>Time:       09:00 AM<br>Courtroom:  4<br>Judge:      Hon. Edward J. Davila |

COOLEY LLP
ATTORNEYS AT LAW

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................................... 1

II.    PLAINTIFF FAILS TO STATE A 10(B) CLAIM............................................................ 2

    A.    The Opposition Confirms that the Complaint has not Adequately Alleged Falsity ......................................................................................................... 2

        1.    Nextdoor's Opinion About Its Monetization Potential Was True .............. 2

        2.    Nextdoor Accurately And Completely Disclosed Its User Metrics ............ 5

        3.    Statements About Nextdoor's Future User Growth And Monetization Potential Are Forward-Looking............................................ 8

        4.    Statements About Nextdoor's Future User Growth And Monetization Potential Are Inactionable Corporate Optimism ................ 10

    B.    Plaintiff Fails to Plead a Strong Inference of Scienter......................................... 11

    C.    Plaintiff Fails to Plead Loss Causation ................................................................ 13

    D.    Plaintiff Lacks Standing for Pre-Merger Statements Under Section 10(b) and May Not Bring a Claim for Statements Post-Dating his Stock Purchases........................................................................................................... 14

III.   PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY UNDER 20(A) ........................................................................................................................ 15

IV.    CONCLUSION ............................................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfus v. Pyramid Tech. Corp.*,
    764 F. Supp. 598 (N.D. Cal. 1991) ...................................................................................... 15

*In re Allied Nevada Gold Corp. Securities Litig.*,
    743 F. App'x 887 (9th Cir. 2018) ......................................................................................... 5

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021)............................................................................................. 12, 13

*Bao v. Solarcity Corp.*,
    2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ............................................................................ 15

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008)............................................................................................. 6, 7

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999)............................................................................................. 15

*Brendon v. Allegiant Travel Co.*,
    412 F. Supp. 3d 1244 (D. Nev. 2019) ................................................................................. 13

*Browning v. Amyris, Inc.*,
    2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)...................................................................... 8

*Cai v. Eargo, Inc.*,
    2025 WL 66041 (9th Cir. Jan. 10, 2025) ............................................................................ 13

*In re CCIV/Lucid Motors Sec. Litig.*,
    110 F.4th 1181 (9th Cir. 2024)............................................................................................ 14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017).................................................................................... 3, 4, 5, 8

*In re Cloudera, Inc. Sec. Litig.*,
    121 F.4th 1180 (9th Cir. 2024).............................................................................................. 6

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................................................ 15

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010).............................................................................................. 10

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003)................................................................................................ 2

**TABLE OF AUTHORITIES**
(continued)

Page

*Espy v. J2 Global, Inc.*,
99 F.4th 527 (9th Cir. 2024)..........................................................................................12

*Fadia v. FireEye, Inc.*,
2016 WL 6679806 (N.D. Cal. Nov. 14, 2016)................................................................11

*Huang v. Avalanche Biotechnologies, Inc.*,
2016 WL 6524401 (N.D. Cal. Nov. 3, 2016)....................................................................4

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
2018 WL 4181954 (N.D. Cal. Aug. 31, 2018)..................................................................6

*Jedrzejczyk v. Skillz Inc.*,
2023 WL 2333891 (N.D. Cal. Mar. 1, 2023), *aff'd*, 2024 WL 1635568 (9th
Cir. Apr. 16, 2024) .......................................................................................................10

*Kovtun v. VIVUS, Inc.*,
2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ........................................................11, 12

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) ..................................................................6

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)..........................................................................................14

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)........................................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)......................................................................................................3, 4

*In re Peregrine Sys., Inc. Sec. Litig.*,
2005 WL 8158825 (S.D. Cal. Mar. 30, 2005) ................................................................12

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)........................................................................................13

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017)........................................................................................10

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)..........................................................................................15

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001)..........................................................................................13

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re Stable Rd. Acquisition Corp.*,
2022 WL 2762213 (C.D. Cal. July 13, 2022) ................................................................ 12, 13

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020) ............................................................................ 11

*Vignola v. FAT Brands, Inc.*,
2019 WL 6888051 (C.D. Cal. Dec. 17, 2019) ................................................................ 5

*Wanca v. Super Micro Computer, Inc.*,
2018 WL 3145649 (N.D. Cal. June 27, 2018) ................................................................ 15

*Wochos v. Tesla, Inc.*,
2019 WL 1332395 (N.D. Cal. Mar. 25, 2019), *aff'd*, 985 F.3d 1180 (9th Cir.
2021) ....................................................................................................................... *passim*

*Zaghian v. Farrell*,
675 F. App'x 718 (9th Cir. 2017) .................................................................................. 9

**Statutes**

PSLRA ............................................................................................................. 4, 11, 12

