UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KEITH HOLLINGSWORTH,<br><br>        Plaintiff,<br><br>    v.<br><br>NEXTDOOR HOLDINGS, INC., et al.,<br><br>        Defendants. | Case No. 5:24-cv-01213-EJD<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 71, 73 |

      Lead Plaintiff, Keith Hollingsworth ("Plaintiff"), brings this securities fraud class action under §§ 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 and SEC Rules 10b-5 and 14a-9 promulgated thereunder. First Am. Compl. ("FAC"), ECF No. 65. Before the Court are two motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The first is brought by Defendants Nextdoor Holdings, Inc., Sarah J. Friar, and Michael Doyle ("Nextdoor Defendants"). Nextdoor Mot., ECF No. 71. The second is brought by Defendants Vinod Khosla, Samir Kaul, Peter Buckland, Khosla Ventures LLC, and Khosla Ventures SPAC Sponsor II LLC ("Khosla Defendants") (collectively, "Defendants"). Khosla Mot., ECF No. 73. Plaintiff filed an omnibus opposition, and Defendants filed separate replies. Opp'n, ECF No. 76; Nextdoor Reply, ECF No. 77; Khosla Reply, ECF No. 78.

      Upon careful consideration of the relevant documents, the Court finds this matter suitable for decision without oral argument pursuant to Local Rule 7-1(b). For the reasons stated below, the Court **GRANTS** Defendants' motions to dismiss with leave to amend.

## I.  BACKGROUND

      Plaintiff alleges that Defendants made material misrepresentations and omissions about

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS

1

1    Nextdoor Private's projected profitability prior to and after its acquisition by Khosla Ventures

2    Acquisition Co. II ("KV Acquisition").

3    　　　　KV Acquisition is a special purpose acquisition company that raises money from investors

4    in an initial public offering and uses the proceeds to acquire business or operational assets,

5    typically from a private company. FAC ¶ 30. On July 6, 2021, KV Acquisition announced they

6    had entered into a merger agreement with Nextdoor Private. *Id.* ¶ 36.

7    　　　　Nextdoor Private first launched in the United States in 2011 as a "neighborhood network"

8    that operated a hyperlocal online social networking platform. *Id.* ¶¶ 39, 37. The platform

9    connected neighbors, public agencies, and businesses with features such as a news feed where

10   neighbors engage with posts, discussions, and pictures. *Id.* ¶ 37. Beginning in 2020, demand for

11   Nextdoor Private's community-based platform rose dramatically as shelter-in-place mandates and

12   other social distancing restrictions led people to increasingly seek social connection and

13   information from their communities on Nextdoor Private's platform. *Id.* ¶ 41. As a result,

14   Nextdoor Private grew rapidly in 2020 with weekly active users (also referred to as "WAUs")

15   growing nearly 37% from 19.5 million in 2019 to nearly 27 million in 2020. *Id.* Average revenue

16   per user ("ARPU") during the same period also grew by 10% from $4.23 to $4.62. *Id.*

17   　　　　Following KV Acquisition shareholders' approval at a special meeting, the merger was

18   completed on November 5, 2021. *Id.* ¶ 47. The new company is called Nextdoor Holdings, Inc.

19   ("Nextdoor"). *Id.*, at 1. Following the merger, virtually all of Nextdoor's revenues are generated

20   through advertising sales. *Id.* ¶ 38. Pursuant to the agreement, KV Acquisition shareholders had

21   the right to receive shares of Nextdoor in exchange for their shares of KV Acquisition. *Id.* ¶ 36.

22   　　　　Shortly after the merger, through a series of disclosures on March 1, May 10, August 9 and

23   November 8, 2022, Nextdoor revealed declining ARPU growth rates and declining weekly active

24   users. By the end of the Class Period, Nextdoor lost 90% of its value. *Id.* ¶ 28.

