**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff*

*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| FRANKIE J. ADAMO, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>v.<br><br>NEXTDOOR HOLDINGS, INC. and SARAH J. FRIAR<br><br>       Defendants. | CASE NO. 5:24-cv-01213-EJD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ....................................................................... 1

III.    PARTIES ..................................................................................................... 2

IV.     INTRODUCTION ........................................................................................ 2

V.      DEFENDANTS MISLED INVESTORS ABOUT HOW "ACTIVE" NEXTDOOR'S "COMMUNITY" WAS ............................................................. 5

        A.      Company Background ........................................................................ 5

        B.      Nextdoor Emphasized Its Active User Base To Promote the Merger ................... 7

        C.      Nextdoor Repeatedly Compared Its "Active Users" to Those of Its Peers in Investor Materials, Suggesting They Were Comparable ...................... 8

        D.      Nextdoor Repeatedly Suggested that Its Active Users Were By and Large "On the Platform," Engaged in Online "Sessions," and Part of an "Active Community". 11

        E.      Defendants Misled Investors About How "Active" Nextdoor's "Community" Was 14

        F.      Investors Suffered Losses When the Truth Was Revealed ................................. 19

VI.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .................................................................................................. 20

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................ 21

VIII.   NO SAFE HARBOR .................................................................................... 23

IX.     LOSS CAUSATION ..................................................................................... 23

        A.      August 9, 2022 ................................................................................ 23

        B.      November 8, 2022 ............................................................................ 24

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE .................................. 24

XI.     CLASS ACTION ALLEGATIONS ................................................................ 25

XII.    COUNT I .................................................................................................... 27

XIII.   COUNT III .................................................................................................. 28

Lead Plaintiff Keith Hollingsworth ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Nextdoor Holdings, Inc. f/k/a Khosla Ventures Acquisition Co. II ("Nextdoor" or the "Company") and securities analyst reports, press releases, and other public statements issued by, or about, the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the publicly traded Class A common stock of Nextdoor between May 10, 2022 and November 7, 2022, inclusive (the "Class Period"). Lead Plaintiff pursues remedies against the Company and certain of the Company's officers and directors under §10(b), SEC Rule 10b-5 promulgated thereunder and §20(a) of the Securities Exchange Act of 1934 ("1934 Act").

## II.     JURISDICTION AND VENUE

2.      The claims asserted arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R.§240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

4.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b) because the Company maintains its corporate headquarters in and conducts business in this District and the events and omissions giving rise to the claims asserted occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the U.S. mails, interstate telephone communications and the facilities of the national securities markets.

### III.  PARTIES

6.     Lead Plaintiff Keith Hollingsworth, as set forth in a previously filed Certification (ECF No. 32-4), purchased Nextdoor Class A common stock during the Class Period and suffered damages.

7.     Defendant Nextdoor is headquartered in San Francisco, California.  Shares of Nextdoor Class A common stock trade on the New York Stock Exchange ("NYSE") under the ticker symbol "KIND."  Prior to the Merger (defined below), Nextdoor Class A common stock traded on the NASDAQ under the ticker symbol "KVSB."

8.     Defendant Sarah J. Friar ("Friar") served as Chief Executive Officer ("CEO"), President and as a member of the Board of Directors (the "Board") of Nextdoor, Inc. ("Nextdoor Private") from December 2018 until the merger in November 2021 with Khosla Ventures Acquisition Co. II (the "Merger").  Following the Merger, defendant Friar served as Nextdoor's CEO, President, and Chairperson of the Company's Board until her resignation in February 2024.

9.     Defendant Friar is referred to as the "Individual Defendant."

10.    The Company and Individual Defendant are collectively referred to as "Defendants."

### IV.  INTRODUCTION

11.    Nextdoor operates a "hyperlocal" online social networking platform that connects neighbors, local public agencies, and local businesses via the internet.  Most users go to Nextdoor for discrete, one-off searches for local services or information.  For example, users may go to Nextdoor to find a local plumber, or find information about the start time of a local bake sale.

12.    In 2020, Nextdoor experienced explosive growth due to the COVID-19 pandemic. As much the United States stayed home, Americans had a new, temporary need to look for local goods and services and to gain local information.  Accordingly, user growth that might have occurred over years was pulled forward and compressed into this unusual period.

13.     In 2021, a SPAC called Khosla Ventures Acquisition Co. II acquired Nextdoor in a merger and took the Company public.  As part of that process, Nextdoor repeatedly inflated shareholders' reasonable expectations about the potential value of the Nextdoor platform based in large part claims about the size of its "community" and how "active" that community was. Nextdoor made the majority of these representations as part of its solicitation of proxy votes for the merger.

14.     To convince shareholders to vote for the merger, Defendants attempted to paint Nextdoor as the next hit social media company, like Twitter or Snap.  Defendants repeatedly compared Nextdoor's active users directly to those of Twitter and Snap, and suggested that Nextdoor could grow its users even more successfully than those companies.  In repeatedly comparing its active users to those of Twitter and Snap, Nextdoor suggested that its "active users," and the composition of the Nextdoor "community," were comparable in kind to those of Twitter and Snap.

15.     In fact, Nextdoor's "community" of "active users" was largely not a community at all.  Nextdoor's definition of "active user" was wholly unique and unexpected in the online services industry because half of these "active" users were merely opening emails and were not meaningfully participating in the Nextdoor community.  In footnotes, Nextdoor defined "daily active users" ("DAU") and "weekly active users" ("WAU") as "the count of unique neighbors who have started a session or opened a content email over the trailing" day or 7 days.  Yet crucially, Nextdoor never disclosed to shareholders that *half* of its DAUs and WAUs were of the latter sort— users who merely opened Nextdoor's marketing emails yet never actually visited Nextdoor's website or app.  Half of its users were not "active users" of its online product in any meaningful sense.

