**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff*

*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| FRANKIE J. ADAMO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NEXTDOOR HOLDINGS, INC., SARAH J. FRIAR, MICHAEL DOYLE, VINOD KHOSLA, SAMIR KAUL, PETER BUCKLAND, KHOSLA VENTURES LLC, and KHOSLA VENTURES SPAC SPONSOR II LLC <br><br> Defendants. | CASE NO.  5:24-cv-01213-EJD <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> <u>**CLASS ACTION**</u> |

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................. 1

II.     FACTUAL BACKGROUND .................................................................................. 3

        A.      Nextdoor's Key Business Metrics .......................................................... 3

        B.      Nextdoor Repeatedly Compared Its "Active Users" to Those of Its Peers in
                Investor Materials, Suggesting They Were Comparable ...................................... 3

        C.      Nextdoor Repeatedly Suggested that Its Active Users Were By and Large "On the
                Platform," Engaged in Online "Sessions," and Part of an "Active Community".. 4

        D.      Defendants Misled Investors To Believe That Virtually All of Nextdoor's Active
                Users Were On-Platform Participants in Nextdoor's "Community" ..................... 6

        E.      Investors Suffered Losses When the Truth Was Revealed ................................. 7

        F.      Plaintiffs' Original Claim Based on the May 10, 2022 Statements Was Dismissed
                on Narrow Grounds, and the Second Amended Complaint Resolves Those
                Concerns .................................................................................................. 7

III.    LEGAL STANDARDS ........................................................................................... 8

IV.     DEFENDANTS MISLED INVESTORS TO BELIEVE THAT, BY AND LARGE,
        ACTIVE USERS PARTICIPATED IN THE NEXTDOOR ONLINE COMMUNITY ... 8

        A.      Defendants Misled Investors To Believe Virtually All of Its Active Users
                Participated in the Nextdoor Community and So Were Active on the Nextdoor
                Platform .................................................................................................. 8

        B.      The Context of Nextdoor's Statement, Including Prior Statements and Industry
                Custom, Made Them All the More Misleading ................................................ 14

                1.      Nextdoor's Prior Statements Primed Investors To Believe that Virtually
                        All of Nextdoor's Active Users Were On-Platform .............................. 14

                2.      Investors Were Also Primed by Industry Custom To Believe that Virtually
                        All of Nextdoor's Active Users Were On-Platform .............................. 16

        C.      The May 10, 2022 Statements Were Not an Opinion, and in Any Event Conflict
                with Facts Known to Defendants ................................................................... 17

V.      NEXTDOOR MADE THE ALLEGED MISSTATEMENTS WITH SCIENTER ......... 19

VI.     THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS
        CAUSATION .......................................................................................................... 22

VII.    THE SECOND AMENDED COMPLAINT STATES A CLAIM UNDER
        SECTION 20(A) .................................................................................................... 23

VIII.   CONCLUSION ............................................................................................................. 24

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **Amended Complaint or AC** | Amended Class Action Complaint (September 10, 2024) (ECF No. 65) |
| **Class Period** | May 10, 2022 to November 7, 2022 |
| **Company** | Nextdoor Holdings, Inc. f/k/a Khosla Ventures Acquisition Co. II |
| **Complaint** | Complaint for Violations of the Federal Securities Laws (February 28, 2024) (ECF No. 1) |
| **DAU** | daily active user |
| **Defendants** | Nextdoor Holdings, Inc. and Sarah J. Friar |
| **FE** | former employee |
| **Individual Defendant** | Sarah J. Friar |
| **Khosla Ventures** | Khosla Ventures Acquisition Co. II |
| **Lead Plaintiff or Plaintiff** | Keith Hollingsworth |
| **Nextdoor** | Nextdoor Holdings, Inc. f/k/a Khosla Ventures Acquisition Co. II |
| **Motion or Mot. or Mem.** | Nextdoor Defendants' Notice of Motion and Motion to Dismiss Plaintiff's Second Amended Class Action Complaint (July 31, 2025) (ECF No. 86) |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u–4) |
| **Second Amended Complaint or SAC** | Second Amended Class Action Complaint (June 16, 2025) (ECF No. 85) |
| **SEC** | United States Securities and Exchange Commission |
| **Van Decl.** | Declaration of Austin P. Van in Support of Plaintiff's Omnibus Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, filed herewith. |
| **WAU** | weekly active user |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...................................................................................................8

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019).....................................................................................20

*Bush v. Rust-Oleum Corp.*,
No. 20-cv-03268, 2021 WL 24842 (N.D. Cal. Jan. 4, 2021)..................................................14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .................................................................................................18

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)....................................................................................13

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................................................22

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ...................................................................................................8

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ..................................................................................................24

*Golub v. Gigamon Inc.*,
847 F. App'x 368 (9th Cir. 2021) ...........................................................................................17

*Hertzberg v. Dignity Partners, Inc.*,
191 F.3d 1076 (9th Cir. 1999) ...............................................................................................13

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ...............................................................................................24

*In re Allied Nev. Gold Corp. Sec. Litig.*,
743 F. App'x 887 (9th Cir. 2018) ...........................................................................................18

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ..............................................................................................19, 20

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ...................................................................................................8

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .................................................................................................22

*In re Daou Sys., Inc., Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ...................................................................................20, 24

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..............................................................................................8

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) ...................................................................................................8

*K-fee Sys. GmbH v. Nespresso USA, Inc.*,
No. CV 21-3402, 2022 WL 22676736 (C.D. Cal. Aug. 31, 2022)..........................................14

*Kellman v. Whole Foods Mkt. Inc.*,
313 F. Supp. 3d 1031 (N.D. Cal. 2018) ...............................................................................13

*Leventhal v. Chegg, Inc.*,
721 F. Supp. 3d 1003 (N.D. Cal. 2024) ................................................................................24

*Maiman v. Talbott*,
No. SACV 09-0012, 2010 WL 11421950 (C.D. Cal. Aug. 9, 2010)......................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).......................................................................................15, 16, 17, 18

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ...............................................................................................19

*Sandifer v. U.S. Steel Corp.*,
571 U.S. 220, 227 (2014))), *aff'd sub nom.*,
*United States ex rel. Silbersher v. Allergan, Inc.*, No. 23-15613,
2025 WL 325761 (9th Cir. Jan. 29, 2025) ...........................................................................13

*Silbersher v. Allergan Inc.*,
No. 18-cv-03018, 2023 WL 2593777 (N.D. Cal. Mar. 20, 2023) ........................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..............................................................................................................19