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iv

**REPLY ISO MOTION TO DISMISS AMENDED
CLASS ACTION COMPLAINT**
CASE NO. 5:24-CV-01213-EJD

## I.    INTRODUCTION

Plaintiff's Opposition ("Opp.") confirms that his Amended Class Action Complaint ("Complaint") fails to state a claim.  To start, Plaintiff withdraws his Section 14 claim entirely, and for his Section 10(b) claim, he no longer pursues nine of the thirteen challenged statements.  For two of the four statements that remain, Plaintiff admits he does not have standing to pursue claims against Nextdoor Holdings, Inc. ("Nextdoor") or its former executives, Sarah Friar and Michael Doyle (together with Nextdoor, the "Nextdoor Defendants").  What remains are weak and misguided arguments that fail to support falsity, scienter, or loss causation for any of the remaining statements.

*First*, Plaintiff fails to plead falsity.  Plaintiff claims it was misleading for Nextdoor to compare its monetization metrics with Twitter and Snap (and even to discuss its own weekly average user ("WAU") metric) because users interact with Nextdoor differently and because Nextdoor uses a different definition of "active user."  But Nextdoor plainly disclosed that people used Nextdoor for specific purposes like "finding a plumber" or "the best spot for dinner" (unlike Twitter and Snap), and that Nextdoor calculated WAU "differently" to include both users who logged onto the Nextdoor website or app as well as those who "engage[d] with an email with monetizable content."  Plaintiff claims that "up to 50%" of Nextdoor's "active users" fell into that latter category, and he appears to assume that if investors had known that "fact," they would have disagreed with Nextdoor's stated opinions about its monetization potential.  That is far from clear, but in any event, it is not a basis for finding that Defendants' opinions were objectively untrue, much less that they did not honestly hold those views – such that those opinion statements could be actionable.  In any case, each of the challenged statements is also inactionable as a matter of law as a forward-looking statement and statement of corporate optimism.

*Second*, Plaintiff fails to establish a strong inference of scienter for each Defendant.  The Complaint relies on vague former employee assertions about access to "reports" or discussions during "companywide meetings," none of which comes close to suggesting that Defendants acted recklessly or with an intent to mislead shareholders.  And because Plaintiff has not shown how knowledge of the underlying facts about user behavior or user metrics necessarily equates with an intent to mislead investors, Plaintiff's attempt to invoke the "core operations" theory likewise fails.

*Third*, the Opposition confirms that Plaintiff fails to plead loss causation.  None of the four alleged corrective disclosures revealed "new information," much less "fraudulent activity."  Nor do the "stock drops" on which Plaintiff relies support loss causation.

*Finally,* Plaintiff concedes that he lacks standing to challenge pre-merger statements as to Nextdoor and its executives and is now only pursuing them as to the Khosla Defendants.  And while Plaintiff offers a half-hearted attempt to dispute it, Plaintiff cannot pursue a claim as to the August 9, 2022 statement (months after his last purchase of Nextdoor stock in May 2022).  These standing issues provide yet another basis for this Court to dismiss three of the four remaining statements.

For each of these independent reasons, the Court should dismiss the Complaint with prejudice.

## II.  PLAINTIFF FAILS TO STATE A 10(B) CLAIM

### A.  The Opposition Confirms that the Complaint has not Adequately Alleged Falsity

Having abandoned the vast majority of his claims,[1] Plaintiff now challenges only four statements: (1) two pre-merger statements comparing Nextdoor to Twitter and Snap and which Plaintiff is now only pursuing with respect to the Khosla Defendants (the "Twitter/Snap Statements"), and (2) two post-merger statements describing Nextdoor's "active users" (the "WAU Statements").  Plaintiff has failed to allege that any of these statements were false or misleading.

#### 1.  Nextdoor's Opinion About Its Monetization Potential Was True

Plaintiff argues that Nextdoor misled investors with (1) a July 6, 2021 presentation depicting an "illustrative" comparison of Nextdoor's daily "active user" and "average revenue per user" metrics to those of Twitter and Snap and (2) Ms. Friar's statement, which accompanied the slide, opining that

---

[1] Plaintiff does not even attempt to defend his Section 14 claim, which was improper, including for lack of standing and statute of limitations.  (Opp. at 3.)  Plaintiff likewise concedes that he is no longer pursuing claims related to Statement Nos. 2, 4-11.  (*Id.*)  While Plaintiff purports to "reserve[] all rights to amend" the Complaint, he does not identify how he would cure the various identified deficiencies.  He cannot.  Accordingly, the Court should dismiss Plaintiff's Section 14 claim and his Section 10(b) claim as Statement Nos. 2, 4-11, with prejudice.  *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("futility of amendment" warrants dismissal with prejudice).