25   　　　　Plaintiff purchased KV Acquisition Class A common stock three days prior to the merger

26   on November 2, 2021. ECF No. 31-3. After the merger, Plaintiff continued to purchase Nextdoor

27   Class A common stocks until May 11, 2022. *Id.* Plaintiff brings this action on behalf of himself

28   Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS

2

and a class of all purchasers of the publicly traded Class A common stock of Nextdoor between July 6, 2021, and November 8, 2022 ("Class Period").

Plaintiff alleges that Nextdoor's significant loss during the Class Period occurred because Defendants misled investors about two aspects of Nextdoor's business.

First, Plaintiff alleges Defendants misled investors about Nextdoor's definition of "active users." Defendants repeatedly made statements regarding the sustained growth of Nextdoor's weekly and daily "active users," but it defined "active users" as users who visited Nextdoor's website or app or opened a content email. *E.g.,* FAC ¶ 26. Plaintiff alleges that Defendants failed to inform investors that half of the "active users" were those who simply opened an email, not those who created advertising revenue by engaging with the website or app. *Id.*

Second, in promoting the merger to investors, Defendants portrayed Nextdoor as the next big hit startup company like Twitter or Snap by directly comparing Nextdoor to those companies and suggesting that there were similarly no structural barriers to its skyrocketing. *Id.* ¶ 24. Plaintiff alleges that these comparisons were materially misleading because Nextdoor could not reasonably expect to obtain ARPU comparable to Twitter's and Snap's given that Nextdoor only attracts users for one-off, discrete tasks, and half of Nextdoor's "active users" merely open Nextdoor emails rather than engaging with Nextdoor's platform and making advertising impressions. *Id.* ¶ 25.

Plaintiff alleges that Defendants misled investors about these aspects of Nextdoor's business by making the following materially false and misleading statements and omissions during the Class Period:

(1) <u>July 6, 2021:</u> Nextdoor filed a July 2021 Investor Presentation, which represented that Nextdoor Private's growth was "sustainable," stating that the company had a "[s]trong foundation for continued revenue growth." *Id.* ¶ 110. The July 2021 Investor Presentation stated that Nextdoor Private had "significant monetization potential" based on a comparison of its ARPU and U.S. daily active users (also referred to as "DAUs") with those of Twitter (k/n/a/ X) and Snap. *Id.*

(2) <u>July 6, 2021:</u> Nextdoor filed with the SEC on Form 425 a transcript of an interview

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
3

Defendants Friar and Khosla gave to correspondents at CNBC's "Squawk on the Street" program. *Id.* ¶ 118. Cohost David Faber asked whether growth had "sort of peaked in 2020/'21 in terms of the revenue number maybe in part because of the pandemic" and whether this was a "concern for you as you try to sell the deal to your SPAC shareholders?" *Id.* Defendant Khosla responded that "it isn't a concern for me[,] we see accelerating growth." *Id.* Nextdoor Private also hosted a conference call with investors that same day where Defendant Doyle stated the following:

> ***We have a growing base of engaged and monetized users. We have more than 60 million verified neighbors on the platform.***
> With this tremendous growth in verified members on the platform, we have the opportunity to really drive engagement. And that's something that we saw demonstrated in 2020 and is ***sustained in 2021 as well, where we had deepening engagement across all cohorts of users***. We were able to increase the frequency of sessions of active users on the platform and also the depth of sessions, the amount of content that users consume and also create, which set us up for driving monetization opportunities with our advertisers, creating a larger, unique audience that's more engaged, that's generating more supply that allows us to do creative things and achieve the campaign objectives of the advertisers and businesses on the platform.
> . . .
> Nextdoor as a platform has just begun its monetization journey. In fact, when I joined about 2.5 years ago, we had just begun to tap into advertising. Today, ***if you look at our scale, we're about 1/3 the size of Twitter. And yet, if you look at our ARPU, we're at about 1/6 the ARPU. Of course, there is no structural reason why Nextdoor should undermonetize***. In fact, if you think about either the video where you saw the wonderful California-based restaurant that was getting recommendations from us or if you think about what Vinod said about the value of a link on Nextdoor, I could perhaps posit that ***Nextdoor should, in fact, overmonetize relative to those platforms***. So this tells me ***we're just getting started***. And even with that top-of-the-funnel growth of new users, we should be able to drive healthy revenue growth as we scale our ARPU.
> . . .
> The tailwind of product-driven growth and increased engagement and the monetization opportunities that I've described give us great confidence in our ability to achieve revenue growth rates year-on-year of more than 40%, here shown through 2022, driving us to almost $250 million of revenue. And we believe these are levels that can be sustained into the future.
> ***We're pleased to be seeing an acceleration in ARPU growth rates really driven by 3 different levers. The first is on deepening engagement, so driving a greater number of sessions per active user, as well as deepening each session in the form of greater consumption of and creation of content. The second is on ad***

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
4

> *delivery, so this is really on the optimization of the supply we have on the platform*, driving fill rates higher, having better targeting, driving performance and ultimately CPMs, higher yield on the platform, *as well as owning the relationships with the advertisers directly*. And then the third lever is on sources of revenue that are not directly tied to the growth of impressions.
> We talked a lot about the focus on revenue. *And for us, those drivers of ARPU that I just walked through give us great confidence in our ability to achieve greater than 40% year-on-year revenue growth in the next several years*. We also want to talk about the investment we're making in the business. We're very much in investment mode, knowing there's a huge opportunity in front of us. An investment for us is really in product and growing the team. We have around 550 employees in the business. The majority of those focused on product development and engineering. And that is where our focus will remain and really driving the product forward and bringing more benefit to the entire ecosystem.

*Id.* ¶¶ 112, 114, 116.

(3) <u>July 9, 2021</u>: Nextdoor filed with the SEC on Form 425 a transcript of an interview Defendant Friar gave to Cheddar News, where Defendant Friar stated:

> [W]hat we see in the U.S. is nextdoor is truly network business. [T]he more people that join the platform, the richer the content. more engaged members are and so growth begats growth. *[S]o we know first of all there's just still quite a runway in the U.S. as I say everyone is a neighbor I would like that to be all households.*

*Id.* ¶ 120.

(4) <u>September 20, 2021</u>: Nextdoor Private hosted an "investor day" to discuss the company's business and financial prospects, where Defendant Friar stated:

> Between the second quarter of 2018 and the second quarter of 2021, *our most recently reported quarter, we grew weekly active users by 123%*. Our growth in WAU has been driven by our value proposition, a compelling combination of utility and community, and our product innovations and launches that have led to both increased engagement from our neighbors and top-of-the-funnel growth. Our extraordinary growth and engagement in the second quarter of 2020 was accelerated by the pandemic, when neighbors found real value in Nextdoor. *We are very pleased with our sustained growth in WAU since that time, which now exceeds 29 million.*
> . . .
> [O]ne could even make the case that we should exceed the monetization level of our peers.
> . . .
> Our total addressable market is both large and under penetrated. Everyone is a neighbor. We believe our near-term opportunity *is to grow to more than 200 million households and the long-term opportunity is to grow to over 300 million*. And this is just in our

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
5

existing markets. We will continue to expand in new markets as well.

*Id.* ¶¶ 122, 124, 126.

(5) October 21, 2021: Nextdoor filed the October 2021 Proxy, which stated:

> Our need to be connected to neighbors was amplified during the pandemic—and that need is real and lasting. For the three months ended June 30, 2021, neighbors who engaged with Nextdoor daily posted 2.1 times more often than in the same prior year period. As the world reopens, consumer behavior is changed for good, with an increased focus on local.
>  . . .
> [Nextdoor had a l]arge and growing total addressable market."

*Id.* ¶¶ 128, 130.