16.     Against this backdrop, on May 10, 2022, Defendants flatly misled investors about how "active" its "community" was.  On an investor conference call that day, Defendant Friar stated:

> Our community is active and becoming increasingly active.  Our product strategy in 2022 is centered on strengthening engagement through building an active valued community.  It's working.  In Q1, over 50% of neighbors were weekly active and

over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

17. Even if investors elsewhere read the fine print in Nextdoor's footnotes and understood that Nextdoor included in its definition of "active user" users who merely opened Nextdoor emails, Nextdoor never suggested in those footnotes what proportion of active users qualified as active users only by opening emails. In these statements, Nextdoor misleadingly implied that by and large its active users were genuinely active in the Nextdoor "community," when in fact half were not. In this way, Nextdoor misled investors about the extent to which its "community" was active and about the extent to which its "active users" were genuinely active. Specifically, Nextdoor misled investors in these statements in three ways.

18. *First*, Nextdoor explained how active its "community" was by referencing how active its "weekly active users" were, which directly suggested that Nextdoor "active users" are by and large active participants in a Nextdoor community, not largely passive email recipients. But Nextdoor omitted that roughly half of its weekly active users were not part of any Nextdoor "community" as that term is commonly understood. A community connotes "an interacting population of various kinds of individuals . . . in a common location."[1] Half of Nextdoor "active users" were merely opening Nextdoor spam emails, not visiting the Nextdoor platform or interacting with other Nextdoor users, and so were not participating as a member of any online community in any meaningful sense. These "active users" were just passively receiving Nextdoor ads.

19. *Second*, Nextdoor had previously defined the term "active" as used in Nextdoor's marketing phrase "active valued community" by using the phrases "involved in the community," "communicate," and "give and get help." In these statements, Nextdoor evidenced its success in building an "active valued community" by the activity of its "active users." In this way, Nextdoor

---

[1] Merriam Webster Dictionary, "Community" (2025), available at https://www.merriam-webster.com/dictionary/community.

implied that "active users" are by and large users who are "involved in the community," "communicate," and "give and get help."

20.    *Third*, Nextdoor suggested that "daily active users" "make Nextdoor a daily use case." Nextdoor did not define what it means to "make Nextdoor a daily use case," so that term should be given its ordinary meaning. Investors would ordinarily understand "making Nextdoor a daily use case" to mean visiting and engaging with the Nextdoor platform on a daily basis. They would not understand "making Nextdoor a daily use case" to mean checking emails daily. Yet again, half of "daily active users" were merely checking their emails and not visiting the Nextdoor platform at all. Accordingly, Nextdoor misled investors to believe that "daily active users" were visiting and engaging with the Nextdoor platform on a daily basis, when in fact half of them were not.

21.    The truths about Nextdoor's misrepresentations took months to be absorbed by the market through a series of partial disclosures of the truth and through materializations of the risks of disappointing results concealed by those misrepresentations. On August 9 and November 8, 2022, the Company repeatedly revealed lower growth figures than shareholders and the market had anticipated based on the Company's misleading statements about its user base and user growth.

22.    Through these actions, Defendants caused investors in Nextdoor tremendous losses and violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Plaintiffs sue to recover these losses.

## V.    DEFENDANTS MISLED INVESTORS ABOUT HOW "ACTIVE" NEXTDOOR'S "COMMUNITY" WAS

### A.    Company Background

23.    Nextdoor Private's platform first launched in the United States in 2011. Nextdoor was formed in 2021 through the merger of Khosla Ventures Acquisition Co. II ("KV Acquisition Co."), a blank check company, and Nextdoor Private. On July 6, 2021, KV Acquisition Co. and Nextdoor Private jointly announced they had entered into a merger agreement (the "Merger"). At

the time of the Merger, Defendants stated the pro forma equity value of the combined company would be $4.3 billion.

24.    Self-proclaimed as the "neighborhood network," Nextdoor operates a hyperlocal online social networking platform that connects neighbors, public agencies, and businesses via the internet.  Nextdoor purports to facilitate this online community through various features and technological functions including, *inter alia*, a news feed where "neighbors" (*i.e.*, users) can view posts, discussions, and pictures from other neighbors, as well as notifications, comments, and groups.  These features enable users to exchange information, services, and goods.

25.    Virtually all of Nextdoor's revenues are generated through advertising sales. Nextdoor purports to offer a differentiated advertising solution that allows its clients to deploy local level marketing campaigns at scale.  Nextdoor's advertising clients range from large national brands to small and mid-sized businesses.

26.    The value of Nextdoor's advertising space—and hence its business, financial, and operational performance—is ultimately dependent on the size and level of engagement of the Company's user base.  Nextdoor publicly discloses purported user and engagement performance primarily through two key business metrics. *First*, Nextdoor reports Weekly Active User metrics or "WAU," which it defines as "a Nextdoor user who opens our application, logs on to our website, or engages with an email with monetizable content at least once during a defined 7-day period." In addition, Nextdoor reports average revenue per weekly active user or "ARPU," which the Company defines as total revenue in a certain geography during a period divided by the average of the number of WAUs in the specified geography during the same period.

27.    Beginning in 2020, demand for Nextdoor Private's community-based platform rose dramatically as shelter-in-place mandates and other social distancing restrictions led people to increasingly seek social connection and pertinent information regarding their communities from Nextdoor Private's products.  As a result, Nextdoor Private grew rapidly in 2020 with WAUs growing nearly 37% from 19.5 million in 2019 to nearly 27 million in 2020.  ARPU during the same period also grew by 10% from $4.23 to $4.62.

SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 5:24-cv-01213-EJD)

**B.    Nextdoor Emphasized Its Active User Base To Promote the Merger**

28.    On July 6, 2021, amid these seemingly favorable market trends, Nextdoor Private announced that it would become a publicly traded company through a merger with KV Acquisition Co.  Following the Merger announcement, Defendants lauded Nextdoor Private's purportedly "phenomenal" growth, stating that the platform was in "1 in 3 U.S. households," and boasting that Nextdoor Private had amassed "27M+ Weekly Active Neighbors" and "60M+ Verified Neighbors." Defendants further represented that Nextdoor Private's outsized growth was poised to continue, claiming the company had a "huge runway" ahead of it, and that it could grow its user base "4.5x" in existing markets alone.    Speaking during a July 2021 conference call, Defendant Friar represented that Nextdoor Private's total addressable market remained "large and still untapped," noting that the company could grow in the "near term" adding "150 million households globally, just doing what we do today."  The July 2021 Investor Presentation also represented that Nextdoor Private's growth was "sustainable," stating that the company had a "[s]trong foundation for continued revenue growth."

29.    In fact, Nextdoor's capacity for expansion faced severe limits that Defendants concealed in these materials to investors.  A former employee ("FE1") has stated that Nextdoor gained a spike in users during 2020 that declined by the start of 2021 and never returned.  FE1 worked at Nextdoor from December 2019 to December 2022 as Marketing Science Lead.  FE1 worked out of the company's headquarters office in San Francisco.  FE1 reported to Vice President—Global Head of Growth Marketing Miren Desai.  According to FE1, not only did growth in users slow following the COVID pandemic, but the users the Company gained "were much less engaged on the platform."

30.    This user base explosion related to COVID-19 pulled forward user growth that might have occurred naturally over years into this period, leaving the U.S. market saturated—by mid-2021, users that were going to sign up or be enticed to join Nextdoor already had done so.

31.    According to FE1, this saturation is demonstrated by the Company's marketing campaign results in 2021 and 2022 following the pandemic.  By that time, Nextdoor's "average

campaign" targeting new users targeted around 450,000 people but converted only around 7% of those people into users.

32.    Another former employee ("FE2"), has confirmed this statistic.  FE2 worked for Nextdoor from May 2019 to April 2022 in Growth Engineering.  In that role, FE2 worked on creating new features for the app within the growth team.  According to FE2, "during COVID, there was a huge spike in registrations; there was a huge spike in daily active users."  However, "after COVID we never saw another big event that grew out the platform—regardless of the new branding, the new functionality, investment, and acquisition expense on marketing and big events, we never saw a second wave, the only wave we got was COVID."  FE2 confirmed that the company's average campaign to acquire users targeted around 450,000 people but converted only around 7% of those targeted into users.

**C.    Nextdoor Repeatedly Compared Its "Active Users" to Those of Its Peers in Investor Materials, Suggesting They Were Comparable**

33.    Nextdoor repeatedly made direct comparisons of its own "active users" to those of peers like Twitter and Snap, and so suggested to investors that its "active user" figures could be compared directly to the active user figures of companies that did not include off-platform users as active users.  In this way, Nextdoor suggested to investors that the inclusion of off-platform users did not materially change its active user count—that Nextdoor's "active user" base was by and large on-platform users like those of Twitter and Snap.

34.    The July 2021 Investor Presentation highlighted Nextdoor Private's U.S. daily active users ("DAUs"), and compared these DAUs to those of peers Twitter and Snap in the following presentation slide:



35.     In this chart, Defendants argued for Nextdoor's potential to grow its users and average revenue per user by comparing those figures directly to those of Twitter and Snap. Investors and analysts understood this chart to imply that Nextdoor was claiming that its user base could be compared to those of Twitter and Snap. For example, analysts at Tech Crunch wrote about this slide: "The argument here is that the company has lots of room to grow on the monetization front as it expands its user base. Snap shows that the company can generate more average revenue per user (ARPU) over time, and Twitter shows that a larger user base may help with that hunt."

36.     Nextdoor compared Nextdoor active users to those of its peers in other instances as well. During the July 6, 2021 call, Defendant Friar compared Nextdoor's user base to Twitter's by stating that "we're about 1/3 the size of Twitter." The context of her statement, including her references to ARPU (which is tied to weekly active users), makes clear that she meant that Nextdoor had about 1/3 the number of active users as Twitter, suggesting again that Twitter and Nextdoor active users are comparable. Friar stated:

> Nextdoor as a platform has just begun its monetization journey. In fact, when I joined about 2.5 years ago, we had just begun to tap into advertising. Today, if you look at our scale, **we're about 1/3 the size of Twitter**. And yet, if you look at our ARPU, we're at about 1/6 the ARPU. Of course, there is no structural reason why Nextdoor should undermonetize. In fact, if you think about either the video where

9

you saw the wonderful California-based restaurant that was getting recommendations from us or if you think about what Vinod said about the value of a link on Nextdoor, I could perhaps (inaudible) that Nextdoor should, in fact, overmonetize relative to those platforms. So this tells me we're just getting started. And even with that top-of-the-funnel growth of new users, we should be able to drive healthy revenue growth as we scale our ARPU.

37. On September 20, 2021, Nextdoor Private hosted an "investor day" to discuss the company's business and financial prospects. During the call, Doyle claimed that Nextdoor Private was "just getting started" in terms of its ARPU growth and that Nextdoor Private "should exceed the monetization level" of Twitter and Snap.

38. Likewise, on November 10, 2021, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the third quarter. During the call, in response to a question regarding Nextdoor's engagement metrics, Defendant Friar stated Nextdoor was "quite proud" of its reported 20% WAU growth, and noted that competing social media platforms experienced a "downtick" after lapping strong comparable periods due COVID-19 impacts, whereas Nextdoor, in contrast, experienced its "highest level of WAUs ever." In these statements, Friar again suggested that Nextdoor's active users were comparable in kind to those of competing social media platforms.