*United States v. Alvarez-Sanchez*,
511 U.S. 350 (1994)..............................................................................................................13

*Vignola v. FAT Brands, Inc.*,
No. CV-18-7469, 2019 WL 6888051 (C.D. Cal. Dec. 17, 2019)...........................................18

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ..............................................................................................23

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...............................................................................................20

**Statutes**

15 U.S.C. § 78u-4(e) ....................................................................................................................23

## I.     INTRODUCTION

During the Class Period, Defendants misled investors about a fundamental aspect of Nextdoor's business—Defendants misled investors to believe that virtually all of their "active users" were so-called "on-platform" users, users who actually visited Nextdoor's platform on its website or app.  In fact, approximately half of Nextdoor's users were "off-platform" users, users whom Nextdoor counted as "active users" even though they never actively used Nextdoor in any meaningful sense—they merely opened Nextdoor's spam emails.  While Nextdoor defined "active users" in its SEC filings as including both on- and off-platform users, Nextdoor misled investors about the *proportion* of those active users who were on-platform—Nextdoor implied that virtually all of Nextdoor's active users were on-platform, when in fact about half of the users were off-platform users simply checking their emails.

In Defendant Friar's May 10, 2022 Statements, Defendants misled investors in three ways to believe that the proportion of active users who were on-platform was far greater than it really was.  *First*, Defendants implied that Nextdoor's "active users" were virtually all participants in a Nextdoor *community*.  As communities are defined by members who *interact*, Nextdoor implied that its active users were virtually all users who interacted with each other on the platform, not off-platform passive email recipients.  *Second*, Nextdoor implied to investors that they could track "active users" by tracking the Company's progress in building an on-platform "active valued community," and so implied that by and large, "active users" were on-platform users.  *Finally*, Nextdoor misled investors to believe that "active users" who were "active daily" were visiting and engaging with the Nextdoor platform on a daily basis, when in fact half of them were not.

Defendants certainly knew those statements were misleading because Defendants knew that *half* of their "active users" were not actually active in any meaningful sense.  A former employee has stated that executives, including Defendant Friar, received daily, weekly, and monthly "executive reports" with data on the *percentage of active users who were on-platform versus off-platform*.  In fact, a former employee has even stated that employees openly questioned whether the Company should be defining "active users" in this blatantly misleading way at weekly companywide meetings attended by Defendant Friar.

The truth about Nextdoor's misrepresentations took months to be absorbed by the market through two partial disclosures. On August 9 and November 8, 2022, the Company revealed declining ARPU growth rates, which revealed that Nextdoor's users were mostly not genuinely "active users" durably engaged in the Nextdoor community, and caused the risks concealed by Nextdoor's misstatements to materialize. All told, *Nextdoor lost 90% of its value* during the Class Period.

In its May 19, 2025 Order (ECF No. 80) ("Order" or "Op"), the Court held that the May 10, 2022 Statements were not misleading under Plaintiff's prior pleading because "Nextdoor's explicit definition of 'active user' eliminates any reasonable expectation that the term could mean something else." Op. at 14. The SAC removes this concern—the SAC alleges that ***even if*** investors fully recognized that Nextdoor defined "active users" as including both on-platform and off-platform users, Nextdoor misled investors to believe that virtually all of those "active users," so defined, were on-platform. That is, Nextdoor misled investors, not to believe that the *definition* of active users excluded off-platform users, but rather to believe that the *proportion* of active users that were purely off-platform was negligible.

The lion's share of Defendants' motion is built on their simple failure to appreciate the above. Defendants repeatedly argue that because Nextdoor defined "active users" as including both on- and off-platform users, investors could not have been misled about the definition of "active users." Defendants fail to see that even if investors fully recognized that Nextdoor's definition of "active users" included both on- and off-platform users, investors could have been (and indeed were) misled to believe that almost all active users were on-platform users, while only a negligible number of "active users" were purely off-platform users. This failure infects the vast majority of Defendants' arguments, and Defendants' remaining arguments seem to have been included as afterthoughts and fail to save their motion.

Investors were misled about this central aspect of Nextdoor's business, and they suffered severe losses as a result. They have a right to have a jury determine as much.

## II.    FACTUAL BACKGROUND

### A.    Nextdoor's Key Business Metrics

Defendant Nextdoor operates a "hyperlocal" online social networking platform that connects neighbors via the internet for discrete, one-off searches for local services or information. SAC ¶ 11. The value of Nextdoor's advertising space—and hence its business—is ultimately dependent on the size and level of engagement of the Company's user base. SAC ¶ 26. Nextdoor publicly discloses purported user and engagement performance primarily through two key business metrics. *Id.* *First*, Nextdoor reports its "active users" through Weekly Active User ("WAU") metrics and defines a WAU as "a Nextdoor user who opens our application, logs on to our website, or engages with an email with monetizable content at least once during a defined 7-day period." *Id.* *Second*, Nextdoor reports average revenue per weekly active user or "ARPU," which the Company defines as total revenue during a period divided by the average of the number of WAUs during the same period. *Id.*

Nextdoor's definition of "active users" is unique in the online-services industry in that Nextdoor includes as "active users" not only so-called "on platform" users (i.e., users that visit the Nextdoor website or app), but also "off-platform" users (i.e., users that merely open a Nextdoor email). SAC ¶ 39.

### B.    Nextdoor Repeatedly Compared Its "Active Users" to Those of Its Peers in Investor Materials, Suggesting They Were Comparable

Leading up to the start of the Class Period, Nextdoor repeatedly made direct comparisons of its own "active users" to those of peers like Twitter and Snap, and so suggested to investors that its "active user" figures could be compared directly to the active user figures of companies that did not include off-platform users as active users. SAC ¶ 33. In this way, Nextdoor suggested to investors that the inclusion of off-platform users did not materially change its active user count—that Nextdoor's "active user" base was by and large on-platform users like those of Twitter and Snap. *Id.*

Nextdoor's July 2021 Investor Presentation argued for Nextdoor's potential to grow its users and average revenue per user in a chart that directly compared Nextdoor's ARPU and DAU

3

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 5:24-CV-01213)

data to those of Twitter and Snap. SAC ¶¶ 34-35. Investors and analysts understood this chart to imply that Nextdoor was claiming that its user base could be compared to those of Twitter and Snap. SAC ¶ 35.