"there is no structural reason why Nextdoor should undermonetize . . . I could perhaps [posit] that Nextdoor should, in fact, overmonetize relative to those platforms."  (Opp. at 4.)  According to Plaintiff, this was misleading because Nextdoor failed to disclose that (1) "due to the nature of the content of the platform" it did not "hold users' attention on each visit like Twitter and Snap do" and (2) "unlike Twitter's and Snap's users, half of Nextdoor's users merely open Nextdoor emails rather than engaging with Nextdoor's platform."  (Opp. at 16-17.)  Plaintiff is wrong on both fronts.

As an initial matter, these statements were opinions and therefore are inactionable unless the Complaint alleges, with particularity, "*both* that the speaker did not hold the belief she professed and that the belief is objectively untrue."  (Mot. at 13.)  Plaintiff attempts to avoid this heavy burden by claiming that these statements could not be opinion statements because they "created an impression about a falsifiable fact."  (Opp. at 13-14 citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).)  But what Plaintiff characterizes as "falsifiable fact" are quintessential matters of opinion—namely, whether Nextdoor's users were "meaningfully active," "engaged," or "comparable" to those of Twitter and Snap.  *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 616 (9th Cir. 2017) (opinion statements "are inherently subjective and involve management's opinion" about a particular fact).  Importantly, there are no objective benchmarks to establish whether any of these conclusions was true or false.  This is especially true given that Nextdoor clearly disclosed (1) that its users behaved differently (*i.e.*, searching for specific items rather than aimlessly scrolling like users on Twitter and Snap) and (2) its own definition of "active users."  The only undisclosed "fact" alleged in the Complaint is that, at some undefined time and for some undefined period, "up to 50%" of Nextdoor's WAUs were those who engaged with email.  (AC ¶¶ 64-65.)  But this alleged "fact" does not explain how Nextdoor came to form its opinions, and so does not render these statements false under the standard articulated in *Omnicare*.  *Cf*. 575 U.S. at 189-90 ("[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion . . .").  It is, at most, a "fact cutting the other way" – not enough to render these opinion statements false or misleading.  *Id.* ("An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.")  At bottom,

Plaintiff is arguing that if investors had known about the alleged 50/50 split, they would have reached a different conclusion than the one expressed. That is not enough under *Omnicare*.

Plaintiff also argues that, even if these statements were opinions, they are still actionable because "reasonable investors would take from Nextdoor's July 6, 2021 investor presentation that Nextdoor daily active users could be reasonably compared to Twitter and Snap daily active users, when in fact, half of Nextdoor's users were not actively using Nextdoor's product at all." (Opp. at 14.) This theory assumes that that the way Nextdoor's users interacted with the platform necessarily meant lower monetization than Twitter and Snap. But while Plaintiff makes the conclusory assertion that "aimless" scrolling on Twitter and Snap would somehow lead to greater monetization based on the number of ads shown to a user (Opp. at 16), there are no particularized allegations in support of this assertion. One could just as easily conclude that the way users interacted with Nextdoor (visiting the website for the specific purpose of finding goods or services) might lead to *more* monetization, especially if advertisers were willing to pay more for advertisements on Nextdoor's platform. Without particularized allegations (as opposed to Plaintiff's conjecture) about how Nextdoor's use case *actually* impacted Nextdoor's monetization and revenue, the Complaint fails to adequately allege this theory of falsity. The same is true for Plaintiff's claim, again without any support, that users who "open Nextdoor emails rather than engaging with Nextdoor's platform" would "heavily weigh down Nextdoor's average revenue per user." (Opp. at 17.) There are no particularized allegations whatsoever to support that conclusion. This is not enough under the PSLRA. *Huang v. Avalanche Biotechnologies, Inc.*, 2016 WL 6524401, at \*6 (N.D. Cal. Nov. 3, 2016) (declining to "connect[ ] the dots" absent particularized facts).

There are also zero particularized allegations that Nextdoor's executives believed that Nextdoor's "structural" differences or "active user" measures meant that Nextdoor could not achieve monetization equal to or greater than Twitter and Snap – a *separate* basis for dismissing these claims. *See Dearborn*, 856 F.3d at 615–16 (plaintiff "must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue'"). Plaintiff argues that the Complaint "alleges that Defendants did not believe these statements" (Opp. at 14, n. 3), but the referenced paragraphs contain only the conclusory allegation that "Defendants knew" their statements were false, without a

single particularized allegation in support of such "knowledge." Such conclusory allegations come nowhere close to alleging the actual knowledge necessary to challenge an opinion statement. *Dearborn*, 856 F.3d at 616. At best, Plaintiff has alleged that Defendants were aware of how Nextdoor's platform was used (which was disclosed), how Nextdoor's "active users" were measured (which was disclosed), and that they had "access" to unspecified reports that identified the mix of on- versus off-platform users at unspecified points in time. None of that speaks to awareness of what impact, if any, this information had on Nextdoor's monetization potential – or that any Defendant interpreted this information as contradicting their statement.