(6) May 10, 2022: Nextdoor held a conference call with analysts and investors, where Defendant Friar stated:

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through ***building an active valued community. It's working. In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily***, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

*Id.* ¶ 132.

(7) August 9, 2022: Nextdoor held a conference call with analysts and investors to discuss the company's financial and operational results for the second quarter. *Id.* ¶ 143. During the call, Defendant Friar assured investors that Nextdoor was observing "durable" engagement trends among the Company's most active users and that those trends "show[ed]" that the Company's efforts to address user engagement were "working," stating:

> Weekly active users, or WAU, grew 26% year-over-year to approximately 37 million. ***We're seeing durable engagement trends amongst our most active users***. In Q2, over 50% of weekly active users were active daily. Across all regions, growth in total sessions accelerated 10 points quarter-over-quarter. ***These trends show that our focus on engagement through the introduction of new machine learning models for increased personalization, more engaging notification, a simplified user experience and welcoming platform initiatives is working***.

*Id.*

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS

6

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Dismissal of a claim under Rule 12(b)(6) may be based on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Moreover, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." *Twombly*, 550 U.S. at 556–57.

At the motion to dismiss stage, the Court must read and construe the complaint in the light most favorable to the non-moving party. *Reese*, 643 F.3d at 690. The Court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). However, courts are not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555. "In all cases, evaluating a complaint's plausibility is a context-specific endeavor that requires courts to draw on . . . judicial experience and common sense." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)) (internal quotation marks omitted).

In addition to Rule 8's requirements, fraud cases are also governed by the heightened pleading standard of Rule 9(b). *See* Fed. R. Civ. P. 9(b). A plaintiff averring fraud or mistake must plead with particularity the circumstances constituting fraud, but malice, intent, knowledge and other conditions of the mind may be averred generally. *Id.* Particularity under Rule 9(b) requires the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). Securities fraud claims must also satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), which states

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
7

1   that the complaint "shall specify each statement alleged to have been misleading, the reason or
2   reasons why the statement is misleading, and, if an allegation regarding the statement or omission
3   is made on information and belief, the complaint shall state with particularity all facts on which
4   that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires a plaintiff to state with
5   particularity facts giving rise to a strong inference of a defendant's scienter. See id. § 78u-4(b)(2).

6   If a motion to dismiss is granted, "a district court should grant leave to amend even if no
7   request to amend the pleading was made, unless it determines that the pleading could not possibly
8   be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)
9   (internal quotation marks omitted).

## III.   DISCUSSION

In his opposition, Plaintiff abandons his § 14(a) claim, his scheme liability claim, and various statements previously challenged under § 10(b), choosing to only "defend[] claims under Sections 10(b) and 20(a) as pleaded in the [FAC] based on the misstatements and omission addressed [in the opposition]." Opp'n 3 n.1. Accordingly, the Court dismisses these claims. For the reasons explained below, the Court also dismisses the remaining claims under §10(b) and § 20(a) for lack of standing and failure to state a claim.

### A.   Judicial Notice

As an initial matter, the Court addresses Defendants' requests for judicial notice. When deciding whether to grant a motion to dismiss, the Court generally "may not consider material outside the pleadings." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). However, the Court may consider material submitted as part of the complaint or relied upon in the complaint, and it may also consider material subject to judicial notice. *See id.* Here, Nextdoor Defendants and Khosla Defendants both filed requests that the Court take judicial notice of the exhibits submitted with their MTDs, which include public filings with the SEC, transcripts from earnings calls and conferences, analyst reports, and a historical stock price chart. RJNs, ECF Nos. 72, 75. Plaintiff did not oppose these requests.

The Court **GRANTS** Defendants' requests to take judicial notice of these documents as

either relied upon in the FAC or as documents that are not subject to reasonable dispute and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201.