39. Yet Nextdoor's active users were not comparable to those of peers Twitter or Snap. As explained further below, Nextdoor's definition of "active users" was wholly unique in the industry. Nextdoor counts "daily active users" ("DAU") and "weekly active users" ("WAU") as "the count of unique neighbors who have started a session or opened a content email over the trailing" day or 7 days. Yet Nextdoor never disclosed to shareholders that *half* of its DAUs and WAUs were of the latter sort—users who merely opened Nextdoor's marketing emails yet never actually visited Nextdoor's website or app. Accordingly, half of its users were not "active users" of its online product in any meaningful sense.

SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 5:24-cv-01213-EJD)

1    **D.    Nextdoor Repeatedly Suggested that Its Active Users Were By and Large**

2    **"On the Platform," Engaged in Online "Sessions," and Part of an "Active**

3    **Community"**

4        40.    Leading up to the Merger and in the year prior to the start of the Class Period,

Nextdoor repeatedly suggested that its active users were by and large on-platform users that were

part of an "active" community." Nextdoor even defined being "active" in a "valued active

community" to mean *interacting* with the community by "communicat[ing]," or "giv[ing] or

get[ting] help," not passively opening emails. In this context, which Nextdoor frequently

reinforced, Nextdoor created a backdrop for investors to believe that, even though Nextdoor

defined "active users" to include off-platform users, the vast majority of its active users were

nevertheless on-platform, genuinely active members of a Nextdoor community.

        41.    On July 6, 2021, Nextdoor hosted a conference call with investors to discuss the

Merger. On this call, Doyle repeatedly implied that Nexstdoor's users ("neighbors" and

"members") were "on the platform," and so suggested that by and large, Nextdoor's active users

actually visited Nextdoor's website:

> We have a growing base of engaged and monetized users. We have more than 60
> million verified **neighbors on the platform**. To illustrate the composition of that
> member base, we have almost 15% of our members coming from markets outside
> the U.S.
>
> [. . .]
>
> With this tremendous growth in **verified members on the platform**, we have the
> opportunity to really drive engagement.

        42.    In the same statements, Doyle repeatedly suggested that "active users" are users

that engage in "sessions" in which they "consume and also create" "content," not merely users

who check their emails.

> And that's something that we saw demonstrated in 2020 and is sustained in 2021
> as well, where we had deepening engagement across all cohorts of users. We were
> able to increase the frequency of **sessions of active users** on the platform and also
> the depth of sessions, the amount of **content that users consume and also create**,
> which set us up for driving monetization opportunities with our advertisers, creating
> a larger, unique audience that's more engaged, that's generating more supply that
> allows us to do creative things and achieve the campaign objectives of the
> advertisers and businesses on the platform.

[. . .]

We're pleased to be seeing an acceleration in ARPU growth rates really driven by 3 different levers.  The first is on deepening engagement, so driving a greater number of **sessions per active user**, as well as deepening **each session** in the form of greater **consumption of and creation of content**.

43.    Also on July 6, 2021, Nextdoor filed with the SEC on Form 425 a transcript of an interview Khosla and Defendant Friar gave to correspondents at *CNBC*'s "Squawk on the Street" program.  Cohost David Faber asked whether growth had "sort of peaked in 2020/'21 in terms of the revenue number maybe in part because of the pandemic" and whether this was a "concern for you as you try to sell the deal to your SPAC shareholders?"  Khosla responded that "it isn't a concern for me[,] we see accelerating growth."  Defendant Friar then suggested that "active users" were growing because by and large they were "members" who "engage[d]" "on the platform."  Defendant Friar stated:

[F]rom a business perspective, we're seeing terrific momentum.  We saw our DAU, **daily active users, grow 50%** year-over-year last year.  [T]hat's always the starting point of any platform network business then you mentioned ARPU, we're seeing phenomenal trends in q1 and q2 of 2021, we saw accelerating ARPU.  [I]t's really driven by, one, more **engagement from the members on the platform** . . . .

44.    On September 20, 2021, Nextdoor Private hosted an "investor day" to discuss the company's business and financial prospects.  During the presentation, Defendant Friar mentioned "neighbors" (which in context refer to users), and repeatedly made clear that neighbors are individuals that are "on the platform" rather than individuals that merely check their emails off-platform:

We've already created an incredible product market fit.  When **neighbors** come to Nextdoor, 3 months in, 75% of them are still **on the platform**.  6 months in, that's 65%.  And by 24 months in, that line begins to asymptote at well above 50%, and we're proud that our retention rate is estimated to be 20 points higher than leading peers.  We know that, when people come, they come with intent and they stay.  That stickiness is a really big piece of our ongoing growth.  We also have strong network effects.  In a young neighborhood with 5% to 10% of the **households in that neighborhood on the platform**, we see good engagement, but as we move up into our top quartile of neighborhood penetration, we start to see engagement levels that are over 2x what we see in the beginning.  This is because more content on the platform drives more engagement, which drives more people to join, which drives more content.  That's our flywheel of growth.

45.   Doyle similarly applauded Nextdoor Private's growth trends, claiming the company's "extraordinary" user growth following the COVID-19 pandemic had been "sustained . . . since that time." In his statement, Doyle suggested that active users were increasing due to their participation in the Nextdoor "community":

> Between the second quarter of 2018 and the second quarter of 2021, our most recently reported quarter, we grew weekly active users by 123%. Our **growth in WAU has been driven by** our value proposition, a compelling combination of utility and **community**, and our product innovations and launches that have led to both increased engagement from our neighbors and top-of-the-funnel growth.

46.   In fact, half of weekly active users were not engaged in the in Nextdoor "community" at all as that term is commonly understood, but were solitarily checking their emails.

47.   The investor day presentation contained a slide deck addressing what the Company meant by "Valued Active Community." The Company defined "Active" with the phrases "involved in the community," "communicate" and "give and get help." In this way, the Company again reinforced the suggestion that "active" neighbors by and large are those that actively participate in the community and communicate or interact with other neighbors, not those that merely open a content email.