During the July 6, 2021 call, Defendant Friar compared Nextdoor's user base to Twitter's by stating that "we're about 1/3 the size of Twitter." SAC ¶ 36. The context of her statement, including her references to ARPU (which is tied to weekly active users), makes clear that she meant that Nextdoor had about 1/3 the number of active users as Twitter, suggesting again that Twitter and Nextdoor active users were comparable. *Id.*

Finally, on a November 10, 2021 conference call with analysts and investors to discuss the Company's financial and operational results for the third quarter, in response to a question regarding Nextdoor's engagement metrics, Defendant Friar stated Nextdoor was "quite proud" of its reported 20% WAU growth, and noted that competing social media platforms experienced a "downtick" after lapping strong comparable periods due to COVID-19 impacts, whereas Nextdoor, in contrast, experienced its "highest level of WAUs ever." SAC ¶ 38. In these statements, Friar again suggested that Nextdoor's active users were comparable in kind to those of competing social media platforms. *Id.*

Yet Nextdoor's active users were not comparable to those of peers Twitter or Snap. Again, Nextdoor's definition of "active users" was wholly unique in the industry because it included off-platform users who merely checked their emails. SAC ¶ 39.

**C.      Nextdoor Repeatedly Suggested that Its Active Users Were By and Large "On the Platform," Engaged in Online "Sessions," and Part of an "Active Community"**

Also leading up to the start of the Class Period, Nextdoor repeatedly suggested that its active users were by and large on-platform users who engaged in online sessions and were part of an "active" "community." SAC ¶ 40. In this way, Nextdoor created a backdrop for investors to believe that, even though Nextdoor defined "active users" to include off-platform users, the vast majority of its active users were nevertheless on-platform, genuinely active members of a Nextdoor community. *Id.*

4

On Nextdoor's July 6, 2021 investor conference call, Nextdoor implied that Nextdoor's users ("neighbors" and "members") were "on the platform," and so suggested that by and large, Nextdoor's active users actually visited Nextdoor's website. SAC ¶ 41. In the same statements, Nextdoor suggested that "active users" were users that engaged in "sessions" in which they "consume and also create" "content," not merely users who check their emails. SAC ¶ 42. Also on July 6, 2021, during an interview Defendant Friar gave to correspondents at *CNBC*'s "Squawk on the Street" program, Defendant Friar suggested that "active users" were growing because by and large they were "members" who "engage[d]" "on the platform." SAC ¶ 43.

During Nextdoor's September 20, 2021 "investor day" presentation, Defendant Friar repeatedly made clear that "neighbors" (in context referring to users) were individuals who were "on the platform" rather than individuals who merely checked their emails off-platform. SAC ¶ 44.

The September 20, 2021 presentation contained a slide deck addressing what the Company meant by "Valued Active Community." SAC ¶ 47. The Company defined "active" with the phrases "involved in the community," "communicate" and "give and get help." *Id.* In this way, the Company again reinforced the suggestion that "active" neighbors by and large were those who actively participated in the community and communicated or interacted with other neighbors, not those who merely opened a content email. *Id.*

On October 21, 2021, Nextdoor filed its October 2021 Proxy, which discussed the habits of "neighbors who engaged with Nextdoor daily." This language tacitly suggested that daily active users were by and large neighbors who engaged with the Nextdoor platform daily. SAC ¶ 48. Finally, on March 1, 2022, Nextdoor issued a shareholder letter reporting its financial results for the fourth quarter and full year ending December 31, 2021, which stated that weekly active users were "creating an Active Valued Community," and so again suggested that by and large weekly active users were active participants in an online community, not merely passive consumers of emails. SAC ¶ 50.

**D.    Defendants Misled Investors To Believe That Virtually All of Nextdoor's Active Users Were On-Platform Participants in Nextdoor's "Community"**

On May 10, 2022, Nextdoor held a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter.  SAC ¶ 51.  After Nextdoor had suggested for months that its active users were comparable to those of Twitter and Snap, and that its "neighbors" were by and large "on the platform" and part of an "active valued community" rather than off-platform email users, Defendant Friar stated:

> Our community is active and becoming increasingly active.  Our product strategy in 2022 is centered on strengthening engagement through building an active valued community.  It's working.  In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

*Id.*  As explained below, in these statements, Nextdoor misleadingly implied in at least three ways that virtually all of its active users were on-platform users genuinely active in the Nextdoor "community," rather than off-platform users who merely checked their emails.  SAC ¶ 52.

In fact, as former employees confirmed, roughly half of Nextdoor's "active users" were off-platform users who were not accessing Nextdoor's website or app.  SAC ¶¶ 53, 56.  According to FE6, 50% or more of Nextdoor's Weekly Active Users were "off-platform" users that merely opened an email from Nextdoor.  SAC ¶ 53.  This fact was confirmed by FE1 and FE7.  SAC ¶¶ 55-56.

FE6 and FE1 also stated that it was highly unusual for a company in Nextdoor's industry to count as "active users" those who merely opened emails.  SAC ¶¶ 53, 56.  Dr. Venkatesh Shankar, an expert in practices of the online services industry concerning user metrics, including common usage of "active users" in that industry, likewise confirmed that Nextdoor's usage of the term "active user" would be unexpected and confusing to those familiar with the industry.  SAC ¶ 58.  According to Dr. Shankar, the terms "daily active users," "weekly active users," and "monthly active users" typically refer in the online services industry to users who actively engage in on-platform activity (on a company's app or website).  SAC ¶ 59.  For example, Snapchat,

Instagram and Facebook restrict their definitions of active users to on-platform usage. *Id.* Multiple academic research articles likewise define active users in this standard way. *Id.*

**E.    Investors Suffered Losses When the Truth Was Revealed**

On August 9, 2022, Nextdoor reported that the Company's ARPU growth had turned negative in the quarter, contracting by 6% year-over-year. SAC ¶ 81. This news caused Nextdoor stock to fall by 25%, from $3.60 per share on August 9, 2022 to $2.70 per share on August 10, 2022, on unusually heavy trading volume. SAC ¶ 82. Then, on November 8, 2022, Nextdoor revealed that the Company's quarterly ARPU growth was contracting by 12% compared to the prior year quarter. SAC ¶ 83. On this news, the price of Nextdoor Class A common stock fell from $2.32 per share on November 8, 2022 to $2.06 per share on November 9, 2022, or approximately 11%, on unusually heavy trading volume. SAC ¶ 84.