Plaintiff's authorities only underscore this point. In *Vignola v. FAT Brands, Inc.*, 2019 WL 6888051, at *8 (C.D. Cal. Dec. 17, 2019), in connection with their IPO, defendants "touted" that the management team "ha[d] the track record" to achieve "significant future growth" but failed to disclose "that the same leadership team had previously steered the subsidiaries of its same flagship brand into bankruptcy while undertaking the same kind of acquisition spree" that the IPO was intended to fund. *Id*. at *10. The same is true for *In re Allied Nevada Gold Corp. Securities Litig.*, 743 F. App'x 887, 887-88 (9th Cir. 2018) where, in an unpublished opinion, the Ninth Circuit held that defendants' knowledge of "serious operating difficulties" in defendants' mining operation "left [defendants] with no basis for their optimistic statements regarding production, finances, and the company's expansion plans." *Id*. Here, Plaintiff's disagreement with Defendants' conclusions, with the benefit of hindsight, comes nowhere close to alleging, with particularity, any information demonstrating that Defendants had "no basis" for their optimism about Nextdoor's monetization potential or user engagement – let alone that any Defendant was contemporaneously aware of such information. The Court should dismiss these Statements.

### 2. Nextdoor Accurately And Completely Disclosed Its User Metrics

Plaintiff argues that the WAU Statements were misleading because Nextdoor misled investors into believing that the number of users who were engaging with its platform was much larger than it actually was. (Opp. at 10.) Plaintiff's argument rests on his chosen definition of "active user" and his unsupported conclusion about the impact of email engagement. (*Id*.) Both arguments fail.

As an initial matter, and as Plaintiff admits, Nextdoor repeatedly disclosed to investors how

it defined WAU: "a Nextdoor user who opens our application, logs on to our website, ***or engages with an email with monetizable content*** at least once during a defined [7-day] period." (*See* Mot. at 6, Ex. 1, Ex. 2, Ex. 4, Ex. 5, Ex. 6.)[2]  Because investors knew exactly how *Nextdoor* was defining these metrics, they could not have been misled into thinking that WAU was being defined some other way.[3]  *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 2011 WL 1158028, at *11 (S.D.N.Y. Mar. 30, 2011) (use of "subprime" not misleading where plaintiff claimed "subprime" loans were loans to borrowers with FICO score of less than 600, but defendant disclosed it was using score of 620 or less).

Plaintiff fails to allege with particularity that his definition of "active user" was the only definition of the term, let alone that it was one that was used industry-wide.  *In re Cloudera, Inc. Sec. Litig.*, 121 F.4th 1180, 1187-88 (9th Cir. 2024) (affirming dismissal where plaintiff failed to "plead sufficient facts to establish that the actual term used had the distinctive" meaning that plaintiff alleged).  Plaintiff points to the allegations of two former employees who claim that "employees" had concerns about Nextdoor's definition of users.  But the Complaint is devoid of any allegations suggesting that FE6 and FE7's opinions are evidence of an exclusive or industry-wide definition.  *See Wochos v. Tesla, Inc.,* 2019 WL 1332395, at *6 n.2 (N.D. Cal. Mar. 25, 2019), *aff'd*, 985 F.3d 1180 (9th Cir. 2021) ("Plaintiffs had to plead sufficient facts to establish that the actual term used had the distinctive, and false, meaning that Plaintiffs claim").  Plaintiff's reliance on *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (Opp. at 13) only underscores this point.  There, the Ninth Circuit considered whether the disclosure of "backlog figures" was misleading where

---

[2] Plaintiff also did not oppose Nextdoor's Request for Judicial Notice.  ECF No. 72.  As such, the Court should take Judicial Notice of the documents submitted in support of Nextdoor's Motion.

[3] Because there are no allegations that Defendants did not accurately measure or report WAU, or other user information based on the disclosed methodology, the portions of Statement Nos. 1, 3, 12, and 13 concerning WAUs are accurate statements of historical fact and are "inactionable on their face." *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018) ("[a]ccurately reported historical information" is inactionable as a matter of law).

defendants did not disclose that those figures included "stopped work" (*i.e.*, work that was unlikely to resume). *Id*. The Ninth Circuit explained that in the absence of a disclosed definition, investors could have interpreted the "phrase as limited to work still in progress or work yet to be started" and not also work that could simply be stopped and "thus immediately interrupt the company's revenue stream." *Id*. at 986. Unlike in *Berson*, Nextdoor disclosed the *exact definition* of WAU—including how the Company calculated it and the assumptions it made in order to calculate the metric. (Mot. at 16.) As such, there was no reasonable alternative interpretation of WAU.