### B. Section 10(b) Claim

Moving to Plaintiff's claims, § 10(b) of the Exchange Act provides that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations . . . ." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision by making it unlawful for any person:

> (a) [t]o employ any device, scheme, or artifice to defraud,
> (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5(b). To state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege facts sufficient to establish: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks omitted).

Defendants argue that the Court should dismiss Plaintiff's claims under § 10(b) in part because Plaintiff lacks standing to bring claims arising from certain statements, and Plaintiff fails to allege facts sufficient to state a claim. The Court addresses each argument in turn.

#### 1. Standing

Defendants argue that Plaintiff lacks standing to bring claims arising from (1) statements made about Nextdoor Private prior to the merger under the "purchaser-seller" rule, and (2) statements made after Plaintiff's last purchase of Nextdoor securities.

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
9

### a. Purchaser-Seller Rule

The "purchaser-seller rule" limits standing to "purchasers or sellers of the stock in question." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). This is a "bright-line rule" intended to "prevent[] 'endless case-by-case erosion' of the limitations on standing that would result from courts' engaging in a 'shifting and highly fact-oriented disposition of' whether plaintiffs have standing." *In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181, 1185 (9th Cir. 2024) (quoting *Blue Chip*, 421 U.S. at 739, 755).

Here, Plaintiff brings claims against Defendants[1] for statements and omissions made about Nextdoor Private prior to the merger. However, Plaintiff never owned Nextdoor Private securities. Rather, he purchased KV Acquisition securities (traded as "KVSB") on November 2, 2021, three days prior to its merger with Nextdoor Private. The Ninth Circuit in *Lucid* recently examined the purchase-seller rule in a similar context of alleged misstatements made in advance of an anticipated merger. *Lucid*, 110 F.4th at 1185. There, a company called CCIV acquired a company called Lucid, and the plaintiffs alleged that Lucid's CEO made misrepresentations overstating Lucid's manufacturing targets prior to the merger. *Id.* at 1183. The court found the plaintiffs lacked standing under § 10(b) and Rule 10b-5 because they never purchased or sold Lucid securities, only CCIV securities, and it was immaterial to standing that CCIV later acquired Lucid. *Id.* at 1187. Similarly, here, Plaintiff brings claims arising in part from statements and omissions Defendants made about Nextdoor Private prior to the merger with KV Acquisition, despite never owning or selling Nextdoor Private securities. Under the bright-line rule, because Plaintiff never purchased or sold Nextdoor Private securities, Plaintiff does not have standing to bring claims arising from statements or omissions made about Nextdoor Private prior to the merger with KV Acquisition.

The Court finds Plaintiff's arguments to the contrary unpersuasive. First, Plaintiff argues that he, as a purchaser of KVSB, has standing to sue for statements Khosla Defendants made

---

[1] Plaintiff's opposition defends only his standing to bring a claim under § 10(b) against Khosla Defendants. Opp'n 23–25. However, his additional § 10(b) arguments include Nextdoor Defendants, so the Court will include all Defendants in its analysis here.

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
10

about Nextdoor Private prior to the merger because they were "related" to KVSB. For example, Plaintiff alleges that Khosla Defendants made misrepresentations or omissions in their July 6, 2021, 8-K that overstated the success of Nextdoor Private by comparing Nextdoor Private's potential monetization to Twitter or Snap. Plaintiff argues that this "relates" to KVSB because investors relied on these statements for information about the potential future value of KVSB should it acquire Nextdoor Private. However, Plaintiff's argument was squarely rejected by the Ninth Circuit in *Lucid*, which held that examining whether the statements were "sufficiently connected" to the security the plaintiff purchased would be the exact type of "endless case-by-case" analysis the Supreme Court sought to avoid in *Blue Chip*. *Lucid*, 110 F.4th at 1186; *see also HBK Master Fund L.P. v. MaxLinear, Inc.*, No. 3:24-CV-01033-CAB-VET, 2025 WL 20438, at *4 (S.D. Cal. Jan. 2, 2025) ("The Ninth Circuit has set a bright-line rule that the 'security' at issue must be one about which the alleged misrepresentations were made."); *Butala v. Owlet, Inc.*, 2024 WL 4560173, at *3 (C.D. Cal. Sept. 26, 2024) ("Under *Lucid*, the relevant inquiry is not whether Plaintiff purchased a security that was affected by an alleged misrepresentation, but rather whether the purchased security was the subject of the misrepresentation.").