48.   On October 21, 2021, Nextdoor filed with the SEC a proxy statement/prospectus on Form 424B3 for the Merger ("October 2021 Proxy"). The October 2021 Proxy discussed the habits of "neighbors who engaged with Nextdoor daily," which tacitly suggested that daily active users are by and large neighbors who engaged with the Nextdoor platform daily:

> Our need to be connected to neighbors was amplified during the pandemic– and that need is real and lasting. For the three months ended June 30, 2021, **neighbors who engaged with Nextdoor daily** posted 2.1 times more often than in the same prior year period. As the world reopens, consumer behavior is changed for good, with an increased focus on local.

49.   On October 26, 2021, Nextdoor Private issued a press release announcing select financial results for the third quarter ending September 30, 2021 – the quarter immediately before the Merger – which was filed with the SEC by Nextdoor ("September 2021 Release"). The September 2021 Release reported that the company's increased 38% year-over-year to $1.61, and its WAU increased 20% year-over-year to 33 million.

50.     Then, on March 1, 2022, Nextdoor issued a shareholder letter reporting its financial results for the fourth quarter and full year ending December 31, 2021 – the same quarter during which the Merger was completed (the "4Q21 Letter"). The 4Q21 Letter stated that weekly active users were "creating an Active Valued Community," and so again suggested that by and large weekly active users were active participants in an online community, not merely passive consumers of emails:

> In Q4, 52% of neighbors globally were active weekly, reflecting an increase of 5 percentage points year-over-year and an all-time high. . . .
>
> We finished 2021 with significant momentum. In Q4, **WAU** grew 32% year-over-year and 9% quarter-over-quarter, continuing the trajectory of accelerating growth and reflecting the early effects of our product focus on creating an **Active Valued Community**. In fact, through the second half of 2021, we added more **WAU** than in any other equivalent period in Nextdoor's history.

**E.     Defendants Misled Investors About How "Active" Nextdoor's "Community" Was**

51.     The Class Period begins on May 10, 2022. On that day, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter. Against the lengthy history outlined above in which Nextdoor repeatedly suggested that its active users were comparable to those of Twitter and Snap, and that its "neighbors" were by and large "on the platform" and part of an "active valued community" rather than off-platform email users, on this call, Defendant Friar misled investors about how "active" Nextdoor's "community" was:

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through building an active valued community. It's working. In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

52.     In these statements, Nextdoor misleadingly implied that by and large its active users were genuinely active in the Nextdoor "community," when in fact half were not. Nextdoor explained how active its "community" was by referencing how active its "weekly active users" were, which directly suggested that Nextdoor "active users" are by and large active participants in a Nextdoor community, not largely passive email recipients. Similarly, Nextdoor evidenced its

success in building an "active valued community" by the activity of its "active users." In this way, Nextdoor implied that "active users" are by and large "active" in the way Nextdoor had previously defined that term in the context of an active valued community, meaning users who are "involved in the community," "communicate," and "give and get help." Nextdoor also suggested that "daily active users" "make Nextdoor a daily use case." Nextdoor did not define what it means to "make Nextdoor a daily use case," so that term should be given its ordinary meaning. Investors would ordinarily understand "making Nextdoor a daily use case" to mean visiting and engaging with the Nextdoor platform on a daily basis, but roughly half of Nextdoor daily active users were entirely off-platform users.

53.     A former employee ("FE6") has confirmed that roughly half of Nextdoor's "active users" were not accessing the website or app, and that this practice of counting as active users persons who merely open their email was highly unusual in the industry and so would not have been expected by investors. FE6 worked for Nextdoor from March 2001 to October 2023 as a member of the Product Growth Team. FE6 worked out of the company's San Francisco office and remotely. FE6 reported to Head of Product, Neighbor Experience Michael Pao, who reported to Defendant Friar. According to FE6, Nextdoor's definition of active users "includes both on-platform and off-platform" users, and so includes those who, for example, "open a Nextdoor digest email, even if did not use the Nextdoor application." According to FE6, 50% or more of Nextdoor's Weekly Active Users were "off-platform" users that merely opened an email from Nextdoor, and that this was true in Q1 2022 and during the Class Period. FE6 believed this way of defining active user was highly unusual and stated, "I could not find another company doing that." According to FE6, "a lot of folks" within Nextdoor "thought we should just count the app usage," a view that according to FE6 existed "for years" within the company. According to FE6, Nextdoor employees expressed such concerns about the definition of users at weekly companywide meetings attended by CEO Friar and the company's senior leadership team, including a question "why do we count this [activity as active users]?" According to FE6, the product team stated that there was a "need to have" a weekly active users number based on "using

the app," but Company leadership responded that "we can't make the change publicly yet" because they wanted to maintain their weekly active user count.

54.     Moreover, according to FE6, Individual Defendant as well as all C-level executives were well aware that about half of "active users" were not actually visiting the app or the website—they received daily, weekly, and monthly "executive reports" that contained data include the percentage users that were on-platform versus off-platform.  FE6 noted that "anyone else [at Nextdoor] who wanted to sign up" could receive the executive reports.

55.     Another former employee ("FE7") has confirmed that roughly 50% of Nextdoor's purported "active users" were off-platform.  FE7 worked for Nextdoor from October 2019 to October 2021 as a Client Partner—Home Services, Entertainment and Travel.  FE7 worked out of the Los Angeles office.  According to FE7, around 50% of Nextdoor's "active users" were off-platform users who opened Nextdoor emails but did not actually use Nextdoor's website or app.