By revealing over successive dates that ARPU was declining (even though, as Defendants note, WAU had increased year-over-year), Nextdoor revealed to investors that a significant percentage of Nextdoor's active users were not meaningfully engaged on the Nextdoor platform, and the risks concealed by Nextdoor's misleading statements and omissions, in which Nextdoor made exaggerations about its active user base, materialized. Primarily off-platform users do not contribute to revenue as much as on-platform users, as off-platform users experience far fewer ad impressions and have fewer monetizable platform interactions than on-platform users, so an unengaged, largely off-platform user base results in an inability to maintain or grow ARPU.

**F.    Plaintiffs' Original Claim Based on the May 10, 2022 Statements Was Dismissed on Narrow Grounds, and the Second Amended Complaint Resolves Those Concerns**

In its Order, the Court held that the May 10, 2022 Statements were not misleading under Plaintiffs' prior pleading because "Nextdoor's explicit definition of 'active user' eliminates any reasonable expectation that the term could mean something else." Op. at 14. The SAC removes this concern because the SAC does not allege that investors necessarily misunderstood Nextdoor's definition of "active user." Rather, the SAC alleges that *even if* investors fully recognized that

Nextdoor defined "active users" as including both on-platform and off-platform users, Nextdoor misled investors to believe that virtually all of those "active users" were on-platform.

## III.    LEGAL STANDARDS

On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s] them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017). When ruling on a motion to dismiss a securities case, any "skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

## IV.    DEFENDANTS MISLED INVESTORS TO BELIEVE THAT, BY AND LARGE, ACTIVE USERS PARTICIPATED IN THE NEXTDOOR ONLINE COMMUNITY

A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ," the question of "[w]hether a statement is misleading and whether adverse facts were adequately disclosed . . . should be left to the trier of fact." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

### A.    Defendants Misled Investors To Believe Virtually All of Its Active Users Participated in the Nextdoor Community and So Were Active on the Nextdoor Platform

Defendants misled investors by creating an "impression of a state of affairs that differs in a material way from the one that actually exists," *Berson*, 527 F.3d at 985 — Defendants misleadingly implied that virtually all of Nextdoor's "active users" were on-platform, when in fact half of Nextdoor's active users were off-platform users that were not part of the Nextdoor "community" in any meaningful sense. On May 10, 2022, Nextdoor held a conference call with analysts and investors. During the call, Defendant Friar made the following statements (the "May 10, 2022 Statements"):

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through building an active valued community. It's working. In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

SAC ¶ 51.

Nextdoor misled investors in these statements in at least three ways. *First*, Nextdoor explained how active its "community" was by referencing how active its "weekly active users" were, which directly suggested that Nextdoor "active users" were by and large active participants in a Nextdoor *community*, not largely passive email recipients. But Nextdoor omitted that roughly half of its weekly active users were not part of any Nextdoor "community" as that term is commonly understood. A community connotes "an interacting population of various kinds of individuals . . . in a common location."[1] Half of Nextdoor "active users" were merely opening Nextdoor spam emails, not visiting the Nextdoor platform or interacting with other Nextdoor users, and so were not participating as a member of any online community in any meaningful sense. These "active users" were just passively receiving Nextdoor ads. Even if investors fully understood that Nextdoor defined "active users" to include both on- and off-platform users, Defendants misled investors in this statement to believe that virtually all of these "weekly active users" were participants in a community, and thus were virtually all on-platform users.

*Second*, Nextdoor had previously defined the term "*active*" as used in Nextdoor's marketing phrase "active valued community" by using the phrases "involved in the community," "communicate," and "give and get help." Ex. A to Van Decl. (ECF. No. 90). These phrases connote on-platform activity, so Nextdoor had previously clearly defined an "active valued community" as consisting of on-platform users. In the May 10, 2022 Statements, Nextdoor stated that it was focused on "building an active valued community," and argued to investors that it was succeeding in building an "active valued community" because more than half of its users were

---

[1] *Community*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/community (last visited Sep. 12, 2025).

"active users." That is, Nextdoor stated that it was succeeding in building its on-platform community because most of its users were "active users." In effect, Nextdoor instructed investors in these Statements to look to "active users" to track the Company's progress in building an on-platform community. That instruction only makes sense if, by and large, "active users" were on-platform users.

*Third*, Nextdoor suggested that "active users" who are "active daily" "make Nextdoor a daily use case." Nextdoor did not define what it means to "make Nextdoor a daily use case," so that phrase should be given its ordinary meaning. Based simply on ordinary parlance, "to use an online services company" means to visit that Company's website or app for the purpose for which the Company is in business. For example, "to use Amazon" would mean to visit Amazon's website or app and make a purchase, or "to use Google maps" would mean to visit Google maps website or app to find a location or get directions. Accordingly, in ordinary parlance, "making Nextdoor a daily use case" means visiting and engaging with the Nextdoor platform on a daily basis. In ordinary parlance, the phrase "making Nextdoor a daily use case" does not mean checking emails daily, just as checking spam emails from Amazon or Google Maps would not constitute daily use of those businesses. Yet again, half of "active users" were merely checking their emails and not visiting the Nextdoor platform at all. Accordingly, Nextdoor misled investors to believe that "active users" who were "active daily" were visiting and engaging with the Nextdoor platform on a daily basis, when in fact half of them were not.

In its Order, the Court held that the May 10, 2022 Statements were not misleading under Plaintiff's prior pleading because "Nextdoor's explicit definition of 'active user' eliminates any reasonable expectation that the term could mean something else." Op. at 14. The SAC removes this concern because the SAC does not allege that investors necessarily misunderstood Nextdoor's definition of "active user." Rather, the SAC alleges that even if investors fully recognized that Nextdoor defined "active users" as including both on-platform and off-platform users, Nextdoor misled investors to believe that virtually all of those "active users" were on-platform. There is no inconsistency in Nextdoor's defining "active users" as including both users who visited Nextdoor's app or website and users who only opened Nextdoor's emails, yet leading investors to believe that

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 5:24-CV-01213)

of those "active users," virtually all visited the Nextdoor's website or app. The SAC now alleges that that is what Nextdoor misleadingly did.