Plaintiff argues that these statements were nonetheless false and misleading because Nextdoor failed to disclose that half of its users (allegedly) fell within the latter category of the WAU definition (*i.e.*, users who "engage[] with an email with monetizable content"). (Opp. at 10.) Importantly, like the Twitter/Snap Statements, the WAU Statements are opinion statements because they reflect management's judgment of what it means for a user to be "active" or engagement to be "durable." *See, e.g.*, *Wochos*, 985 F.3d at 1196 (statement that "'great progress' was being made" was "'pure statement of opinion' [and] generally not actionable"); *see also supra* at Section II.A.1. Without particularized allegations that these statements were not subjectively believed *and* were "objectively untrue" they are not actionable. The Complaint is woefully deficient in both regards.

Plaintiff seems to suggest that these statements were objectively untrue because users who "engage[] with an email with monetizable content" are materially less "monetizable" or "active" than users who interacted with the Nextdoor website or app. (Opp. at 3.) But the Complaint is devoid of *any* facts—particularized or otherwise—to support that conclusion. It alleges no facts about how much revenue Nextdoor generated, or expected to generate, from either type of user. Instead, Plaintiff simply surmises—again, without any support—that a "user's merely opening an email is materially different." (Opp. at 10.) But even assuming that there was some unspecified difference between users who engage with an email versus those who engage with the website or app (AC ¶¶ 64-65), the Complaint fails to allege particularized facts about how any purported split between the two types of users supports falsity. Indeed, while the Complaint alleges that "up to 50%" of WAUs were those who engaged with a Nextdoor email, instead of the website or app (*id*.), the Complaint contains no particularized allegations about *when* WAU was split in that way, for how long, or what that meant

for revenue at any particular point in time.[4]

Finally, with respect to the actual knowledge requirement, there is a not a single allegation to support that Ms. Friar (the sole identified speaker of these statements) believed Nextdoor's community was not "active" as she used the phrase, or that Nextdoor's engagement trends were not "durable." The only allegations about Ms. Friar's state of mind support – at most – that she was aware of how Nextdoor defined WAU, that some employees had "concerns" about the definition, and that she had "access" to information showing the split between email and website/app users, which was at some unspecified point in time "up to 50%" email users. Without any particularized allegations about how Ms. Friar interpreted that information and the impact it had on her beliefs, those allegations fail. *Dearborn*, 856 F.3d at 616.

Because Nextdoor explicitly defined how it measured "active users" and because there are no particularized allegations that its disclosures created a misleading impression, Plaintiff's WAU Statements theory fails to state a claim.

### 3.    Statements About Nextdoor's Future User Growth And Monetization Potential Are Forward-Looking

Plaintiff claims that the challenged statements were not "forward looking" or "accompanied by any meaningful cautionary language." (Opp. at 14-15.) Plaintiff is wrong.

As an initial matter, statements about Nextdoor's monetization potential (Statement Nos. 1, 3) were forward looking because they discussed what Nextdoor expected to happen with the platform in the future. *See Browning v. Amyris, Inc.*, 2014 WL 1285175, at *13 (N.D. Cal. Mar. 24, 2014) (statements about what defendants "expect" are forward looking); *Wochos*, 985 F.3d at 1191 (holding

---

[4] Even assuming that there was an alleged 50/50 split in WAU, no particularized allegations support that Nextdoor lacked an "active" community or that "over half of weekly active users were [not] active daily" simply because half of its community was "active" on email. (Statement No. 12.) Similarly, there are no allegations to support that Nextdoor's engagement trends were not "durable," even if half of such engagement was by email. (Statement No. 13.) These vague statements cannot be objectively true or untrue based on a 50/50 split. *See also infra* at Section II.A.4.

that the "definition of 'forward-looking statements' . . . expressly includes 'statements of the plans and objectives of management for future operations' . . . , and 'statements of the assumptions underlying or relating to' those plans and objectives").[5]

Plaintiff claims that these statements are nonetheless actionable because "they were not accompanied by meaningful cautionary language." (Opp. at 14.)  But neither the Opposition nor the Complaint identifies the specific "risk" Nextdoor should have warned of.  Indeed, the Complaint alleges only the "materializations of the risks of disappointing results," (AC ¶ 28) presumably because Nextdoor did not achieve the same monetization levels as Twitter and Snap (which, of course, it never said it would).  Importantly, Nextdoor did warn investors that it may not be able to achieve monetization of its platform, warning that "Nextdoor is still in the early stages of monetizing its platform" and "[t]here can be no assurance that Nextdoor will successfully increase monetization on its platform or that it will sustain or increase the current growth rate of its revenue." (ECF No. 71-5 at 57.)  With respect to Nextdoor's market opportunity (such as the market opportunity as compared to Twitter and Snap) Nextdoor warned that "[m]arket opportunity estimates and growth forecasts discussed herein, including those Nextdoor has generated itself, are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate." (*Id*. at 63.)  These risk factors warned of the specific risk that Plaintiff claims materialized – the inability to achieve the same monetization levels as Twitter and Snap.