Next, Plaintiff attempts to distinguish his claims from those in *Lucid* by arguing that *Lucid*'s holding rested on the speaker of the statements rather than their content. In *Lucid*, the plaintiffs sued Lucid, the target company, for misstatements Lucid and its CEO made about Lucid prior to the merger. Here, Plaintiffs sue KV Acquisition, the acquiring entity, for statements KV Acquisition made about Nextdoor Private that impacted the value of its own securities. The Court finds this distinction immaterial. *Lucid* did not rely on the speaker of the statements in finding the plaintiff lacked standing; instead, *Lucid* reiterated the simple bright-line rule from *Blue Chip*—"a plaintiff has standing under Section 10(b) if the plaintiff purchased or sold the securities about which the alleged misrepresentations were made." *Lucid*, 110 F.4th at 1186.

Finally, Plaintiff contends that the Court's adaptation of Defendant's argument would create an unworkable rule that would immunize any statements made about a private target company prior to its acquisition. Plaintiff's argument was also contemplated and rejected by the

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
11

Supreme Court in *Blue Chip*. The Supreme Court recognized that the bright-line purchaser-seller rule could be fairly criticized as "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages." *Blue Chip*, 421 U.S. at 738. Regardless, the Court emphasized that the private right of action under § 10(b) was created by the courts, not Congress. As such, the Court emphasized the importance of maintaining the narrow grant of standing absent congressional action. Despite the potential arbitrary distinctions, the Court was ultimately "persuaded by the 'countervailing advantages' of the bright-line rule—namely, that it prevented 'endless case-by-case erosion' of the limitations on standing that would result from courts' engaging in a 'shifting and highly fact-oriented disposition of' whether plaintiffs have standing." *Lucid*, 110 F.4th at 1185. Though Plaintiff's policy argument may have merit before Congress, for these purposes, the Court rejects the argument as contrary to clear Supreme Court and Ninth Circuit precedent.

Accordingly, the Court finds that Plaintiff does not have standing to sue for any statements about Nextdoor Private made prior to the merger in July, September, and October of 2021.

### b.     Statements After Final Purchase

"As a matter of law, 'conduct actionable under Rule 10b-5 must occur before investors purchase the securities.'" *Wanca v. Super Micro Computer, Inc.*, 2018 WL 3145649, at *7 (N.D. Cal. June 27, 2018) (quoting *Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999)) (dismissing Section 10(b) claims "because [plaintiff] cannot support claims for securities fraud with false statements allegedly made after his stock purchase.").

Here, Plaintiff's claims arise from statements including one made in August 2022. However, Plaintiff last purchased Nextdoor securities on May 11, 2022. Accordingly, because he had already made his last purchase, he does he does not have standing to bring claims arising from the August 2022 statements or omissions.

Plaintiff does not attempt to address the rule that conduct prior to purchase is inactionable here, instead citing two cases which analyzed Article III standing and class representation under Rule 23. Opp. at 25. However, as this Court held in *Wanca* when it rejected the very same

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS

12

argument, Article III standing and compliance with Rule 23 "are concepts distinct from the one implicated by this case, which is whether Plaintiff may pursue claims based on post-purchase statements as a matter of law." 2018 WL 3145649, at *8. Plaintiff failed to present the Court with any reason to find different here.

Accordingly, the Court finds that Plaintiff does not have standing to sue for any statements made after his last purchase on May 11, 2022.