56.     FE1 confirmed that around 50% of "active users" were off-platform, and that this was true in Q1 2022 as in other quarters.  likewise confirmed that it was highly unusual for a company in Nextdoor's industry to count as "active users" those who merely opened emails.  "Peer companies" like Twitter, Facebook and Instagram define active users as those who visit the companies' websites or apps and initiate a "session."  Indeed, Nextdoor "would auto-subscribe people to emails across a broad range of triggers," and Nextdoor users had to "opt-out" or receiving emails.  Yet opt-outs were "often unreliable."  "People would commonly receive marketing that they opted out of."  Moreover, according to FE1, Nextdoor counted as users who engage with an email as users who merely open the email, not necessarily users who click within the email and visit the Nextdoor website.  According to FE1, only about 1 in 10 users who opened an email actually clicked within the email and visited the Nextdoor website or app.  Nextdoor followed this strategy of sending emails to users who had opted out and counting those users as active users in order to maintain the Company's active user count, which was otherwise "not growing."  FE1 knew about this strategy and Company's practice of ignoring opt-outs because FE1's team was

generally responsible for getting these users back onto the platform. FE1 described these practices as "digging up graves of users."

57.    FE1 confirmed that Friar's statement that "over 50% of neighbors were weekly active," was true only in the narrow sense that over 50% of neighbors were "weekly active users." FEI likewise confirmed that Friar's statement that "over half of weekly active users were active daily" was true only in the narrow sense that over half of "weekly active users" were "daily active users." Half of active users were merely checking their emails, and were not really "daily active" on the Nextdoor platform.

58.    An expert in practices of the online services industry concerning user metrics, including common usage of "active users" in that industry, has confirmed that Nextdoor's usage of the term "active user" would be unexpected and confusing to those familiar with the industry. Dr. Venkatesh Shankar is a professor of marketing and the academic director of the Brierley Institute for Customer Engagement at the Cox School of Business, Southern Methodist University. He routinely measures user-based activity and engagement and associated revenues for industry partners. He advises companies on the use of customer metrics in tracking the progress of a company and forecasting its revenues more accurately for better management and investor communications. Dr. Shankar has students who are engaged in collaborative initiatives with industry partners, such as social media and subscription businesses, in which user engagement is central to driving revenue. In those projects, he advises his students on how to effectively and accurately track the progress of new initiatives related to metrics such as active users. He teaches customer engagement and digital and social media marketing at the graduate level.

59.    According to Dr. Shankar, the terms "daily active users," "weekly active users," and "monthly active users" typically refer in the online services industry to users who actively engage in on-platform activity (on a company's app or website). For example, Snapchat, Instagram and Facebook restrict their definitions of active users to on-platform usage. Multiple academic research articles likewise define active users in this standard way. In Althoff et al. (2017), an active user is one who has at least one post in each of the previous four weeks in the social

SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 5:24-cv-01213-EJD)

network.[2] According to Peters et al. (2024), "active use includes behaviors that revolve around social interactions and the creation of content, while passive use includes behaviors that revolve around content consumption."[3] Likewise, in Liu et al. (2019), active users are measured by active days within an app, and "[a]n active day is defined as a user having at least one valid session, which is a session containing at least one action we record."[4]

60.     Dr. Shankar opined that a statement from an online services company that "our community is active" in the context of discussing active users suggests to someone familiar with the industry that the users by and large have deeper engagement in the platform, not merely passive off-platform engagement through opening emails. Dr. Shankar opined that since the company markets itself as a community engagement platform, and off platform actions like email opens do not provide a user experience comparable to apps or website usage, this statement can be interpreted as a "marketing spin," a statement that is potentially deceptive particularly to participants in the industry, who are primed to read "active" to mean active on-platform.

61.     Moreover, according to Dr. Shankar, Nextdoor's use of the term "active user" in comparing Nextdoor active users to those of Twitter and Snap would be confusing to those familiar with the online services industry even though Nextdoor's defined "active user" as including off-platform email recipients. Those familiar both with the standard use of the term "active user" and with Nextdoor's definition of "active user" might believe, based on Nextdoor's comparing Nextdoor's active users to those of Twitter and Snap, that Nextdoor's active users, like Twitter's and Snap's, were nevertheless by and large on-platform users, even if Nextdoor's definition encompassed the possibility of some off-platform users.

---

[2] Althoff, et al., Online Actions with Offline Impact: How Online Social Networks Influence Online and Offline User Behavior, *Proc Int Conf Web Search Data Min*. (Feb. 2017) 2017: 537–546.

[3] Peters, H. et al., Context-Aware Prediction Of User Engagement On Online Social Platforms (June 2024).

[4] Liu, Y. et al. Characterizing and Forecasting User Engagement with In-app Action Graph: A Case Study of Snapchat, *Association for Computing Machinery* (June 2019).

**F.    Investors Suffered Losses When the Truth Was Revealed**

62.    On August 9, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the second quarter ended June 30, 2022 ("2Q22 Form 10-Q").  The 2Q22 Form 10-Q revealed that Nextdoor's platform materially declined, reporting that Nextdoor's U.S. WAUs had declined to 29.2 million.  The 2Q22 Form 10-Q further reported that the Company's ARPU growth had turned negative in the quarter, contracting by 6% year-over-year.  During the corresponding conference call, Defendant Doyle revealed the Company was slashing its revenue guidance for fiscal 2022 by more than $31 million at the midpoint, or approximately 12%, to a range of $220 million to $225 million.  In this way, the risks concealed by Nextdoor's misleading statements and omissions, in which it made exaggerations about its active user base, materialized and caused Plaintiff and the Class significant damages.

63.    On this news, the price of Nextdoor Class A common stock fell from $3.60 per share on August 9, 2022 to $2.70 per share on August 10, 2022, or approximately 25%, on unusually heavy trading volume.

64.    Then, on November 8, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the third quarter ended September 30, 2022 ("3Q22 Form 10-Q").  The 3Q22 Form 10-Q revealed that Nextdoor's business continued to deteriorate.  Specifically, the 3Q22 Form 10-Q reported that Nextdoor's revenues during the quarter declined sequentially by $1 million to $54 million, representing just 2% year-over-year growth, and that the Company's quarterly ARPU growth was negative, contracting by 12% compared to the prior year quarter.  During the corresponding conference call, Defendant Doyle reported that Nextdoor was reducing revenue guidance again by an additional $12 million, warning investors that Nextdoor now expected fiscal 2022 revenues of just $210.5 million at the midpoint – far below the up to $256 million figure provided to investors previously.  In this way again, the risks concealed by Nextdoor's misleading statements and omissions, in which made exaggerations about its active user base, materialized and caused Plaintiff and the Class significant damages.