The Court also held in its Order that the fact that Nextdoor's definition of "active user" was unusual in the industry did not show that investors would have been surprised by this definition, because Nextdoor disclosed the definition to investors. The Court was correct. Yet the SAC now alleges not that investors were surprised by Nextdoor's definition of "active user," but rather that investors would not have expected the proportion of these "active users" that was off-platform to be roughly 50%, given Nextdoor's statements creating the impression that nearly all of Nextdoor's "active users" were on-platform users. Nevertheless, industry practice provides relevant context for the May 10, 2022 Statements. As investors were accustomed to understanding the term "active users" to mean on-platform users, investors were primed to interpret the May 10, 2022 Statements as suggesting that the vast majority of Nextdoor's "active users" were on-platform users, even if investors recognized that Nextdoor defined active users as potentially including off-platform users.

In their Motion, Defendants first accuse Plaintiff of "trying to redefine 'active user.'" Not at all. The SAC recites Nextdoor's definition of "active user" and does not dispute that the Company defined "active user" in this way. SAC ¶ 15. The central problem with Defendants' Motion is their failure to recognize the following: the SAC alleges not that Defendants misrepresented their *definition* of "active user" as including both on- and off-platform users, but rather that they misled investors about the *proportion* of those "active users," so defined, who were on-platform—Defendants created the distinct impression that nearly all of their active users were on-platform users, when in fact about half were off-platform users. It is no response to Plaintiff's allegations that Defendants misled investors about the proportion of "active users" who were on platform, for Defendants to argue that investors knew that the Company defined "active users" as including both on- and off-platform users—this definition revealed nothing to investors about the proportion of users who were on-platform.

Next, as noted above, Defendants directly suggested that Nextdoor "active users" were virtually all participants in a Nextdoor "community." As a "community" connotes "an interacting

11

population of various kinds of individuals . . . in a common location," Nextdoor's statements implied that virtually all "active users" were "interacting" "in a common location," i.e., visiting the Nextdoor platform.[2]  In their Motion, Defendants argue that this definition does not "suggest[] that every single member of a "community" . . . is 'interacting.'"  In fact, it does—Websters makes clear that a "population" of "individuals" constitutes a "community" if and only if those individuals are interacting, and so suggests that non-interacting individuals do not constitute a community.  Defendants argue that Webster's reference to "a common location" must refer to a common physical location, but no such qualification appears in the definition—a website is certainly a common location that can form the basis of community interacting, and indeed that is the basis of Nextdoor's business model and brand image.

As explained above, in the May 10, 2022 Statements, Nextdoor implied that "active users" are by and large on-platform users who are "involved in the community," "communicat[ing]," and "giv[ing] and get[ting] help."  Nextdoor in effect instructed investors in the May 10, 2022 Statements to look to "active users" to track the Company's progress in building an on-platform community, and so implied that by and large, "active users" were on-platform users.  Defendants argue that the phrases "involved in the community," "communicate," and "give and get help" may apply to off-platform users who only opened emails.  Defendants are mistaken.  As noted above, involvement in a community requires an individual to *interact* with other individuals in that community, i.e., "to act upon one another," and an individual that merely passively receives an email does act upon any other individual.[3]  Passive email recipients likewise do not communicate with other members or give them help.  Defendants also argue that investors could not have understood Nextdoor to be instructing them to look to growth in "active users" to track the growth of on-platform users because Nextdoor defined "active users" to include both on- and off-platform users.  But again, there is no inconsistency in Nextdoor's defining active users to include both

---

[2] *Community*, Merriam-Webster Dictionary, *supra* note 1.

[3] *Interact*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/interact (last visited Sep. 12, 2025).

types of users, yet implying to investors that by-and-large, its active users were on-platform. And reasonable investors would have understood Nextdoor's instruction that investors track the Company's success in building an on-platform community by tracking active users to imply that its active users were by and large on-platform.

Finally, as explained above, Nextdoor suggested that "active users" who are "active daily" "make Nextdoor a daily use case," and so misleadingly suggested that daily active users are on-platform users who actively engage with the Nextdoor website. Defendants argue first that Defendant Friar "did not actually say that Nextdoor's 'daily active users' 'ma[d]e Nextdoor a daily use case.'" Mot. at 11-12. Defendant Friar stated, in relevant part: "over half of weekly *active users* were *active daily*, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a *daily use case*." SAC ¶ 16 (emphasis added). In this way, Defendant Friar unmistakably conveyed that "active users" who are "active daily" "make Nextdoor a daily use case"—that is, that daily active users make Nextdoor a daily use case. Next, Defendants argue that there is something improper about alleging the ordinary usage of a term. Mot. at 11-12. There is not. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999) (citing *United States v. Alvarez-Sanchez*, 511 U.S. 350, 357 (1994)) ("The term 'any person' is quite broad, and we give words their ordinary meaning."); *Silbersher v. Allergan Inc.*, No. 18-cv-03018, 2023 WL 2593777, at *10 (N.D. Cal. Mar. 20, 2023) ("[U]nless otherwise defined, words are interpreted as taking their ordinary, contemporary, common meaning." (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014))), *aff'd sub nom. United States ex rel. Silbersher v. Allergan, Inc.*, No. 23-15613, 2025 WL 325761 (9th Cir. Jan. 29, 2025); *see also City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) ("[R]ather than resolve the factual dispute over whether plaintiff should have understood the word 'renewal' to carry a special meaning in this context, the Court must assume, as the complaint asserts, that it carries its ordinary meaning."). There is also nothing wrong with the Court applying its own understanding of English in determining whether Defendants' statements were misleading. *See, e.g.*, *Kellman v. Whole Foods Mkt. Inc.*, 313 F. Supp. 3d 1031, 1051 (N.D. Cal. 2018) (representations about concentration of skin sensitizers that may cause

sensitization reactions in consumers precludes dismissal of claims about how a reasonable consumer would interpret hypoallergenic); *Bush v. Rust-Oleum Corp.*, No. 20-cv-03268, 2021 WL 24842, at *5 (N.D. Cal. Jan. 4, 2021) (denying motion to dismiss where Defendant offered differing definitions of terms as "[t]hese are not questions that can be resolved on a motion to dismiss"); *K-fee Sys. GmbH v. Nespresso USA, Inc.*, No. CV 21-3402, 2022 WL 22676736, at *2 (C.D. Cal. Aug. 31, 2022) (court construed "barcode" as having its plain and ordinary meaning). Lastly, Defendants argue again that they defined "active users" as including both on- and off-platform users, so investors could not have been misled when they suggested that virtually all of those active users were on-platform. Again, Defendants fail to appreciate that Defendants' definition of "active users" as including both on- and off-platform users said nothing about the *proportion* of active users that were on- and off-platform. Reasonable investors were well justified in understanding Nextdoor to be implying, in multiple ways in the May 10, 2022 Statements, that its active users were by and large on-platform users, even if they understood fully well that Nextdoor defined active users as potentially including off-platform users as well.