The sole case cited by Plaintiff to support his argument, *Zaghian v. Farrell*, 675 F. App'x 718, 719–20 (9th Cir. 2017), is distinguishable.  There, plaintiff alleged the materialization of a specific risk – the risk that a new video game would fail because it would not be adopted by "hardcore gamers" who were not interested in child-focused games.  *Id*. at 720.  Defendants argued that a risk factor related to the failure to "achieve sales expectations" provided sufficient cautionary language to warn of this risk.  *Id*.  The Court disagreed, noting that the risk factor in question was focused on "potential product defects and supply chain disruption, neither of which had occurred."  Here,

---

[5] Plaintiff does not appear to dispute this. (Opp. at 14-15.) Statement Nos. 12 and 13 are also forward-looking to the extent they implied future expectations based on present "active user" engagement.

Plaintiff identifies no similar specific and known risks, which was not adequately disclosed by Nextdoor.

Finally, contrary to Plaintiff's conclusory assertion, there are no allegations that any of these statements were made with actual knowledge of falsity. *See supra at* Section II.A.1 & II.A.2.

As such, Statement Nos. 1 & 3 are protected under the PSLRA's safe harbor.

### 4. Statements About Nextdoor's Future User Growth And Monetization Potential Are Inactionable Corporate Optimism

"[V]ague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" are not actionable. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Plaintiff does not even attempt to distinguish the vast majority of cases cited in the Motion, holding that statements such as "business will be good this year," results will be "excellent," or a company had a "strong foundation" for growth, are inactionable corporate optimism. (Mot. at 15; *compare with* Nextdoor has a "strong foundation for continued growth," Nextdoor should "overmonetize" (Statement Nos. 1 & 3)). And while Plaintiff claims – without any analysis – that "Defendants' statements are nothing like the vague statements that were at issue" (Opp. at 15) in *Jedrzejczyk v. Skillz Inc.*, 2023 WL 2333891, at *5-6 (N.D. Cal. Mar. 1, 2023), *aff'd*, 2024 WL 1635568 (9th Cir. Apr. 16, 2024), it is hard to imagine a more direct comparison. In *Skillz*, statements touting a platform's "extraordinary user engagement" and "stickier, more engaging, and continuously improving user experience" were inactionable. Here, Plaintiff challenges very similar statements around user engagement, including "[o]ur community is active and becoming increasingly active" and "[w]e're seeing durable engagement trends" (Statement Nos. 12, 13). Like the statements in *Skillz*, these statements are subjective, "feel good monikers" with no single objective meaning and should be dismissed.[6]

---

[6] *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) does not help Plaintiff. (Opp. at 15.) There, defendants described the state of the company's pipeline in concrete, rather than "subjective or emotive terms," including that "more than half the large practice market, more than 75% of the midsize practice market is still fair game for new system sales" or "[t]here is nothing drying up and there is nothing slowing down." No similar statements are challenged here.

### B.    Plaintiff Fails to Plead a Strong Inference of Scienter

The Complaint fails to plead a strong inference of scienter as to the Nextdoor Defendants. Importantly, the Opposition does not explain how, *even if all scienter allegations are credited*, those allegations are sufficient to demonstrate that any Defendant knowingly or recklessly misled investors. Instead, Plaintiff simply assumes that knowledge of particular facts (here, the structure of Nextdoor's platform and its "active user" definition and mix) equates to knowledge that a particular statement would mislead investors. But there is nothing obviously contradictory between the two. Plaintiff cannot simply assume intent and instead must allege "contemporaneous knowledge that the statement[s] [were] false when made." *Kovtun v. VIVUS, Inc.,* 2012 WL 4477647, at *19 (N.D. Cal. Sept. 27, 2012). He has failed to do so here and for that reason, his Complaint should be dismissed.