* * *

The Court **GRANTS** Defendants' motions to dismiss claims arising out of statements or omissions from July, September, October 2021, or August 2022 for lack of standing. Out of an abundance of caution, the Court dismisses with leave to amend. *Lopez*, 203 F.3d at 1127 ("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.") (internal quotation marks omitted).

The only statement remaining is the one made on May 10, 2022. The Court will proceed with its analysis examining only this statement.

### 2. Failure to State a Claim

Defendants next raise several arguments regarding Plaintiff's failure to allege facts sufficient to meet all elements of a § 10(b) claim, but the Court need only address the first element—a material misstatement or omission by Defendants.

To sufficiently allege a material misstatement for a § 10(b) claim, a plaintiff must specify each allegedly misleading statement and the reasons why each statement is misleading. *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005), *abrogation on other grounds recognized by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 2023 WL 2532061, at *11 (9th Cir. Mar. 16, 2023); *see also* 15 U.S.C. § 78u-4(b)(1). A misleading omission "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A material omission is one that a reasonable investor would consider to significantly

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
13

alter the total mix of information. *Matrixx Initiatives*, 563 U.S. at 37.

Here, the only remaining alleged misleading statement or omission is the following statement made by Defendant Friar on May 10, 2022, during a conference call:

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through **building an active valued community. It's working. In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily**, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

FAC ¶ 132. Plaintiff alleges this statement was materially false and misleading because the majority of Nextdoor's weekly and daily users did not actually visit Nextdoor's website or app each week, but instead only clicked on marketing emails from Nextdoor. Plaintiff presented a former employee who stated that "this practice of counting as active users persons who merely open their email was highly unusual in the industry and so would not have been expected by investors." *Id.* ¶ 64. Accordingly, Plaintiff contends that this statement regarding the growth in active users was materially misleading and omitted material information necessary to make the statement not misleading. *Id.* ¶ 133.

The Court finds that Plaintiff fails to plead facts to show that this is a material misstatement or omission. Though this practice of defining people who merely open their email as "active users" may have been highly unusual in the industry, Plaintiff has not alleged facts to support his allegation that it would have been unexpected by investors because Nextdoor explicitly defines an "active user" as a person who "opens our application, logs on to our website, or engages with an email with monetizable content at least once during a defined . . . period." *Id.* ¶ 40. Regardless of what is typical in the industry, Nextdoor's explicit definition of "active user" eliminates any reasonable expectation that the term could mean something else. *See Wochos*, 985 F.3d at 1194 ("Plaintiffs pleaded no facts to support their premise that 'production car' would be understood as referring exclusively to the fully automated production of identical vehicles."); *see also Kelly v. Elec. Arts, Inc.*, 2015 WL 1967233, at *7–8 (N.D. Cal. Apr. 30, 2015) (finding the plaintiff failed to allege that the term "de-risk" had the meaning necessary to render defendants'

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
14

uses of the term false).

Accordingly, the Court finds that Plaintiff failed to allege facts sufficient to show a material misstatement or omission and **GRANTS** Defendants' motion to dismiss claims arising from the May 10, 2022, statement with leave to amend. *Lopez*, 203 F.3d at 1127.

### C. Section 20(a) Claim

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . . " 15 U.S.C § 78t. Here, as discussed above, Plaintiff has failed to plead a predicate violation of the securities laws, thus his claim under § 20(a) necessarily fails. The Court therefore **GRANTS** Defendants' motions to dismiss this claim as well with leave to amend. *Lopez*, 203 F.3d at 1127.

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants' motions to dismiss with leave to amend. Should Plaintiff wish to file an amended complaint, he must do so by **June 9, 2025**.

**IT IS SO ORDERED.**

Dated: May 19, 2025

EDWARD J. DAVILA
United States District Judge

Case No.: 5:24-cv-01213-EJD
ORDER GRANTING MOTIONS TO DISMISS
15