65.    On this news, the price of Nextdoor Class A common stock fell from $2.32 per share on November 8, 2022 to $2.06 per share on November 9, 2022, or approximately 11%, on unusually heavy trading volume.

## VI.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

66.    On May 10, 2022, Nextdoor held a conference call with analysts and investors. During the call, Defendant Friar stated:

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through building an active valued community. It's working. In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

67.    The statements above were materially false and misleading because Nextdoor misleadingly implied that by and large the Nextdoor "community" was "active" when in fact half of Nextdoor's active users were off-platform users that were not part of the Nextdoor "community" in any meaningful sense.

68.    Specifically, Nextdoor misled investors in these statements in at least three ways. *First*, Nextdoor explained how active its "community" was by referencing how active its "weekly active users" were, which directly suggested that Nextdoor "active users" are by and large active participants in a Nextdoor *community*, not largely passive email recipients. But Nextdoor omitted that roughly half of its weekly active users were not part of any Nextdoor "community" as that term is commonly understood. A community connotes "an interacting population of various kinds of individuals . . . in a common location."[5] Half of Nextdoor "active users" were merely opening Nextdoor spam emails, not visiting the Nextdoor platform or interacting with other Nextdoor users, and so were not participating as a member of any online community in any meaningful sense. These "active users" were just passively receiving Nextdoor ads.

---

[5] Merriam Webster Dictionary, "Community" (2025), available at https://www.merriam-webster.com/dictionary/community.

69.    *Second*, Nextdoor had previously defined the term "*active*" as used in Nextdoor's marketing phrase "active valued community" by using the phrases "involved in the community," "communicate," and "give and get help."  In these statements, Nextdoor evidenced its success in building an "active valued community" by the activity of its "active users."  In this way, Nextdoor implied that "active users" are by and large users who are "involved in the community," "communicate," and "give and get help."

70.    *Third*, Nextdoor suggested that "daily active users" "make Nextdoor a daily use case."  Nextdoor did not define what it means to "make Nextdoor a daily use case," so that term should be given its ordinary meaning.  Investors would ordinarily understand "making Nextdoor a daily use case" to mean visiting and engaging with the Nextdoor platform on a daily basis.  They would not understand "making Nextdoor a daily use case" to mean checking emails daily.  Yet again, half of "daily active users" were merely checking their emails and not visiting the Nextdoor platform at all.  Accordingly, Nextdoor misled investors to believe that "daily active users" were visiting and engaging with the Nextdoor platform on a daily basis, when in fact half of them were not.

71.    Even if investors read the fine print in Nextdoor's footnotes to other statements and understood that Nextdoor included in its definition of "active user" users who merely opened Nextdoor emails, Nextdoor never suggested in those footnotes what proportion of active users qualified as active users only by opening emails.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

72.    According to FE1, Individual Defendant and all major executives had direct and continuous access to all major company metrics, including Daily Active Users, Weekly Active Users, and Average Revenue Per Users, via a "very publicly available dashboard" hosted on the platform called Looker.  Moreover, these key metrics were defined through "senior leadership," including Defendant "Sarah Friar."  According to FE1, "Sarah was a big advocate that all engagement is engagement.  I think most people were very skeptical of that."

73. According to FE6, Individual Defendant as well as all C-level executives received daily, weekly, and monthly "executive reports" with data on DAUs, WAUs, Monthly Active Users, revenue, advertising, and importantly, the percentage users that were on-platform versus off-platform. FE6 knew that Individual Defendant received these reports and their contents because they were routinely sent to a distribution on which FE6 was included that included all executives, including the Individual Defendant.

74. According to FE6, Nextdoor held weekly companywide meetings that Individual Defendant and senior management regularly attended. Nextdoor employees expressed concerns about Company's unusual and misleading method of defining active users (as including users who simply open Nextdoor emails) at weekly companywide meetings attended by CEO Friar and the company's senior leadership team, including a question "why do we count this [activity as active users]?" "A lot of folks" expressed their concerns at company-wide meetings including Individual Defendant that Nextdoor "should just count the app usage" in determining active users.

75. Nextdoor executives also had access to information suggesting that Nextdoor's active users were roughly half off-platform users from information about ad impressions. FE8 has confirmed that Nextdoor tracked ad impressions, as well as the amount of time users spent on Nextdoor's website and app. According to FE8, Nextdoor tracked ad impressions through the Google Ad Manager server that the company used to manage its ad business. According to FE8, this practice of monitoring ad impressions was standard in the industry, and metrics concerning ad impressions were "definitely being watched by the C-suite." FE8 also confirmed that Nextdoor tracked how long users spent on the Nextdoor platform.

76. Nextdoor's user base was among the most important issues facing the Company and the focus of Nextdoor's management, including the Individual Defendant. The Individual Defendant repeatedly held herself out as among the persons most knowledgeable regarding Nextdoor's user base and related engagement levels, in both U.S. and international markets.

1

**VIII.   NO SAFE HARBOR**

2

77.    The "Safe Harbor" warnings accompanying Nextdoor's reportedly forward looking

3

statements ("FLS") issued during the Class Period were ineffective to shield those statements from

4

liability.

5

78.    Defendants are liable for any false or misleading FLS pled because, at the time each

6

FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized

7

and/or approved by an executive officer of Nextdoor who knew that the FLS was false.

8

**IX.   LOSS CAUSATION**

9

79.    Throughout the Class Period, Defendants materially false and misleading

10

statements and omissions caused the price of Nextdoor Class A common stock to be artificially

11

inflated. Lead Plaintiff and other Class members purchased Nextdoor Class A common stock at

12

those artificially inflated prices.