**B.     The Context of Nextdoor's Statement, Including Prior Statements and Industry Custom, Made Them All the More Misleading**

While Nextdoor defined "active user" to include both on- and off-platform users, the context of Nextdoor's May 10, 2022 Statements made investors all the more susceptible to being misled by those statements to believe that virtually all of Nextdoor's active users were on-platform users. This context includes Nextdoor's prior statements suggesting its active users were by and large on-platform users, as well as the broadly accepted custom in Nextdoor's industry of defining "active user" to mean on-platform users.

**1.     Nextdoor's Prior Statements Primed Investors To Believe that Virtually All of Nextdoor's Active Users Were On-Platform**

For almost a year prior to the May 10, 2022 Statements, Nextdoor made statements that primed investors to be misled to believe that by and large Nextdoor's active users were on-platform users.

*First*, as detailed above and in the SAC at ¶¶ 33-39, Nextdoor repeatedly made direct

14

comparisons of its own "active users" to those of peers like Twitter and Snap, and so suggested to investors that its "active user" figures could be compared directly to the active user figures of companies that did not include off-platform users as active users. In this way, Nextdoor suggested to investors that the inclusion of off-platform users did not materially change its active user count—that Nextdoor's "active user" base was by and large on-platform users like those of Twitter and Snap.

*Second*, as detailed in the SAC at ¶¶ 40-50, in the year prior to the start of the Class Period, Nextdoor repeatedly suggested in a number of different phrases that its active users were by and large on-platform users that were part of an "active" "community." For example, Nextdoor repeatedly implied that Nextdoor's users were "on the platform," and so suggested that by and large, Nextdoor's active users actually visited Nextdoor's website. SAC ¶ 41. Nextdoor likewise repeatedly suggested that "active users" are users that engage in "sessions" in which they "consume and also create" "content," not merely users who check their emails. SAC ¶ 42. Defendant Friar suggested that "active users" were growing because by and large they were "members" who "engage[d]" "on the platform," and repeatedly made clear that neighbors are individuals that are "on the platform" rather than individuals that merely check their emails off-platform. SAC ¶¶ 43-44. Notably, Nextdoor defined being "active" in a "Valued Active Community" to mean *interacting* with the community by "communicat[ing]," or "giv[ing] or get[ting] help," not passively opening emails. SAC ¶ 47. In this context, Nextdoor created a backdrop for investors to believe that, even though Nextdoor defined "active users" to include off-platform users, the vast majority of its active users were nevertheless on-platform, genuinely active members of a Nextdoor community.

In their Motion, Defendants largely ignore the context of these prior statements, but the Court must consider this context in determining whether the May 10, 2025 Statements were misleading. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).

**2.    Investors Were Also Primed by Industry Custom To Believe that Virtually All of Nextdoor's Active Users Were On-Platform**

Even though Nextdoor defined "active users" as including on- and off-platform users, investors were primed to interpret Nextdoor's May 10, 2022 Statements as implying that, as a proportion, virtually all of Nextdoor's active users were on-platform users because the term "active users" is used in the industry to refer only to on-platform users.

According to FE6, Nextdoor's way of defining users was highly unusual in Nextdoor's industry. SAC ¶ 53. FE6 stated, "I could not find another company doing that." *Id*. Indeed, many individuals within Nextdoor appear to have recognized that Nextdoor's practice of including users who merely open their emails as "active users" was problematic—according to FE6, "a lot of folks" within Nextdoor "thought we should just count the app usage," a view that had been prevalent "for years." *Id*. FE1 likewise confirmed that it was highly unusual for a company in Nextdoor's industry to count as "active users" those who merely opened emails. SAC ¶ 56. "Peer companies" like Twitter, Facebook and Instagram define active users as those who visit the companies' websites or apps and initiate a "session." *Id*.

Dr. Venkatesh Shankar, an expert in practices of the online services industry concerning user metrics, including common usage of "active users" in that industry, has confirmed that Nextdoor's usage of the term "active user" would be unexpected and confusing to those familiar with the industry. SAC ¶ 58. According to Dr. Shankar, the terms "daily active users," "weekly active users," and "monthly active users" typically refer in the online services industry to users who actively engage in on-platform activity (on a company's app or website). SAC ¶ 59. For example, Snapchat, Instagram and Facebook restrict their definitions of active users to on-platform usage. *Id*. Multiple academic research articles likewise define active users in this standard way. *Id*.

Dr. Shankar opined that a statement from an online services company that "our community is active" in the context of discussing active users suggests to someone familiar with the industry that the users by and large have deeper engagement in the platform, not merely passive off-platform engagement through opening emails. SAC ¶ 60.

In its Order, the Court held that "[r]egardless of what is typical in the industry, Nextdoor's explicit definition of 'active user' eliminates any reasonable expectation that the term could mean something else." Op. at 14. Yet the SAC now alleges not that investors misunderstood Nextdoor's definition of "active user" due to industry practice, but rather that industry practice primed investors to believe that the proportion of on-platform users was much larger than it actually was.

In their Motion, Defendants argue that falsity under Section 10(b) is determined with reference to a reasonable investor, not someone "familiar with the industry." Mot. at 13. Yet Defendants themselves admit that a reasonable investor "take[s] into account the customs and practices of the relevant industry," and so is assumed to be familiar with those practices. *Id.* (quoting *Omnicare*, 575 U.S. at 190). Indeed, industry practice is a critical part of the context the Court must consider in determining whether a statement is misleading. *See Omnicare*, 575 U.S. at 190 (a reasonable investor reads each statement "in light of all its surrounding text" and "takes into account the customs and practices of the relevant industry"); *Golub v. Gigamon Inc.*, 847 F. App'x 368, 372-73 (9th Cir. 2021) ("'[W]hether an omission makes an expression of opinion misleading always depends on context,' because 'investors take into account the customs and practices of the relevant industry.'" (quoting *Omnicare*, 575 U.S. at 190)).