The Opposition relies almost exclusively on allegations about FE6 concerning "defendants'" "access" to reports and employee "concerns" expressed at "company-wide meetings." (Opp. at 19-20.) But, although FE6 allegedly received unspecified "executive reports," there is no dispute that FE6 (and therefore the Complaint) has nothing to say about what any of those executive reports allegedly said, whether the reports were inconsistent with the Company's public statements, when those reports were sent, received, or accessed, how the contents of those reports changed over time, or whether any Defendant actually reviewed any particular report. Moreover, the Complaint alleges no facts to suggest that any of these unspecific reports caused Nextdoor's executives to reach any conclusions that differed from the opinions that they expressed. This is precisely the type of unparticularized scienter allegation that the PSLRA is meant to ward off. *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 888 (N.D. Cal. 2020) (allegations insufficient "because they do not describe with particularity the specific contents of these daily summaries and periodic reviews of key metrics.").

The same is true for the allegations about "company-wide meetings." The Complaint does not specify at what meeting a question about WAUs was asked (and when) or whether Ms. Friar (or anyone else) heard the question or responded to it. Such allegations are woefully deficient. *See Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016) ("[p]laintiffs needed to have provided information about *precisely* what was said by the parties in these meetings, which facts the

[d]efendants were exposed to, and why this exposure supports an inference of scienter.") (emphasis added).  Without particularized allegations that any Defendants knew about these opinions or when – let alone that they agreed with them – these allegations are insufficient to plead a strong inference of scienter.  *See Espy v. J2 Global, Inc.*, 99 F.4th 527, 536 (9th Cir. 2024) (disregarding FE allegations that "fail[ed] to establish reliability or personal knowledge, or simply amount to criticisms"); *Wochos*, 985 F.3d at 1194 (allegations that employees raised concerns insufficient to establish scienter where no facts indicated that defendants agreed with the concerns).

Finally, as to the "core operations" theory, Plaintiff has failed to show how this is the "rare circumstance[]" where this theory would support a strong inference of scienter.  For that purpose, it does not matter that Defendants knew how Nextdoor measured "active users."  Investors also knew that.  The question is whether knowledge of that fact is enough to support a strong inference that Defendants intended to mislead shareholders (or misled them recklessly) by expressing their views about Nextdoor's monetization potential or by disclosing Nextdoor's WAU metrics.  *See Espy*, 99 F.4th at 537 (knowledge of omitted information "alone would not indicate a strong inference of scienter"); *In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *41 (S.D. Cal. Mar. 30, 2005) ("allegations that a [d]efendant was generally aware of facts . . . is not sufficient to show scienter"). Even assuming that 50% of users were part of the latter half of Nextdoor's "active user" definition, that fact still would not establish scienter without allegations of what any Defendant understood in terms of impact on Nextdoor's monetization potential generally, or their statements more specifically. *Kovtun*, 2012 WL 4477647, at *19 ("the PSLRA requires 'particular allegations which strongly imply [d]efendant[s'] contemporaneous knowledge that the statement was false when made'").  This is simply not the type of situation where a "core operations" inference can save Plaintiff's claim.

The three cases cited by Plaintiff only highlight the inapplicability of the theory to the allegations in this case.  (Opp. at 19 citing *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019), *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021), *In re Stable Rd. Acquisition Corp.*, 2022 WL 2762213, at *10 (C.D. Cal. July 13, 2022).)  All three cases involved management's awareness of mission-critical risks to their business that were inconsistent with management's statements to investors: awareness of pervasive plane maintenance issues while telling

investors that the airline was a "safe operation" in *Allegiant Travel Co*; awareness of a material data-security vulnerability while warning investors about only the possibility of such issue in *In re Alphabet*; and awareness of the failure of the only test of its flagship product while touting the product and its launch to investors in *In re Stable*. No such mission critical risks are identified here (and there are no allegations that any such risks were not disclosed). As such, the core operations theory is simply inapplicable. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (rejecting core operations theory because "at best, these facts support a mere inference of the defendants' knowledge of all core operations, not scienter"); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (same).

Viewed holistically, the more compelling inference is an innocent one.[7] Defendants were transparent with investors about the bases for their beliefs, their methodology for calculating "active users," and the risks they would face in continuing to grow their business. While optimistic about Nextdoor's prospects, Defendants' "[h]onest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). Coupled with a lack of motive, including that Ms. Friar and Mr. Doyle did not sell any shares and continued to increase their holdings (evidencing their belief in Nextdoor's prospects), the only inference that can be drawn here is an innocent one. *See Cai v. Eargo, Inc.*, 2025 WL 66041 at * 2 (9th Cir. Jan. 10, 2025) (affirming no scienter where individual defendants "increased their . . . stock holdings during the class period, which contradicts the inference of scienter"). The Complaint should be dismissed, with prejudice.