13

80.    Through partial corrective disclosures, and materializations of concealed risks, over

14

two dates, investors and the market learned of the artificially inflation of the prices of Nextdoor

15

Class A common stock. Lead Plaintiff and Class members suffered losses when the prices of

16

Nextdoor's stock fell and eliminated this artificial inflation.

17

**A.    August 9, 2022**

18

81.    On August 9, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q

19

announcing the Company's financial results for the second quarter ended June 30, 2022 ("2Q22

20

Form 10-Q"). The 2Q22 Form 10-Q revealed that Nextdoor's platform materially declined,

21

reporting that Nextdoor's U.S. WAUs had declined to 29.2 million. The 2Q22 Form 10-Q further

22

reported that the Company's ARPU growth had turned negative in the quarter, contracting by 6%

23

year-over-year. During the corresponding conference call, Defendant Doyle revealed the

24

Company was slashing its revenue guidance for fiscal 2022 by more than $31 million at the

25

midpoint, or approximately 12%, to a range of $220 million to $225 million. In this way, the risks

26

concealed by Nextdoor's misleading statements and omissions, in which it made exaggerations

27

about its active user base, materialized and caused Plaintiff and the Class significant damages.

28

82.    On this news, the price of Nextdoor Class A common stock fell from $3.60 per share on August 9, 2022 to $2.70 per share on August 10, 2022, or approximately 25%, on unusually heavy trading volume.

**B.    November 8, 2022**

83.    On November 8, 2022, Nextdoor filed with the SEC its quarterly report on Form 10-Q announcing the Company's financial results for the third quarter ended September 30, 2022 ("3Q22 Form 10-Q").  The 3Q22 Form 10-Q revealed that Nextdoor's business continued to deteriorate.  Specifically, the 3Q22 Form 10-Q reported that Nextdoor's revenues during the quarter declined sequentially by $1 million to $54 million, representing just 2% year-over-year growth, and that the Company's quarterly ARPU growth was negative, contracting by 12% compared to the prior year quarter.  During the corresponding conference call, Defendant Doyle reported that Nextdoor was reducing revenue guidance again by an additional $12 million, warning investors that Nextdoor now expected fiscal 2022 revenues of just $210.5 million at the midpoint – far below the up to $256 million figure provided to investors previously.  In this way again, the risks concealed by Nextdoor's misleading statements and omissions, in which made exaggerations about its active user base, materialized and caused Plaintiff and the Class significant damages.

84.    On this news, the price of Nextdoor Class A common stock fell from $2.32 per share on November 8, 2022 to $2.06 per share on November 9, 2022, or approximately 11%, on unusually heavy trading volume.

**X.    APPLICABILITY OF PRESUMPTION OF RELIANCE**

85.    Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

86.    Lead Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Nextdoor Class A common stock was an efficient market at all relevant times by virtue of the following factors, among others:

    a.   Nextdoor Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the NYSE, highly efficient markets;

    b.   Nextdoor regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    c.   Nextdoor was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

87.    As a result, the market for Nextdoor Class A common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all those who transacted in Nextdoor Class A common stock during the Class Period suffered similar injury through their transactions in Nextdoor Class A common stock at artificially inflated prices and a presumption of reliance applies.

88.    Without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and other Class members purchased or acquired Nextdoor Class A common stock between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Lead Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Nextdoor Class A common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XI.    CLASS ACTION ALLEGATIONS

89.    Lead Plaintiff brings this action on behalf of all purchasers of publicly traded Nextdoor Class A common stock during the Class Period who were damaged thereby (the "Class").

Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants have or had a controlling interest.

90.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nextdoor Class A common stock was actively traded on national securities exchanges, specifically the NASDAQ prior to the Merger and the NYSE after the Merger. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nextdoor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country. Joinder would be highly impracticable.

91.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws.

92.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

93.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts as alleged;

    b.    whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

c.   whether the prices of Nextdoor Class A common stock during the Class Period were artificially inflated because of Defendants' conduct in this complaint; and

d.   whether the members of the Class have sustained damages and, if so, the proper measure of damages.

94.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5

### Against All Defendants

95.   Lead Plaintiff incorporates ¶¶1-94 by reference.

96.   During the Class Period, Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a.   employed devices, schemes, and artifices to defraud;

b.   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Nextdoor Class A common stock during the Class Period.

98.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nextdoor Class A common stock. Lead Plaintiff and the Class would not have purchased Nextdoor Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

99.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Nextdoor Class A common stock during the Class Period.

## XIII.    COUNT III

### For Violation of §20(a) of the Exchange Act

### Against All Defendants

100.    Lead Plaintiff incorporates ¶¶1-99 by reference.

101.    During the Class Period, Defendants acted as controlling persons of Nextdoor within the meaning of §20(a) of the Exchange Act. By virtue of her positions and power to control public statements about Nextdoor and/or Nextdoor Private, the Individual Defendant had the power and ability to control the actions of Nextdoor and/or Nextdoor Private and their employees, had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Nextdoor, including the content and dissemination of the various statements that Lead Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

102.    The Individual Defendant had the ability to prevent the issuance of the statements alleged to be misleading or cause the statements to be corrected.

103.    The Individual Defendant had direct and supervisory involvement in the day-to-day operations of Nextdoor.

104.    Nextdoor controlled the Individual Defendant and all of its other officers and employees. As set forth above, the Individual Defendant had the ability to exercise control over and did control a person or persons who have each violated Section 10(b), by their acts and

omissions as alleged.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding Lead Plaintiff and the members of the Class damages and interest;

C.    Awarding Lead Plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated:  June 16, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Austin P. Van*
POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
Austin P. Van
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com

*Counsel for Lead Plaintiff Keith Hollingsworth and for the Class*

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Lead Plaintiff Keith Hollingsworth*