### C.    The May 10, 2022 Statements Were Not an Opinion, and in Any Event Conflict with Facts Known to Defendants

Defendants argue the May 10 Statements were statements of opinion. Mot. at 13-15. As detailed above, the May 10 Statements implied three misleading propositions, none of which was an opinion. *First*, Defendants implied that Nextdoor "active users" were by and large on-platform participants in a Nextdoor *community*, not largely passive email recipients. Whether Nextdoor's active users were by-and-large on-platform is a falsifiable statement of fact. *Second*, Nextdoor implied to investors that they could track "active users" by tracking the Company's progress in building an on-platform "active valued community," and so implied that by and large, "active users" were on-platform users. Again, whether virtually all of Nextdoor's active users were on-platform users is a falsifiable statement of fact. *Finally*, Nextdoor misled investors to believe that "active users" who were "active daily" were visiting and engaging with the Nextdoor platform on

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 5:24-CV-01213)

a daily basis, when in fact half of them were not.  Again, whether daily active users were virtually all on-platform users who visited the Nextdoor platform daily is a falsifiable statement of fact.  None of these misleading propositions directly implied by Nextdoor's statements was an opinion.

Even if these statements were somehow statements of opinion (they are not), these statements would nevertheless be actionable because they omit material information that conflicts with what a reasonable person would take from these statements.  *See Omnicare,* 575 U.S. at 189 (an opinion statement is actionable if it "omits material facts about the issuer's . . . knowledge," and "those facts conflict with what a reasonable investor would take from the statement itself"); *In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x 887, 887-88 (9th Cir. 2018); *Vignola v. FAT Brands, Inc.*, No. CV-18-7469, 2019 WL 6888051, at *9 (C.D. Cal. Dec. 17, 2019).  As explained above, reasonable investors would take from Defendants' May 10 Statements that virtually all of Nextdoor's "active users" were on-platform users, when Defendants knew full well that half of those "active users" were off-platform users who were not meaningfully active in the Nextdoor community at all.

In their Motion, Defendants argue that Ms. Friar's May 10, 2025 Statements "contain[ed] multiple opinions," such as whether the Nextdoor community was active or whether Nextdoor's product strategy was working.  Mot. at 14.  But even if that were true, those are not the propositions in the May 10, 2025 Statements articulated above that are alleged to be misleading.[4]  Moreover, propositions of facts embedded within statements of opinions are actionable.  *See Omnicare*, 575 U.S. at 185-86; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 614 (9th Cir. 2017).

---

[4] Defendants argue that "whether Nextdoor's neighbors were 'active' weekly or daily is an opinion.  Mot. at 14.  Defendants do not clarify what statement they believe to be an opinion, but as noted above, whether Nextdoor's "daily active users" were virtually all on-platform users is a falsifiable statement of fact.

Moreover, even if Nextdoor's misstatements were opinions (they were not), as explained below, *infra* Part V, the SAC alleges that Defendant Friar did not actually believe these statements by alleging that Defendants knew these statements were misleading. SAC ¶¶ 54, 72-76, 78, 96.

## V.    NEXTDOOR MADE THE ALLEGED MISSTATEMENTS WITH SCIENTER

The required inference of scienter "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). A "strong inference" is merely one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. That is, "a tie goes to the Plaintiff." *Maiman v. Talbott*, No. SACV 09-0012, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010). Allegations showing "'actual access to the disputed information' . . . support[] a strong inference of scienter." *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008)).

Here, the inference that Defendants were aware that half of the Company's "active users" were in fact off-platform users merely checking their emails is overwhelming, and at least as compelling as any alternative inference. *First*, and dispositively, Defendant Friar as well as all C-level executives received daily, weekly, and monthly "executive reports" with data on DAUs, WAUs, Monthly Active Users, revenue, advertising, and the *percentage of users that were on-platform versus off-platform*. SAC ¶ 73. FE6 knew that Individual Defendants received these reports and knew their contents because the reports were routinely sent to a distribution list on which FE6 was included that also included all executives, including the Individual Defendants.

*Second*, Defendants were expressly alerted to concerns from employees that the Company's inclusion of off-platform users in the definition of "active users" was problematic and questionable. According to FE6, Nextdoor held weekly companywide meetings that Defendant Friar and senior management regularly attended. SAC ¶ 74. Nextdoor employees expressed concerns about the Company's unusual and misleading method of defining active users (as including users who simply open Nextdoor emails) at weekly companywide meetings attended by CEO Friar and the company's senior leadership team, including a question "why do we count this [activity as active users]?" *Id*. "A lot of folks" expressed their concerns at company-wide

19

meetings including Defendant Friar that Nextdoor "should just count the app usage" in determining active users. *Id.*

*Finally*, knowledge that Nextdoor's "active users" were in fact mostly individuals checking their emails was simply knowledge of the core operations of the Company. It would be "absurd to suggest" that Defendant Friar and the leaders of Nextdoor were unaware that half of their user base consisted merely of folks checking their emails rather than genuinely active users of their platform. *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019) ("Allegations regarding management's role in a company may support scienter . . . 'where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'"); *see also Alphabet*, 1 F.4th at 706.

Given these facts, there should be no question that Defendants knew that the Company's "active users" were in fact mostly individuals checking their emails and that their statements implying the contrary were misleading.

In their Motion, Defendants argue that the statements by former employees cannot support scienter because those former employees had no direct contact with Defendants. Mot. at 16. No such rule exists. To rely on statements by former employees, Plaintiff need merely describe the witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (quoting *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Here, the SAC details each former employees' position, role at the company, dates of employment, and how the witness learned the facts ascribed to them. SAC ¶¶ 29-32, 53-57, 72-75. With respect to the allegations mentioned above, the SAC alleges that FE6 worked for Nextdoor's San Francisco office from March 2001 to October 2023 as a member of the Product Growth Team, and reported to Head of Product, Neighbor Experience Michael Pao, who reported directly to Defendant Friar. The SAC explains that FE6 knew that Defendant Friar received daily, weekly, and monthly "executive reports" and knew their contents because the reports were routinely sent to a distribution list on which FE6 was included that also included Defendant Friar. The SAC likewise explains that FE6 knew that Defendant Friar was alerted to concerns about the

Company's definition of "active users" because FE6 attended "weekly" companywide meetings at which Defendant Friar and senior leadership were present at which a participant expressly asked, "why do we count this [activity as active users]?" SAC ¶ 74. The former employees' statements are therefore wholly appropriate bases to support a strong inference of scienter.