C.    **Plaintiff Fails to Plead Loss Causation**

Plaintiff's flawed loss causation theory, which is nothing more than a disguised attempt at investment insurance, also warrants dismissal. Despite Plaintiff's conclusory assertion that "each of the four corrective disclosures revealed new facts about the Company's contracting ARPU growth

---

[7] Plaintiff tries to disclaim a bright-line rule that "statements by former employees cannot support scienter because those former employees had no direct contact." (Opp. at 21.) A lack of direct contact should be weighed, amongst other factors, in determining the reliability of a particular witness.

rate and its declining WAUs," (Opp. at 22) the Opposition and Complaint are devoid of any such "new facts."  None of the four corrective disclosures revealed any facts about how Nextdoor was calculating its WAU mix.  Nor did they reveal any facts about Nextdoor's platform structure, as compared to Twitter or Snap, or how that was impacting the Company's ability to grow and scale its business.  At most, these disclosures "revealed" that Nextdoor revised its full year guidance, like many other companies during this time period.  This is insufficient to allege loss causation – particularly on four separate occasions.  *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (plaintiff must "allege that the market 'learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.'").

Plaintiff also claims that the stock drops were "manifestly significant." (Opp. at 22.)  Of course, Ex. 26 (ECF No. 71-28), demonstrates the actual stock prices following the alleged corrective disclosures.  As such, the Court can see for itself the minimal stock drop on March 1, 2022 and the immediate rebounds following the May 10, 2022 and November 8, 2022 disclosure – all of which belie any fraudulent causation.  *See Wochos*, 985 F.3d at 1198 ("quick and sustained price recovery . . . refutes the inference that the alleged concealment of th[e] particular fact caused any material drop.").  Plaintiff claims that *Wochos* "has no application where, as here, Defendants continued to make misleading statements at the time of the corrective disclosures," but he cites no authority in support.  The Court can dismiss on loss causation, both because none of the alleged corrective disclosures "revealed fraudulent activity" and the stock drops were not significant or sustained.

**D.      Plaintiff Lacks Standing for Pre-Merger Statements Under Section 10(b) and May Not Bring a Claim for Statements Post-Dating his Stock Purchases**

Plaintiff appears to concede that he lacks standing to bring a claim against Nextdoor and its executives regarding the July 6, 2021 statements.  (Opp. at 23-24 (arguing only that he has standing to sue the Khosla Defendants for pre-merger statements)).  As Plaintiff admits, binding Ninth Circuit precedent prevents Plaintiff from bringing claims (including dropped Statements Nos. 2, 4-11) based on alleged misstatements by Nextdoor Private because he was never a "purchaser[] and seller[] of the securities about which the alleged misrepresentations were made."  *In re CCIV/Lucid Motors Sec. Litig.*, 110 F.4th 1181, 1185 (9th Cir. 2024).

Plaintiff also admits that he made his last purchase of stock on May 11, 2022, months before the last challenged statement on August 9, 2022. (Opp. at 25.) This Court's decision in *Wanca v. Super Micro Computer, Inc.*, 2018 WL 3145649, at *7 (N.D. Cal. June 27, 2018) and the precedent it cites, *Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999), make clear that conduct actionable under Rule 10b-5 is limited to conduct that occurred *before* investors purchased the securities in question. Plaintiff makes no attempt to distinguish *Wanca* or *Binder*. Instead, he cites two other cases: *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 606 (N.D. Cal. 1991) and *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008), both of which analyzed Article III standing and class representation under Rule 23. (Opp. at 25.) As this Court held in *Wanca* in rejecting the very same argument, Article III standing and compliance with Rule 23 "are concepts distinct from the one implicated by this case, which is whether Plaintiff may pursue claims based on post-purchase statements as a matter of law." 2018 WL 3145649, at *8.

The Court should dismiss Statement Nos. 1, 3, and 13.

## III.    PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY UNDER 20(A)

Because the Complaint does not state a primary violation as to Nextdoor and Ms. Friar, the "control person" claim under Section 20(a) as to all Defendants necessarily fails. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). Moreover, because the Complaint contains no particularized allegations in support of "control person" liability as to Mr. Doyle, including zero allegations about his involvement in the making of the remaining statements, the Court should dismiss the Section 20(a) claim against him with prejudice, regardless of whether it finds an underlying primary violation. *Bao v. Solarcity Corp.*, 2016 WL 54133 at *9 (N.D. Cal. Jan. 5, 2016) (no Section 20(a) liability because allegations that defendant was part of the "executive management team" were "too conclusory" to establish defendant's control over the company).

## IV.    CONCLUSION

For the above stated reasons and the reasons in Defendants' Motions, the Complaint should be dismissed with prejudice.[8]

---

[8] Nextdoor Defendants join in the arguments advanced by the Khosla Defendants in their briefs.

Dated:   February 13, 2025

COOLEY LLP


By:   /s/ Shannon M. Eagan
         Shannon M. Eagan

Attorneys for Defendants

*Nextdoor Holdings, Inc., Sarah J. Friar, and Michael Doyle*