Defendants also argue that Plaintiff must allege "that [Defendant Friar] saw specific reports, as well as specific references to [the] contents of those reports." Mot. at 17. Again, no such bright-line requirements exist, but even if they did, Plaintiff alleges exactly that. Plaintiff alleges that Defendant Friar received "executive reports" on a daily, weekly, and monthly basis, and allege the "contents" of those reports—they contained data on DAUs, WAUs, Monthly Active Users, revenue, advertising, and the *percentage of users who were on-platform versus off-platform*. Defendants argue that the SAC fails to allege that Defendant Friar received these reports or when, but it alleges exactly that—FE6 stated that these reports were sent daily, weekly, and monthly throughout the Class Period to a distribution on which FE6 was included that included all executives, including Defendant Friar. SAC ¶¶ 54, 73. As the SAC alleges that roughly half of "active users" were off-platform users at all relevant times, SAC ¶¶ 46, 53-57, the SAC alleges that Defendant Friar received constant reports showing as much.

Finally, Defendants argue, remarkably, that even if Defendant Friar knew that roughly half of active users were off-platform users, and acted knowingly when she implied to investors that virtually all of active users were on-platform, these facts do not support a strong inference of scienter. Mot. at 18. Defendants' impossibly high standard for scienter is mistaken—if an individual knowingly makes a false statement, there is a strong inference that that individual acted with scienter in making that statement. Defendants argue that "there are zero allegations suggesting that Ms. Friar did not believe her statement was true," Mot. at 18, but of course the ample allegations described above demonstrating that Defendant Friar knew that half of active users were off-platform support the strong inference that she did not believe her statements implying the contrary. Defendants quote Defendant Friar as stating that "all engagement is engagement," Mot. at 18, but even if one could read that tautology as conveying something meaningful (unclear), she appears at best only to be noting that both on- and off-platform users

count as "active users" under the Company's definition. That Defendant Friar recognized that the Company defines active users as on- and off-platform did not prevent her from knowingly misleading investors to believe that virtually all active users were on-platform users.

## VI. THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Plaintiff faces a minimal bar in pleading loss causation. To plead loss causation, Plaintiff need only "provide enough factual content to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind,'" which "should not prove burdensome." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)) (cited by Defendants).

Here, Plaintiff pleads that two partial corrective disclosures revealed over time that Defendants' misstatements were misleading by disclosing that Nextdoor's users were not genuinely engaged to the extent that Nextdoor's misleading statements about its "active users" had led investors to believe. As detailed above, *supra* Part II.F, on August 9 and November 8, 2022, Nextdoor revealed to investors that ARPU was declining. Primarily off-platform users do not contribute to revenue as much as on-platform users, as off-platform users' ad impressions are limited to an email. Accordingly, Nextdoor's declining ARPU (particularly next to increasing year-over-year WAU) revealed to investors that a significant percentage of Nextdoor's active users were not meaningfully engaged on the Nextdoor platform—a significant percentage of Nextdoor's active users were off-platform users. Moreover, through these disclosures, the risks concealed by Nextdoor's misleading statements and omissions, in which Nextdoor made exaggerations about its active user base, materialized in the form of declining ARPU.

In their Motion, Defendants argue first that Plaintiff does not explain how any corrective disclosure revealed any "new facts." Mot. at 21 (quoting *BofI*, 977 F.3d at 790). As detailed above, *supra* Part II.F, each of the two corrective disclosures revealed new facts about the Company's contracting ARPU growth rate. Moreover, Defendants fail to respond to the allegations that Nextdoor's declining ARPU was a materialization of the risks concealed by

Nextdoor's misleading statements and omissions, in which Nextdoor made exaggerations about how active its user base was. SAC ¶¶ 81, 83.

Defendants also argue that the August 9 and November 8 disclosures are invalid loss causation dates because, they claim, the stock price recovered. Mot. at 21-22. Defendants argue that a week after the August 9, 2022 disclosure, Nextdoor's stock price had "almost" returned to pre-disclosure levels. Mot. at 21. In fact, Nextdoor's stock price has *never* returned to pre-disclosure levels as of the date of this filing. Ex. B to Van Decl. (ECF No. 90). Defendants similarly argue that Nextdoor's share price recovered quickly from the November 8, 2022 disclosure. Mot. at 21-22. In fact, the average price of Nextdoor during the 90-day PSRLA lookback period, *see* 15 U.S.C. § 78u-4(e), following the November 8, 2022 disclosure was $2.17, well below the Company's closing price of $2.32 the day before that disclosure. *See* Ex. C to Van Decl. Moreover, Nextdoor's stock drops on August 9, 2022 and November 8, 2022 were manifestly significant—the stock plummeted by approximately 25% on August 9, from $3.60 per share on August 9, 2022 to $2.70 per share on August 10, 2022, and by a further 11% following the November 8, 2022 disclosure, from $2.32 per share on November 8 to $2.06 per share on November 9, 2022. SAC ¶¶ 82, 84.

In any event, Defendants' authority suggesting that a price drop needs to be sustained for the purposes of loss causation has no application where, as here, Defendants continued to make misleading statements at the time of the corrective disclosures. Mot. at 21-22 (citing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021)). Whereas a "quick and sustained price recovery" might "refute[] the inference that the alleged concealment of th[e] particular fact caused any material drop," *id*. (quoting *Wochos*, 985 F.3d at 1198), a quick and sustained price recovery could just as well be attributed to continuing misrepresentations where, as here, the truth was revealed over a series of partial corrective disclosures.

## VII.    THE SECOND AMENDED COMPLAINT STATES A CLAIM UNDER SECTION 20(A)

As Plaintiff has adequately pleaded a claim under Section 10(b), Defendants' primary argument for dismissal of Plaintiff's Section 20(a) claim fails. Mot. at 22. Defendants also argue

that Plaintiff cannot pursue Section 20(a) liability against Defendant Friar where they also pursue a claim against her under Section 10(b), Mot. at 22, but Defendants ignore ample case law permitting both claims to proceed against the same individual. *See, e.g.*, *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *Daou*, 411 F.3d at 1030, *abrogated on other grounds*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), *as recognized by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023); *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1018 (N.D. Cal. 2024).

## VIII.    CONCLUSION

Defendants' Motion should be denied.

Dated:  September 15, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Austin P. Van*
Jeremy A. Lieberman (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024
Telephone:  (310) 405 7190
Facsimile:  (917) 463 1044
jpafiti@pomlaw.com

*Attorneys for Lead Plaintiff*